BC

FILED
3/4/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

VINCE FARIDANI,

Plaintiff,

v.

MCKENNA CAPITAL, LLC, RYAN MCKENNA, SEAN MCKENNA, ENG TAING, TOUZI CAPITAL LLC, RYAN BEATTY, JULIE JING CHEN, HENG TAING, QIAN (CHEN) TAING, JENNY TAING, and YUAN HENG,

Defendants,

and

EMILY MCKENNA and JILLIAN MCKENNA,

Relief Defendants.
_______________________________/

Case No.: 1:24-cv-08030

**COMPLAINT FOR**
1. **Federal Securities Fraud**
2. **Violation of the Illinois Securities Law**
3. **Fraud and Deceit**
4. **Breach of Contract**
5. **Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act**
6. **Negligent Misrepresentation**
7. **Unjust Enrichment**

**JURY TRIAL DEMANDED**

**PLAINTIFF'S AMENDED COMPLAINT**

COMES NOW, Vince Faridani, Pro Se Plaintiff, ("Plaintiff"), invoking the jurisdiction of this Honorable Court and seeking redress for grievances suffered due to the actions and omissions of McKenna Capital LLC, Ryan McKenna, CEO of McKenna Capital, and his brother Sean McKenna, COO, Touzi Capital LLC, Eng Taing, CEO of Touzi Capital, Ryan Beatty, Julie Jing Cheng, Heng Taing, Qian (Chen) Taing, Jenny Taing, and Yuan Heng, (collectively referred to herein as "Defendants"), and Relief Defendants Emily McKenna and Jillian McKenna (collectively referred to herein as "Relief Defendants"). Through this Amended Complaint, Plaintiff outlines multiple counts of legal action, including Federal Securities Fraud, Violation of

the Illinois Securities Law, Fraud and Deceit, Breach of Contract, and Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, arising from Defendants' coordinated scheme to mislead and defraud Plaintiff in a cryptocurrency mining investment venture. Herein, Plaintiff sets forth the facts and legal grounds upon which his claims are based and prays for relief as detailed in the subsequent sections of this Amended Complaint.

## NATURE OF ACTION

1. This is a civil action brought by Plaintiff Vince Faridani to redress injuries sustained due to the fraudulent, deceptive, and unlawful practices of Defendants McKenna Capital LLC, Ryan and Sean McKenna, Touzi Capital LLC, Eng Taing. These Defendants, through a coordinated scheme, misrepresented the nature, benefits, and profitability of investments in a Bitcoin mining operation, leading to substantial financial losses for the Plaintiff.

2. Specifically, Defendants engaged in a pattern of making false promises and representations about the operations, financial returns, and security of investments in cryptocurrency mining. Despite raising significant capital and making explicit assurances to investors, including Plaintiff, Defendants failed to deliver on these promises, violating principles of honesty and transparency required in the solicitation and management of investor funds.

3. This action asserts claims for relief based on violations of the Illinois Securities Law of 1953 (815 ILCS 5/), which governs the offer and sale of securities in the State of Illinois, and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/), which prohibits deception, fraud, and false pretenses in the conduct of trade or commerce. Additionally, this Amended Complaint asserts claims for common law fraud, breach of contract, and seeks compensatory and punitive damages, injunctive relief, and any other relief this Court deems just and proper.

4. Through this action, Plaintiff seeks to hold Defendants accountable for their misconduct, recover damages sustained as a result of Defendants' actions, and prevent Defendants from engaging in similar deceptive practices in the future. The relief sought herein is predicated on Defendants' acts and omissions that caused significant financial harm to Plaintiff, undermining the integrity of Illinois' financial and consumer marketplaces.

## PARTIES

5. Plaintiff Vince Faridani is an individual and a resident of Melbourne, Florida.

6. Defendant McKenna Capital LLC is a limited liability company organized under the laws of Delaware, with its principal place of business located at 2516 Waukegan Rd #399, Glenview, IL 60025.

7. Defendant Ryan McKenna is an individual and CEO of McKenna Capital LLC, with business activities tied to the Glenview, Illinois office.

8. Defendant Sean McKenna is COO of McKenna Capital LLC, based in Glenview, Illinois.

9. Defendant Touzi Capital LLC is a California limited liability company, with its principal office at 340 S Lemon Ave #8284, Walnut, CA 91789.

10. Defendant Eng Taing is the CEO of Touzi Capital LLC and, upon information and belief, has repeatedly engaged in a pattern of failed investment ventures, often leaving investors with significant financial losses. Defendant Eng Taing's management of investor funds is marred by lawsuits, misuse allegations, unauthorized transactions, and questionable practices that strongly suggest a concerted intent to evade accountability. This repeated behavior reflects an intentional strategy to exploit investor funds, shield assets from accountability, and obscure the full extent of misappropriated funds. Evidence indicates that Eng Taing regularly wires funds overseas, co-

mingles assets across various entities under his control, and conceals funds in personal cryptocurrency wallets, making recovery by Plaintiff and other investors nearly impossible. Such consistent failures, coupled with recurring legal actions against him, demonstrate a systematic disregard for transparent business practices, with substantial consequences for Plaintiff and others.

11. Defendant Ryan Beatty is an individual and served as the Director of Investor Relations for Touzi Capital LLC. Through his role, Beatty held a position of trust, actively soliciting investments from Plaintiff and other investors. He directly communicated with Plaintiff, coordinated with Eng Taing, and played a substantial role in disseminating material misrepresentations that falsely portrayed the profitability and security of the investments, thus exploiting investor trust.

12. Defendant Julie Jing Cheng is an individual, believed to be the mother-in-law of Eng Taing, who played an instrumental role in concealing assets derived from the fraudulent scheme. Plaintiff asserts that her actions are part of a broader, orchestrated strategy to shield financial assets from rightful recovery by Plaintiff and other investors. Cheng's efforts to protect and obscure the proceeds obtained from investor funds align directly with Defendants' calculated scheme, thereby actively contributing to Plaintiff's inability to recover substantial financial losses.

13. Defendant Heng Taing, brother of Eng Taing, served as the Director of Operations of Touzi Capital LLC. In this capacity, Heng Taing was responsible for overseeing the day-to-day operations of the cryptocurrency mining venture central to this lawsuit. As Director of Operations, he possessed substantial access to financial and operational information and knowingly participated in or endorsed the representations made to Plaintiff and other investors. Plaintiff asserts that Heng Taing played an active role in directing and approving misleading communications, which furthered the fraud and deprived investors of accurate, material

information. His direct involvement renders him accountable for the misrepresentations and actions that led to Plaintiff's financial harm.

14. Defendant Qian Taing is the spouse of Eng Taing, and there is substantial reason to believe that she has knowingly participated in concealing and safeguarding assets misappropriated from investors. Defendant Eng Taing's repeated history of failed investments and multiple lawsuits, along with accusations of fund misuse, indicate a systematic approach to evade transparency and shield assets. Plaintiff asserts that Eng Taing has co-mingled funds across entities, wired money internationally, and stored funds within personal cryptocurrency wallets to avoid accountability. Qian Taing's close connection to Eng Taing, coupled with her alleged role in concealing millions of dollars in misappropriated assets, suggests her active participation in obstructing Plaintiff's recovery efforts. These actions, along with similar activities by other family members, reveal a calculated and collaborative scheme to exploit investor trust and retain funds taken under false pretenses.

15. Defendant Jenny Taing is a family member of Defendant Eng Taing. Upon information and belief, she actively assisted in concealing and transferring assets derived from the fraudulent scheme alleged herein. Plaintiff asserts that Defendant Jenny Taing played a critical role in shielding assets from recovery by Plaintiff and other defrauded investors. These actions, including the reallocation and movement of funds and property traceable to investor contributions, were conducted in direct response to ongoing lawsuits and increased legal scrutiny faced by Defendant Eng Taing. These assets, believed to include cryptocurrency and real property, were transferred to her by Defendant Eng Taing with the intent to obscure their origin and prevent lawful recovery. Her close familial ties to Defendant Eng Taing and her active involvement in managing and transferring financial resources tied to the scheme justify her inclusion as a defendant in this

action. Furthermore, her role in facilitating the concealment of misappropriated assets during critical periods of legal exposure makes her directly accountable for hindering Plaintiff's recovery efforts.

16. Defendant Yuan Heng is a family member of Defendant Eng Taing. Upon information and belief, he actively facilitated the concealment and redistribution of funds and assets derived from the fraudulent scheme alleged herein. Defendant Yuan Heng is alleged to have used personal accounts and international financial connections to transfer assets during periods of heightened legal risk for Defendant Eng Taing, including ongoing lawsuits brought by Plaintiff and other investors. These actions were specifically designed to frustrate transparency and shield assets from rightful recovery. Defendant Yuan Heng further played a key role in directing resources into accounts and entities controlled by Defendant Eng Taing and his family. His active involvement in safeguarding misappropriated assets and moving them to evade lawful recovery renders him a necessary party to this action.

17. Relief Defendant Jillian McKenna is the spouse of Defendant Ryan McKenna, CEO of McKenna Capital, LLC. Upon information and belief, Jillian McKenna holds assets that are traceable to the fraudulent activities alleged herein. These assets, including funds and property, were transferred to her by Defendant Ryan McKenna without legitimate consideration and are believed to have been derived from the misappropriation of investor funds. Relief Defendant Jillian McKenna has not been accused of any wrongdoing but is named in this action to facilitate the recovery of assets and to ensure that all funds traceable to Plaintiff's investments are accounted for. Her close marital connection to Defendant Ryan McKenna and her role in holding assets tied to this matter make her inclusion as a relief defendant necessary for the Court to provide full and equitable relief.

18. Relief Defendant Emily McKenna is the spouse of Defendant Sean McKenna, COO of McKenna Capital, LLC. Upon information and belief, Emily McKenna holds or controls assets that are directly traceable to the fraudulent activities alleged herein. These assets, transferred to her by Defendant Sean McKenna, are believed to have been derived from investor funds. Relief Defendant Emily McKenna is not accused of any wrongdoing but is named in this action to preserve and recover funds that are critical to the equitable resolution of Plaintiff's claims. Her inclusion as a relief defendant ensures that all assets connected to the alleged scheme are subject to the Court's authority.

## JURISDICTION AND VENUE

19. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (Diversity of Citizenship) because Plaintiff Vince Faridani is a citizen of the State of Florida, and all Defendants are citizens of states other than Florida, namely Illinois and California. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, thereby satisfying the requirements for federal diversity jurisdiction.

20. Additionally, this Court has jurisdiction over the state law claims pursuant to the supplemental jurisdiction granted under 28 U.S.C. § 1367, as these claims form part of the same case or controversy under Article III of the United States Constitution.

21. **Eng Taing and Touzi Capital, LLC established, supervised, and retained final approval authority over an Illinois-centered fundraising and investor administration system that directly generated Plaintiff's investments and losses. The jurisdictional facts set forth below describe Defendants' integration of Illinois-based solicitation, approval, and capital-administration operations into the structure of the offering.**

22. **From at least November 2021 through 2024, Eng Taing and Touzi Capital maintained an operational relationship with McKenna Capital, LLC, headquartered in Glenview, Illinois, pursuant to which solicitation materials prepared by Touzi were disseminated through McKenna Capital's Illinois-based investor portal and email infrastructure; investor subscriptions were processed through that Illinois-administered portal; and subscription acceptance required designation as "Approved" and "Funded" within Touzi's SponsorCloud/SynPro administrative system. McKenna Capital and its principals have admitted in sworn interrogatory responses that Touzi Capital controlled investor onboarding, subscription documentation, investor communications, bank accounts, accounting systems, and the SponsorCloud investor portal. (Exhibits K; L; M; N).**

23. **Pursuant to authority conferred by Eng Taing and Touzi Capital under the Fund's governing structure, and subject to their ongoing oversight and retained final approval authority, McKenna Capital—operating from its headquarters in Glenview, Illinois—was designated as a co-manager and authorized marketing and investor-relations representative for Fund IV. In that capacity, McKenna Capital acted as Touzi Capital's authorized agent in Illinois for purposes of investor solicitation, onboarding, subscription processing, and portal administration, and its Illinois-based activities were undertaken within the scope of authority granted by Eng Taing and Touzi Capital. Functioning as Touzi's designated investor-facing intermediary in Illinois, Illinois-based personnel of McKenna Capital, including Ryan McKenna and Sean McKenna, operated and administered the Fund IV investor portal, subscription processing interface, and funding infrastructure through which investors were solicited, onboarded, and routed into Touzi's centralized approval system, and directed to transmit capital to Touzi-controlled accounts.**

**Touzi retained final and exclusive authority over investor acceptance, capital deployment, fund management, and operational decision-making. (Exhibits C, K, M, N)**

24. **Eng Taing and Touzi Capital retained the right to control the manner and means by which McKenna Capital conducted investor solicitation, onboarding, and subscription processing, including final authority over investor acceptance, subscription approval status, investor communications, and capital deployment. McKenna Capital's Illinois-based solicitation and onboarding activities were undertaken pursuant to that retained authority and for Touzi Capital's direct financial benefit, and Touzi knowingly accepted and deployed capital generated through those Illinois-based activities. These Illinois-based solicitation, onboarding, and portal-administration activities were undertaken pursuant to authority granted, supervised, and retained by Eng Taing and Touzi Capital, constituted Defendants' deliberate and forum-directed utilization of Illinois-based infrastructure to generate and administer investor capital, and were not the unilateral or unauthorized acts of an independent intermediary.**

25. **Beginning in or about November 2021, McKenna Capital—operating from Illinois and acting in coordination with Touzi Capital—distributed mass email solicitations promoting Bitcoin Mining Fund IV, representing that it was "partnering with Touzi Capital" and reporting investor commitments exceeding $16 million and later $30 million. Discovery responses confirm that the core solicitation materials, including the Fund IV slide deck and financial projections, were authored by Eng Taing and Touzi Capital and transmitted to Illinois for mass distribution through McKenna Capital's email campaigns, including dissemination via Mailchimp during the initial fundraising period. The projections and performance metrics contained in those solicitations were attributed to Touzi Capital.**

**These Illinois-originated communications invited investors, including Plaintiff, to subscribe through the centralized reservation and onboarding system that functioned as the mandatory entry point into Defendants' subscription and approval process. (Exhibits A-C; L; M)**

26. **Plaintiff received these Illinois-originated solicitations, responded through the Illinois-administered portal, and reasonably relied upon them in deciding to invest in Bitcoin Mining Fund IV. (Exhibits A–C)**

27. **Capital generated through Illinois-based solicitation, including Plaintiff's investments, was processed by McKenna Capital personnel in Illinois and accepted by Eng Taing and Touzi Capital, who retained exclusive control over investor acceptance and capital deployment. Investor capital was deployed only following Touzi's approval through the Illinois-administered portal. Subscriptions generated through Illinois-originated solicitations were designated as funded within Touzi's centralized SponsorCloud/SynPro system and transmitted pursuant to wire instructions displayed on the Illinois-administered portal directing payment to Touzi Mining Invest LLC accounts. During the relevant period, Defendants knowingly accepted and retained substantial investor capital originating from Illinois residents through this Illinois-administered system and did so without geographic limitation, restriction, or disavowal. (Exhibits K; L–N).**

28. **In sworn interrogatory responses, Defendant Ryan McKenna admitted that Touzi Capital and Eng Taing controlled the structure of the offering, investor intake, subscription documentation, investor communications, and maintained exclusive control over investor funds, bank accounts, accounting systems, and investor portals. Sean McKenna likewise admitted that Touzi Capital controlled accounting systems and investor reporting.**

**These admissions confirm that Illinois-based solicitation and onboarding operated within a centralized control structure directed by Touzi. (Exhibit L-N)**

29. **In 2022 and 2023, McKenna Capital issued co-branded "Touzi Capital / McKenna Capital" investor updates from its Illinois headquarters that disseminated operational communications expressly attributed to Eng Taing concerning Fund performance, bankruptcy proceedings, contract negotiations, and distribution expectations. These Illinois-issued updates stated that they were conveying communications from Eng Taing and included substantive representations regarding fund operations and management decisions made or approved by Taing. (Exhibits F-J)**

30. **In July 2023, McKenna Capital advised investors that "Eng Taing (CEO of Touzi Capital) and I had a very solid relationship (talking several times a week)," and that weekly meetings were conducted with Touzi personnel concerning Fund IV operations and investor matters, confirming sustained and direct coordination between Illinois-based personnel and Touzi leadership. These communications, together with sworn admissions that Touzi retained control over investor intake, approval systems, and fund administration, establish that Illinois-based solicitation and onboarding occurred with Taing's knowledge, participation, and oversight. (Exhibits H; K; L–N).**

31. **Illinois-issued communications conveying Eng Taing's operational updates and representations, together with the centralized administrative structure reflected in the SponsorCloud/SynPro records and sworn interrogatory admissions, demonstrate sustained and intentional coordination between Touzi Capital and Illinois-based personnel concerning investor solicitation, onboarding, subscription processing, investor communications, and fund administration. McKenna Capital's principals admitted that Touzi retained exclusive**

**control over investor communications, subscription documentation, investor portals, bank accounts, and accounting systems, confirming that Illinois-based investor activities operated within Touzi's centralized control structure. These activities were not unilateral, incidental, or unauthorized acts of an independent intermediary, but were undertaken with Taing's knowledge and oversight. Illinois was not the fortuitous location of a passive third party; it was an intentionally utilized operational component of Defendants' fundraising architecture that generated continuing investor communications, capital processing, and investor-relations activity within this District. These sworn interrogatory admissions and platform records are inconsistent with Defendant Taing's declaration asserting that Touzi "has never sold products or services in the State of Illinois" and did not "target or visit Illinois." (Exhibits F–J; K; L–N).**

32. **Touzi Capital and Eng Taing did not merely control a multi-state system that incidentally included Illinois. Rather, they knowingly and deliberately structured and utilized Illinois as a core investor-relations and subscription-processing hub for Fund IV. They selected and authorized an Illinois-headquartered co-manager to serve as their designated investor-facing intermediary and affirmatively structured Fund IV's solicitation and onboarding workflow to operate through that Illinois-based entity, coordinated directly and repeatedly with Illinois-based personnel regarding investor intake and fund operations, transmitted offering materials into Illinois for mass dissemination, and knowingly accepted and deployed capital generated through Illinois-administered onboarding infrastructure. These actions constitute Defendants' own deliberate and Illinois-directed forum contacts, not the unilateral acts of a third party.**

33. **Eng Taing personally and knowingly authorized and supervised McKenna Capital's Illinois-based solicitation, onboarding, and investor-relations activities by reviewing and approving investor communications transmitted from Illinois to prospective investors, participating in recurring operational meetings with Illinois-based personnel concerning investor intake and fund operations, retaining and exercising final authority over subscription approval status within Touzi's centralized administrative system, and knowingly accepting investor capital generated through Illinois-based solicitation efforts without objection or limitation. Taing's participation was not passive or incidental, but constituted his own deliberate and Illinois-directed conduct undertaken through his direct supervision, approval authority, and operational coordination with Illinois-based personnel and directed at Illinois-based fundraising infrastructure. (Exhibits F–H; K; L–N).**

34. **Throughout 2023 and 2024, McKenna Capital continued to issue Illinois-originated investor communications concerning Touzi-related management, litigation posture, asset recovery efforts, and operational status, demonstrating the continuity, centrality, and indispensability of Defendants' Illinois-based investor-relations channel. (Exhibits F-J; K)**

35. **Platform and banking records reflect that Plaintiff's $50,000 and $125,000 investments were reviewed, approved, and designated as funded within Touzi's centralized administrative system and were transmitted pursuant to wire instructions generated, authorized, and disseminated by McKenna Capital personnel in Illinois directing payment to Touzi-controlled accounts. (Exhibits K-3; K-5; K-9)**

36. **Platform records reflect that subscriptions generated during the December 2021 through March 2022 Illinois-based solicitation period—including Plaintiff's—were**

**reviewed, affirmatively approved, and designated as funded within Touzi's centralized SponsorCloud/SynPro administrative system pursuant to approval protocols authorized and enforced by Eng Taing and Touzi Capital. Investor subscriptions were not self-executing; they required affirmative approval status changes within Touzi's system before capital transmission was authorized. Touzi retained and exercised the right to control investor acceptance and capital deployment through that centralized approval mechanism.**

37. **The SponsorCloud records further reflect that McKenna Capital personnel, including Ryan McKenna and Sean McKenna, were granted administrative access within Touzi's centralized system during the relevant period and appeared as authorized operational participants in investor onboarding, review, funding status management, accreditation processing, and payment instruction workflows pursuant to protocols authorized and enforced by Eng Taing and Touzi Capital.**

38. **In discovery, McKenna Capital and its principals disclaimed possession and control of portal access logs, backend permissions, financial records, and subscription approval data, admitting that such materials were not within their custody or control. These responses reflect that ultimate administrative and financial authority resided with Touzi Capital and Eng Taing, not Illinois-based personnel. Exhibit L-N.**

39. **Subscriptions generated through Illinois-based activities—including investments from Illinois residents solicited through Illinois-originated communications—were operationally and contractually routed through Touzi's centralized approval infrastructure, affirmatively reviewed, and designated as funded within that system pursuant to Touzi's retained authority. Those investments were accepted without rejection, geographic limitation, disavowal, or segregation, and Touzi retained exclusive control over**

**the resulting investor funds. These facts demonstrate the deliberate integration of Illinois-based solicitation and onboarding operations into Touzi's structured fundraising and fund administration model. (Exhibits K-2; K-3; K-4; K-6; L–N).**

40. **At no time did Eng Taing or Touzi Capital disclaim McKenna Capital's authority to communicate with investors on their behalf, instruct McKenna Capital to cease holding itself out as Touzi's partner, impose geographic limitations on Illinois-based solicitation activities, or reject, refund, or segregate capital raised through Illinois-originated communications. Instead, Touzi reviewed, approved, accepted, and retained exclusive control over investor funds generated through those Illinois-based activities, thereby ratifying and deliberately incorporating Illinois-based fundraising operations into its structured offering model. (Exhibits A–C; F–J).**

41. **Plaintiff's investments were solicited, processed, approved, and designated as funded through this Illinois-based portal infrastructure. Plaintiff's claims arise directly from those Illinois-directed activities and the approval framework through which his investments were accepted and administered. (Exhibits A–C; F–J; K; L–N).**

42. **Eng Taing and Touzi Capital knowingly permitted and directed McKenna Capital to function as their exclusive investor-facing intermediary, coordinated directly with Illinois-based personnel regarding investor relations and fund operations, accepted substantial financial benefits generated through Illinois-based activities, and retained exclusive dominion and control over resulting investor funds, including discretion over deployment, retention, and distribution. (Exhibits F-J; K; L-N)**

43. **The exercise of jurisdiction in Illinois comports with traditional notions of fair play and substantial justice. Defendants intentionally structured and utilized Illinois-based**

**infrastructure to solicit, process, and administer investor capital and coordinated directly with Illinois-based personnel in furtherance of that integrated system. Illinois has a legitimate interest in adjudicating disputes arising from fundraising activities conducted through operational infrastructure located within this District. The burden on Defendants—who purposefully engaged in sustained coordination with Illinois-based personnel and benefitted from Illinois-centered fundraising operations—is not constitutionally unreasonable. Having deliberately availed themselves of Illinois-based operational mechanisms to generate and administer investor capital, Defendants cannot plausibly claim unfair surprise at being required to answer claims arising from that conduct in this forum.**

## STANDARD OF REVIEW

44. Plaintiff is a pro se litigant and has not hired an attorney. Courts have consistently held that pleadings filed by pro se litigants are entitled to a more lenient standard of review compared to those drafted by attorneys. This principle ensures that access to justice is not unduly hindered by procedural technicalities for individuals representing themselves.

45. The following cases illustrate the courts' commitment to this principle:

- "Plaintiff is pursuing his claim pro se. As such, his pleadings are held to a less stringent standard than those of an attorney. See Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir.1998)."
- "The Supreme Court has instructed federal courts to liberally construe the 'in artful pleading' of pro se litigants. Eldridge v. Block, 832 F.2d 1132,1137 (9th Cir. 1987)."

- A pro se pleading is held to a less stringent standard than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)".

46. In light of these precedents, Plaintiff respectfully requests that this honorable court apply a lenient standard in reviewing his pleadings, consistent with the established legal principles governing pro se litigants.

## STATEMENT OF FACTS

47. Plaintiff Vince Faridani, motivated by the prospects of entering the burgeoning field of cryptocurrency mining, invested a significant amount of capital into a venture presented by Defendants McKenna Capital LLC, Ryan McKenna, CEO, his brother, Sean McKenna, COO, Touzi Capital LLC and its CEO Eng Taing. This investment was made in reliance on the representations and assurances provided by Defendants, which painted a picture of a highly lucrative, low-risk opportunity backed by cutting-edge technology and strategic industry insights.

48. Over a series of communications beginning in November 2021, Defendants engaged in an aggressive campaign to solicit investments from Plaintiff and others. Through email exchanges, webinars, and direct communications, Defendants promised unprecedented returns, minimal risks, and the implementation of advanced mining technology—all purportedly distinguishing their venture from others in the cryptocurrency mining sector.

49. On November 23, 2021, Defendants initiated the misleading campaign with an email that misleadingly advertised the potential profitability and security of the cryptocurrency mining venture. This marked the beginning of a series of communications designed not only to entice investment but to reassure investors of the soundness and future success of their investment.

50. In the months following the initial investment solicitation, Defendants McKenna Capital LLC, Ryan and Sean McKenna, Touzi Capital, Eng Taing, engaged in a deliberate campaign to portray the cryptocurrency mining venture as a burgeoning success, despite underlying operational and financial instabilities. Through a series of calculated communications, Defendants crafted a narrative of unbridled success and exponential growth, misleading Plaintiff and other investors about the venture's actual condition.

- On November 23, 2021, Defendants initiated this deceptive campaign by proclaiming they had already secured $16 million in funding for the cryptocurrency mining project. This announcement was designed to convey a false sense of security to potential investors, suggesting a high level of trust and confidence from the market and implying the project's viability and attractiveness. The figure was presented without context, masking the operational realities and the speculative nature of the venture.
- By December 3, 2021, Defendants escalated their misleading assurances by claiming an increase in the fundraising total to $30 million. Accompanying this boast was a promise of uniquely favorable investment terms, purportedly adjusting standard expectations to offer significantly higher returns to investors. This move was calculated to create an illusion of exceptional opportunity and financial acumen on the part of Defendants, further enticing investment under false pretenses.
- On February 1, 2022, Defendants presented what they termed a "State of the Union" for the BTC mining operation. In this communication, they falsely asserted the securing of a new mining facility, which they claimed would

promise significantly reduced operational costs and, consequently, increased profitability for investors. This announcement was particularly misleading, suggesting that Defendants had not only secured advantageous terms but were also on the cusp of realizing substantial profits, neither of which was rooted in the venture's actual financial or operational status.

- March 23, 2022, marked another pivotal moment in Defendants' scheme, with the announcement of an alleged $40 million raised. Defendants outlined grand plans for deploying miners across strategic locations, purporting these developments would inflate both the returns to investors and the operational efficiency of the mining venture. This claim further distanced the narrative from the venture's struggling reality, misleading investors about the scale and potential success of the operation.
- Between April and May 2022, Defendants continued their deceptive practices by providing fabricated updates on the operational status and early successes of the mining operations. These updates significantly deviated from the grim reality of the venture's performance, painting a picture of progress and profitability that did not exist. Such communications were designed to maintain investor confidence and forestall inquiries into the venture's actual conditions, contributing to the facade of success that Defendants had meticulously constructed.

51. Throughout this period, Defendants' communications were marked by a consistent pattern of exaggeration, omission, and outright fabrication, all aimed at misleading investors about the venture's financial health and operational achievements. This calculated misinformation

campaign served not only to attract additional investment under false premises but also to keep existing investors placated, thereby exacerbating the financial losses ultimately borne by Plaintiff and others deceived by Defendants' actions.

52. Plaintiff, relying on the detailed and seemingly well-substantiated projections provided by Defendants, was led to believe in the high profitability and low-risk nature of the venture, prompting his investment decision.

53. Contrary to the rosy picture painted by Defendants, the venture failed to deliver on nearly all accounts. The technology and operational advancements touted by Defendants either did not materialize or fell significantly short of the promised capabilities, leading to operational inefficiencies and financial losses rather than the assured profits.

54. The financial losses sustained by Plaintiff as a direct consequence of Defendants' actions were not mere outcomes of market volatility or operational hiccups but were significantly exacerbated by Defendants' misrepresentations and mismanagement. These actions eroded the entirety of Plaintiff's investment, leaving him with substantial financial losses.

55. Defendants' conduct, as detailed herein, constitutes a deliberate and systematic effort to defraud investors. Through false promises and manipulated information, Defendants induced Plaintiff to invest under false pretenses, culminating in considerable financial losses for Plaintiff. This scheme to defraud not only highlights Defendants' disregard for truthful and transparent business practices but also underscores the need for judicial intervention to address and rectify the injustices endured by Plaintiff.

56. Upon information and belief, Defendants Ryan McKenna and Sean McKenna, as key participants in the alleged fraudulent scheme, transferred significant assets derived from the scheme to their respective spouses, Relief Defendants Jillian McKenna and Emily McKenna.

These transfers were made without legitimate consideration or legal obligation, suggesting an intent to safeguard the assets and shield them from recovery efforts by Plaintiff and other defrauded investors.

57. Relief Defendants Jillian McKenna and Emily McKenna are named solely to account for and preserve assets that are traceable to the alleged fraudulent activities of Ryan McKenna and Sean McKenna. These assets, including funds and property, were transferred to them and are necessary to provide full relief to Plaintiff. Neither Relief Defendant has been accused of engaging in any fraudulent activity but holds assets critical to the equitable resolution of this matter.

**LEGAL BASIS FOR RELIEF DEFENDANTS**

58. Relief Defendants Jillian McKenna and Emily McKenna are named in this action pursuant to well-established legal principles recognizing the Court's authority to order the disgorgement of assets traceable to fraudulent schemes. As articulated in SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998), a relief defendant may be included in an action to account for assets unjustly held, provided the relief defendant lacks a legitimate claim to the assets. Here, Relief Defendants Jillian McKenna and Emily McKenna are included solely to facilitate the recovery of assets traceable to the fraudulent conduct alleged in this Amended Complaint.

**COUNT I**

(Federal Securities Fraud)

59. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

60. This Count is brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

61. At all relevant times, Defendants engaged in the offer and sale of securities, as defined under the Exchange Act, to Plaintiff and others. The investments solicited and obtained by Defendants from Plaintiff were "securities" within the meaning of the Exchange Act.

62. Defendants, directly and indirectly, by use of means or instrumentalities of interstate commerce and by use of the mails, have:

a. Employed devices, schemes, and artifices to defraud.

b. Made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the Plaintiff and other investors.

63. Specifically, Defendants misrepresented and omitted material facts related to the investment's value, the risks associated with the investment, the operational status of the cryptocurrency mining venture, and the use of investor funds.

64. **The foregoing misrepresentations and omissions were material. A reasonable investor would consider information regarding projected internal rates of return, promised monthly payouts, expected capital repayment timelines, operational deployment status, and the actual use of investor funds to be important in deciding whether to invest. Had Plaintiff known the true operational condition of the venture, the actual risks involved, the capital**

**deployment realities, and the inaccuracies in Defendants' representations, he would not have invested or would have invested materially different amounts**

65. Plaintiff and other investors relied on Defendants' representations in deciding to invest and subsequently maintain their investments in the venture. This reliance was reasonably placed, given Defendants' positions of trust and their affirmative representations about the venture's profitability, operational achievements, and future prospects.

66. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered significant financial loss. The value of Plaintiff's investment has been substantially diminished, and the promised returns and benefits have not materialized.

67. Defendants' actions, as described herein, were done knowingly or recklessly and for the purpose of misleading Plaintiff and other investors regarding the true nature of the investment opportunity presented.

68. Defendants, including Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing, played central roles in a coordinated scheme to defraud Plaintiff by employing interstate commerce and communication to execute a calculated series of misrepresentations, omissions, and deceptive practices. These acts concealed the true nature of the cryptocurrency mining investment's risks, misled investors regarding its operational success, and created a false impression of financial stability and returns to induce reliance.

69. Specifically, Ryan Beatty, as Director of Investor Relations, and Heng Taing, as Director of Operations, communicated or oversaw communications directly with Plaintiff, providing assurances and purported facts that were materially misleading. These misrepresentations were designed to create a false sense of security and encourage Plaintiff's investment. Furthermore, Julie Jing Cheng and Qian Taing are alleged to have actively

participated in the concealment of assets and supported Eng Taing's efforts to misappropriate investor funds through co-mingling and offshore transfers, thereby obstructing Plaintiff's ability to trace or recover funds.

Plaintiff's reliance on these representations led to significant financial harm.

**COUNT II**

(Illinois Securities Law Violation)

70. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

71. This Count is asserted pursuant to the Illinois Securities Law of 1953 (the "Act"), specifically under 815 ILCS 5/12, which prohibits fraud in connection with the sale of securities within the State of Illinois.

72. At all pertinent times, Defendants engaged in the offer and sale of securities to Plaintiff and other investors within Illinois, thereby subjecting these transactions to the regulations and protections afforded by the Act.

73. Defendants, in the course of these transactions, committed acts constituting a violation of the Act, including but not limited to:

a. Employing any device, scheme, or artifice to defraud in connection with the sale or offer of securities.

b. Making untrue statements of material facts and omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

c. Engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

74. Defendants' conduct as detailed herein, including their dissemination of materially false and misleading information about the cryptocurrency mining venture, its profitability, operational status, and the use of investor funds, directly contravenes the provisions of the Act intended to protect investors from fraudulent practices.

75. Plaintiff and other investors relied upon the representations made by Defendants in deciding to invest in the cryptocurrency mining venture. This reliance was justified based on the information provided by Defendants at the time of the investment and the reasonable expectation that Defendants were complying with Illinois securities laws.

76. As a direct and proximate result of Defendants' violations of the Act, Plaintiff has suffered significant financial losses. The promised returns and operational success, which formed the basis of Plaintiff's investment decision, were never realized, leading to the substantial diminution in the value of Plaintiff's investment.

77. Defendants' actions were committed willfully and with the intent to deceive and defraud the Plaintiff and other investors, warranting not only compensatory damages but also punitive damages to deter such conduct in the future.

**COUNT III**

**(Fraud And Deceit)**

78. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

79. At all relevant times, Defendants made false representations to Plaintiff and other investors regarding the nature, profitability, and risk of the investment in the cryptocurrency mining venture. These representations were made knowingly, or with reckless disregard for their truth, with the intent that Plaintiff and others rely upon them.

80. Defendants had a duty to provide accurate and truthful information to Plaintiff regarding the investment. Despite this duty, Defendants:

a. Made material misrepresentations and omissions regarding the operational status and financial health of the cryptocurrency mining venture.

b. Falsely represented the expected profitability and risk level of the investment.

c. Failed to disclose significant risks and operational challenges known to them, which directly impacted the viability of the investment.

81. Additionally, the Defendants falsely represented specific rates of return and operational advancements that were either nonexistent or grossly exaggerated, such as:

- The Defendant's Claims in their investment presentation included: "Target IRR: 93% w/Realistic 5 Year Price Target" and "Equity Multiple: 7.5x Equity Multiple."
- These figures suggest an exceptionally high return on investment that is not typical in the highly volatile Bitcoin market. Presenting such optimistic projections can create an unrealistic expectation of substantial profits among potential investors.
- This exaggerated claim has led the Plaintiff to believe that the investment was exceptionally lucrative and almost guaranteed to yield high returns, thereby inducing them to invest under false pretenses. The claim lacks a balanced view of the inherent risks, making it seem more secure and profitable than it likely is.
- "Annual Returns: 12% a Year" and "Monthly Payout: 1% a Month"
- Promising guaranteed returns in a high-risk investment like Bitcoin mining is highly misleading. Such guarantees are unrealistic and not reflective of thetrue nature of the investment's risks.

- The Plaintiff was likely misled into believing that the investment was low-risk with stable and predictable returns. This assurance of guaranteed monthly and annual returns induced the Plaintiff to invest, under the impression that their capital was safe and would grow steadily. The actual financial losses experienced by the Plaintiff were a direct result of relying on these false guarantees.
- Quick Returns: 12 Months Return of Capital"
- Promises of a quick return of capital are highly optimistic and do not account for the many variables and potential setbacks in Bitcoin mining operations. Such claims present the investment as more liquid and secure than it actually is
- The Plaintiff was led to believe that their investment was not only safe but also quickly recoverable. This false sense of security prompted the Plaintiff to invest more than they would have if they were fully aware of the actual risks involved.

82. Plaintiff relied on Defendants' misrepresentations and omissions in deciding to invest and subsequently maintain his investment in the cryptocurrency mining venture. This reliance was reasonable and justified, given the information provided by Defendants and the context in which it was presented. Specifically, Defendants:

a. Knew about significant delays in the supply chain for the mining equipment, which could impact the timely delivery and setup of the miners. Despite this, Defendants assured investors of a Q1-Q2 2022 deployment without disclosing the potential for delays, thereby misleading investors about the project timeline

b. Were aware of the high operational costs and potential instability of electricity sources. Although they promoted the use of nuclear energy and the development of solar panels, Defendants did not disclose the risks associated with

securing these energy sources or potential cost fluctuations, which could significantly affect operational costs and profitability

c. Understood the challenges associated with the procurement of mining equipment. While they purchased high-quality miners at $8,000 per machine and stated current market prices were between $10,500 and $11,000, they did not inform investors about the difficulties in sourcing these machines from resellers, which could lead to higher acquisition costs and impact overall profitability.

83. Plaintiff's reliance on Defendants' fraudulent misrepresentations and omissions was to Plaintiff's detriment. As a direct and proximate result of his reliance on Defendants' fraudulent conduct, Plaintiff has suffered significant financial losses, including but not limited to, the loss of his investment principal and the foregone opportunity to invest those funds elsewhere.

84. By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, for which he is entitled to recover compensatory damages from Defendants. Furthermore, due to the intentional and deceitful nature of Defendants' actions, Plaintiff seeks punitive damages to punish Defendants and deter such conduct in the future.

85. Defendants, including Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing, knowingly engaged in a calculated fraudulent scheme designed to mislead Plaintiff and other investors. By presenting materially false representations regarding the stability, profitability, and operational success of the cryptocurrency mining investment, each defendant induced Plaintiff's investment under false pretenses.

86. Ryan Beatty and Heng Taing played critical roles in promoting the investment through communications that misrepresented returns and minimized risks—claims that were either grossly exaggerated or entirely fabricated. Julie Jing Cheng and Qian Taing materially contributed

to the scheme by concealing and safeguarding fraudulent proceeds within a complex network of assets, including cryptocurrency, thus preventing Plaintiff from recovering losses. This coordinated effort aggravated Plaintiff's financial losses and perpetuated the fraud, resulting in significant

damages.

**COUNT IV**

**(Breach Of Contract)**

87. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

88. At various times commencing in November 2021, Plaintiff and Defendants entered into an agreement ("the Contract") whereby Plaintiff agreed to invest money in a cryptocurrency mining venture operated by Defendants. This Contract was established through Defendants' solicitations, representations, and promises made via email communications, webinars, and other promotional materials, which constituted an offer that Plaintiff accepted by providing investment funds to Defendants.

89. The terms of the Contract, as understood by Plaintiff based on Defendants' representations, included, among others, the following obligations of Defendants:

a. To use Plaintiff's investment funds solely for the purpose of purchasing and operating cryptocurrency mining equipment.

b. To operate the cryptocurrency mining venture in a manner that aimed to generate profits for investors, including Plaintiff, within the projected time frames and profitability rates explicitly stated or implied by Defendants.

c. To provide timely and accurate updates regarding the operation's status and financial performance to Plaintiff.

90. Defendants breached the Contract by failing to fulfill their obligations as outlined above, specifically by:

a. Misappropriating or mismanaging Plaintiff's investment funds contrary to the stated purposes.

b. Failing to operate the cryptocurrency mining venture in a manner consistent with the representations made to Plaintiff, resulting in the venture's failure to generate the promised profits.

c. Failing to provide Plaintiff with accurate and timely information regarding the venture's operational status and financial performance, and in many instances, providing false or misleading updates. Specifically:

- On November 23, 2021, Defendants announced they had secured $16 million in funding for the cryptocurrency mining project. By December 3, 2021, they claimed the fundraising total had increased to $30 million. These announcements were misleading as they presented a false sense of security and market trust without disclosing the actual financial challenges and the speculative nature of the venture.

- On February 1, 2022, Defendants falsely asserted they had secured a new mining facility that would significantly reduce operational costs and increase profitability. This update was misleading as the promised benefits did not materialize, and the actual status and terms of the facility were not fully disclosed.

- On March 23, 2022, Defendants announced they had raised $40 million and outlined plans for deploying miners across strategic locations. This claim misled investors

about the scale and potential success of the operation, as the actual deployment faced significant logistical and operational challenges that were not disclosed to investors.

91. As a direct and proximate result of Defendants' breach of the Contract, Plaintiff has suffered significant financial damages. The losses include the principal amount invested and the expected profits that were not realized due to Defendants' misconduct and breach of their contractual obligations.

92. Plaintiff relied on Defendants' representations and promises in entering the Contract and would not have invested his funds but for Defendants' assurances regarding the operation and profitability of the cryptocurrency mining venture.

93. Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Contract.

## COUNT V

## (Illinois Consumer Fraud and Deceptive Business Practices Act)

94. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

95. This Count is asserted under the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.) ("the Act"), which prohibits unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, in the conduct of any trade or commerce.

96. Defendants engaged in deceptive acts or practices in violation of the Act by:

a. Making false representations and statements regarding the nature, profitability, and risk associated with the cryptocurrency mining venture.

b. Failing to disclose material facts about the operation's viability, the use of investor funds, and the realistic potential for returns, which were necessary for Plaintiff and other consumers to make informed decisions about their investments.

c. Deliberately omitting information about the significant risks and challenges faced by the venture, which were known to Defendants but concealed from Plaintiff and others.

97. Defendants' actions as described herein were designed to mislead Plaintiff and the investing public, inducing them to invest under false pretenses and to maintain their investments based on fabricated success metrics and operational achievements.

98. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff suffered significant financial harm. The harm includes the loss of the investment principal and the opportunity costs associated with investing those funds elsewhere.

99. Defendants' conduct was intentional and calculated to deceive consumers, including Plaintiff, and represents a flagrant violation of the consumer protection objectives of the Act.

100. Under the Act, Plaintiff is entitled to recover actual damages, including the loss of his investment and any additional damages the Court finds just and proper. Furthermore, the Act permits the recovery of attorney's fees and costs, providing a further basis for relief in this action.

**COUNT VI**

**(Negligent Misrepresentation)**

101. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

102. Defendants, in the course of their business, supplied false information for the guidance of Plaintiff and others in their investments, concerning the cryptocurrency mining venture.

103. At various times, Defendants represented to Plaintiff that the investment was substantially less risky than it actually was, that it would produce specific returns, and that certain operational milestones had been achieved, all of which were false and known by Defendants to be false or recklessly disregarded for their truth or falsity.

104. Defendants had a duty to provide accurate and truthful information to Plaintiff, given their positions as promoters and managers of the investment venture, and knowing that Plaintiff would rely on the information provided in making investment decisions.

105. These representations were made negligently and without the care expected of individuals and entities in Defendants' positions. Defendants failed to exercise reasonable care or competence in obtaining or communicating the information, leading Plaintiff to rely on them to his detriment.

106. Plaintiff justifiably relied on Defendants' misrepresentations in deciding to invest in the cryptocurrency mining venture. This reliance was reasonable given the Defendants' positions and the nature of the representations made.

107. As a direct and proximate result of relying on these negligent misrepresentations, Plaintiff suffered significant financial losses, including but not limited to the investment made in the venture, and the lost opportunity for those funds to be invested elsewhere.

108. Plaintiff seeks damages for the losses incurred as a result of Defendants' negligent misrepresentation, including the amount of the investment, interest, consequential damages, and any other relief the Court deems just and proper.

## COUNT VII

## (Unjust Enrichment)

109. **Plaintiff incorporates by reference all preceding paragraphs of this Amended Complaint as though fully set forth herein.**

110. Defendants have been unjustly enriched at the expense of Plaintiff and other investors. Defendants received and continue to hold funds from Plaintiff, which were obtained under the pretenses outlined in the previous counts of this Amended Complaint.

111. Defendants accepted and retained these funds under circumstances that make it unjust for them to keep the benefits without compensating Plaintiff. Specifically, the funds were obtained through misrepresentations, fraudulent conduct, and breaches of contract, as previously alleged.

112. It would be inequitable and unjust for Defendants to retain the benefits received from Plaintiff without providing the promised returns on investment, given the misrepresentations and breaches of contract as alleged herein.

113. Under the principles of equity and justice, Defendants are obligated to disgorge all profits, benefits, and other compensation obtained from Plaintiff and other similarly situated investors through their deceptive practices and breaches of duty.

114. Plaintiff seeks restitution from Defendants in the form of a full return of all funds invested, as well as any profits or benefits derived from those funds, along with pre-judgment and post-judgment interest, costs of litigation, and any other relief the Court deems just and proper.

115. Defendants, including Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing, have each benefitted unjustly by retaining assets obtained under false pretenses from Plaintiff and other investors. This unjust enrichment arose from a pattern of deception and concealment that deprived Plaintiff of substantial investments and potential profits.

116. The participation of Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing in coordinating and protecting these assets, including funds hidden through international transfers and cryptocurrency wallets, makes it both inequitable and unconscionable for them to retain these funds without providing compensation to Plaintiff. Plaintiff alleges that Defendants, acting collectively, exploited investor trust for personal gain while obscuring the misappropriated funds from rightful recovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Vince Faridani respectfully requests that this Court grant the following relief:

1. For the Court to award Plaintiff compensatory damages in an amount to be determined at trial, but sufficient to compensate Plaintiff for the financial losses sustained as a direct and proximate result of Defendants' actions, including but not limited to the loss of investment principal, lost profits, and any additional financial harm suffered by Plaintiff.

2. Where applicable, particularly in relation to Counts alleging fraud, deceit, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, for the Court to award punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful acts and to deter similar conduct in the future.

3. For the Court to issue an injunction, where appropriate, to prohibit Defendants from continuing to engage in the unlawful practices detailed in this Amended Complaint, thereby protecting Plaintiff and the public from future harm.

4. An order prohibiting Defendants from serving as officers, directors, or managers of any entity offering or selling securities in the future, given their demonstrated pattern of deceit and fraudulent conduct.

5. Under the count of Unjust Enrichment, for the Court to order Defendants to disgorge all profits, benefits, and other compensation obtained through their unjust enrichment at the expense of Plaintiff and other investors.

6. For the Court to order Defendants to make full restitution to Plaintiff and all similarly situated investors for any losses incurred as a result of Defendants' actions.

7. For the Court to award pre-judgment and post-judgment interest on any monetary awards at the maximum rate allowed by law, from the date each loss was incurred until the date of payment.

8. Plaintiff requests that the Court permit all necessary actions related to this case, including but not limited to attendance at hearings, submission of documents, and communication with the Court and Defendants, to be conducted remotely via electronic means where feasible.

9. For the Court to order Defendants to pay all costs associated with the prosecution of this action, including reasonable attorneys' fees, expert witness fees, and other expenses as allowed under the Illinois Consumer Fraud and Deceptive Business Practices Act and other applicable laws.

10. For the Court to prohibit Defendants from offering or selling securities in the future, given their demonstrated pattern of deceit and violations of securities laws.

11. For the Court to establish a compliance monitoring mechanism, including the appointment of a special master or overseer, requiring Defendants to submit periodic financial disclosures, provide quarterly reports of all financial transactions, and allow for independent audits to ensure adherence to the Court's orders.

12. For the Court to order an appropriate mechanism for monitoring Defendants' compliance with the terms of the Court's orders, including the appointment of a special master or overseer if deemed necessary.

13. Compensatory damages to cover the substantial financial losses sustained by Plaintiff as a result of Ryan Beatty's, Julie Jing Cheng's, Heng Taing's, and Qian Taing's deliberate and coordinated actions in executing the fraudulent scheme and concealing Plaintiff's assets.

14. Punitive damages to penalize Defendants, including Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing, for their intentional, deceitful, and injurious conduct, deterring future schemes that exploit investor trust through concealment and asset misappropriation.

15. Injunctive relief prohibiting Ryan Beatty, Julie Jing Cheng, Heng Taing, and Qian Taing from engaging in future acts intended to hide or transfer assets derived from fraudulent means, thus protecting Plaintiff's and other investors' financial interests.

16. An order requiring Defendants Jenny Taing and Yuan Heng to account for and disgorge all funds, assets, or property they hold or control that are traceable to Plaintiff's investments or the alleged fraudulent scheme described herein.

17. An order granting a limited asset-freeze against all Defendants to prevent the dissipation of funds or assets potentially subject to recovery by Plaintiff.

18. An order permitting expedited discovery to identify and locate all assets held or controlled by all Defendants that are traceable to Plaintiff's investments or the alleged fraudulent scheme.

19. An order naming Jillian McKenna and Emily McKenna as Relief Defendants in this action, on the grounds that assets transferred to them are directly traceable to the alleged fraudulent scheme orchestrated by Ryan and Sean McKenna, and that such transfers were made to shield assets from recovery.

20. An order requiring Relief Defendants Jillian McKenna and Emily McKenna to account for and disgorge any funds, assets, or property they hold or control that are traceable to Plaintiff's investments or the alleged fraudulent scheme, ensuring full recovery for Plaintiff.

21. An order imposing a limited asset freeze against Relief Defendants Jillian McKenna and Emily McKenna to prevent the dissipation of any funds or property potentially subject to recovery.

22. An order imposing a constructive trust over any funds, assets, or property held by Relief Defendants Jillian McKenna and Emily McKenna that are traceable to Plaintiff's investments and the fraudulent scheme, ensuring these assets are preserved for recovery.

23. An order permitting expedited discovery to identify and locate all assets held or controlled by Relief Defendants Jillian McKenna and Emily McKenna that are traceable to the alleged fraudulent scheme.

**24.** Such other and further relief as the Court deems just and equitable to ensure a full and fair recovery by Plaintiff and other defrauded investors, including but not limited to remedies necessary to prevent future harm or irreparable damage.

**DEMAND FOR JURY TRIAL**

The Plaintiff respectfully demands trial by jury of all issues so triable.

Date:

Respectfully Submitted,

/s/ Vince Faridani
Vince Faridani
Pro Se Plaintiff
8471 Strom Park Drive
Melbourne, FL 32940
Phone: 954-774-1391
Email: VFaridani@hotmail.com

# Exhibit A

Outlook

**[Over $16M in Soft Reserves!!] Bitcoin Mining Fund and Data Center Income Fund**

**From** McKenna Capital <Ryan@McKennaCapital.com> via mailchimpapp.net
**Date** Tue 11/23/2021 5:51 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>

McKenna
CAPITAL

YOUR PASSIVE REAL ESTATE INVESTING PARTNER



## OVER $16M IN SOFT RESERVES ALREADY!!

**We've received an overwhelming and unbelievable response to our Bitcoin Mining Fund and Data Center Income Fund. $16M+ in soft reserves is the most demand we've ever seen for a deal and we're not even through the first day!**

We're so excited about the investor interest level and wanted investors to know

that **if you already submitted a soft reserve you're in this deal for the allocation you requested**. We still have room left as this was a very large allocation to begin with, but at this rate, we could fill up in the next couple days.

Please know that I've received hundreds of emails, calls and texts and am doing my best to get back to everyone. It will likely take several days to answer all of the questions but know that we will get to each and everyone one of you.

For anyone **still considering** this opportunity, please click on the **"soft reserve"** button below to submit your request.

Thanks,

Ryan

CLICK TO SOFT RESERVE YOUR SPOT

## Bitcoin Mining Fund & Data Center Income Fund

McKenna Capital is pleased to present you with a very **unique and attractive opportunity** to partner in the **future of Bitcoin through our Bitcoin Mining Fund and Data Center Income Fund**. This dual fund approach allows investors to participate in either fund (or both) depending on your interest and investment goals.

**McKenna Capital is partnering with Touzi Capital for the fourth deployment of their popular bitcoin mining fund** which will be located in our **new permanent home in Sandusky, Ohio**. This **ex-GM plant occupies 1.3 Million square feet** and is located near a **Nuclear facility** which will provide a **strong green energy source**.

We're very excited for this new partnership with Touzi Capital and believe this fund opportunity will be the first of many to come. **I invested in Bitcoin Mining Fund 3 and am planning to personally invest at least $500K into our Bitcoin Mining Fund IV.** We've already **received a tremendous amount of interest in both funds** just from our sneak peak email so we **highly recommend reserving your spot now** by clicking the soft reserve button below.

# INVESTMENT HIGHLIGHTS

TOUZICAPITAL AND McKenna CAPITAL

PRESENT

# BITCOIN MINING FUND IV
&
# DATA CENTER INCOME FUND

## "HOMEBASE"

**INVESTMENT THESIS:** McKenna Capital is partnering with Touzi Capital for the fourth deployment of their popular bitcoin mining fund which will be located in our new permanent home in Sandusky, Ohio. Occupying 1.3 Million Square Feet in this ex-GM plant, we're launching the fourth bitcoin mining fund. Strong green energy source in a nearby Nuclear facility.

### Bitcoin Mining Fund IV

**Target IRR:** 93% w/ Realistic 5 Year Price Target

**Equity Multiple:** 7.5X Equity Multiple

**Depreciation Benefit:** 90% of Investment

**Downside Protection:** $10k low cost to mine BTC

**Quick Returns:** 12 Months Return of Capital

**Term of Investment:** 5+ Year Investment

**9%** — Monthly Returns

**$10K** — Breakeven Price of Bitcoin

### Data Center Income Fund

**Annual Returns:** 12% a Year

**Monthly Payout:** 1% a Month

**Depreciation Benefit:** 100% of Investment, in 2021

**Fixed Returns:** Triple Net Lease to Bitcoin Miners

**Quick Returns:** 1% a Month Starting **First** month

**Term of Investment:** 3 Years

**100%** — Bonus Depreciation

**1st Month** — 1% Monthly Starting Next Month









**Closing End of December 2021**

## BITCOIN MINING FUND TERMS

- **5+ Years of Mining**
- **Return of Capital within ~12 MONTHS**
- **Monthly Distributions in BTC (Bitcoin) or USD**
- **90/10 Profit Share during Return of Investment**
- **50/50 Profit Share after Return of Capital**
- **$50K Minimum** (Can be split between both funds)
- **Earn While You Wait (6% Annualized Interest)**
    - As soon as you fund your Bitcoin Mining investment with us you can start earning interest on your investment before mining begins. The earliest distribution is expected by Q2 2022, after the first month of live mining operations as logistics and supply chains can delay, so we want to provide investors a reward for your patience.

**SD-IRAs are accepted but checkbook control SD-IRAs are highly recommended** because not every custodian will be able to accept distributions in Bitcoin at this point.




## DATA CENTER INCOME FUND TERMS

- **Monthly Dividends:** Investors receive **1% a month every month starting the first month of their investment.**
- **Fixed Returns: - 12% Annualized Fixed Return** with no associated acquisition or asset management fees.
- **Early Liquidity:** Investors may be redeemed out at **1, 2 or 3 years**. No early redemption Fee.
- **Hold Time:** One year term with one year optional extension for investors to keep earning 1% monthly dividends.
- **$50K Minimum** (Can be split between both funds)

## WATCH INVESTOR WEBINAR

Since investing in Bitcoin Mining is likely new for most investors we highly recommend watching the investor webinar recording that we put together. A lot of your questions will be answered in this webinar and it should give you a good feel for this investment opportunity. Click here or on picture below to watch.




## DOWNLOAD COMPREHENSIVE FAQ GUIDE

We've put together a very comprehensive Frequently Asked Questions Guide for your reference. Please click here or on picture of FAQ Guide to review as many of your

questions related to this exciting opportunity will be covered in the FAQ Guide.


TOUZICAPITAL McKenna CAPITAL

Bitcoin Mining Investor FAQs

TOPICS

Page 2 - INTRODUCTION TO BITCOIN
Page 4 - INTRODUCTION TO BITCOIN MINING
Page 5 - BITCOIN MINING QUESTIONS
Page 8 - FUND 4 OPERATIONS
Page 10 - INVESTMENT QUESTIONS
Page 13 - TAXES AND LEGAL

## DOWNLOAD INVESTMENT SUMMARY DECK

Click here or on picture below to download our Investment Summary Deck which includes further information about this opportunity.



## WHAT IS BITCOIN MINING VIDEO

Below is a quick "What is Bitcoin Mining" tutorial video (presented by Touzi Capital) for those of you unfamiliar with Bitcoin Mining.

What is Bitcoin Mining?

## INVESTOR TIMELINE

**Subscription Documents Ready ➞** Later this week

**Earn 6% Annualized Cash Flow While You Wait Bonus ➞** starts next week for investors who fund early in the Bitcoin Mining Fund

**Funds Due By ➞** December 17th

**Target Closing Date ➞** End of December

**This opportunity is open to Accredited and Non-Accredited Investors**. (Non-Accredited spots are extremely limited)

**Click the links below** to access our **Investment Summary, FAQs Guide** and to **soft reserve** your spot.

Note: Submitting a soft reserve does not lock you in, nor does it guarantee you'll get your full reserve amount. Reservations are taken on a first-come, first-served basis. Any reserves that come in after deal is full will immediately be put on a backup waiting list.

---

## DOWNLOAD INVESTMENT SUMMARY DECK

## CLICK TO SOFT RESERVE YOUR SPOT

---

If you have any questions feel free to reach out at any time. We look forward to potentially partnering with you on this exciting opportunity.

To Your Success!
Ryan

Ryan@McKennaCapital.com
M: 847.354.9766

McKenna CAPITAL

**Visit us at**
www.McKennaCapital.com

Connect with McKenna Capital

Disclaimer:
This email summary is for informational purposes and to gauge potential investor interest. This email summary is not intended to be a general solicitation or a securities offering of any kind. Prior to making any decision to contribute capital, all investors must review and execute all private offering documents, including the Private Placement Memorandum and its exhibits, which contains the complete information about this investment opportunity. The information contained herein is from sources believed to be reliable, however no representation by the Sponsors, either expressed or implied, is made as to the accuracy of any information on this property and all investors should conduct their own research to determine the accuracy of any statements made. Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or legal document. This e-mail contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive messages

for the addressee), you may not use, copy or disclose this message, or any information contained herein. Unauthorized use of this information in any manner is prohibited.

---

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit B

Outlook

**[NEW DEAL ALERT] Bitcoin Mining Fund and Data Center Income Fund**

**From** McKenna Capital <Ryan@McKennaCapital.com>
via mailchimpapp.net

**Date** Tue 11/23/2021 10:52 AM

**To** vfaridani@hotmail.com <vfaridani@hotmail.com>

McKenna
CAPITAL

YOUR PASSIVE REAL ESTATE INVESTING PARTNER



## Bitcoin Mining Fund & Data Center Income Fund

McKenna Capital is pleased to present you with a very **unique and attractive opportunity** to partner in the **future of Bitcoin through our Bitcoin Mining Fund and Data Center Income Fund**. This dual fund approach allows investors to participate in either fund (or both) depending on your interest and investment goals.

**McKenna Capital is partnering with Touzi Capital for the fourth deployment of their popular bitcoin mining fund** which will be located in our **new permanent home in Sandusky, Ohio**. This **ex-GM plant occupies 1.3 Million square feet** and is located near a **Nuclear facility** which will provide a **strong green energy source**.

We're very excited for this new partnership with Touzi Capital and believe this fund opportunity will be the first of many to come. **I invested in Bitcoin Mining Fund 3 and am planning to personally invest at least $500K into our Bitcoin Mining Fund IV.** We've already **received a tremendous amount of interest in both funds** just from our sneak peak email so we **highly recommend reserving your spot now** by clicking the soft reserve button below.

**CLICK TO SOFT RESERVE YOUR SPOT**

---

## INVESTMENT HIGHLIGHTS

TOUZICAPITAL AND McKenna CAPITAL

PRESENT

# BITCOIN MINING FUND IV
&
# DATA CENTER INCOME FUND

## "HOMEBASE"

**INVESTMENT THESIS:** McKenna Capital is partnering with Touzi Capital for the fourth deployment of their popular bitcoin mining fund which will be located in our new permanent home in Sandusky, Ohio. Occupying 1.3 Million Square Feet in this ex-GM plant, we're launching the fourth bitcoin mining fund. Strong green energy source in a nearby Nuclear facility.

### Bitcoin Mining Fund IV

**Target IRR:** 93% w/ Realistic 5 Year Price Target

**Equity Multiple:** 7.5X Equity Multiple

**Depreciation Benefit:** 90% of Investment

**Downside Protection:** $10k low cost to mine BTC

**Quick Returns:** 12 Months Return of Capital

**Term of Investment:** 5+ Year Investment

**9%**
Monthly Returns

**$10K**
Breakeven Price of Bitcoin

### Data Center Income Fund

**Annual Returns:** 12% a Year

**Monthly Payout:** 1% a Month

**Depreciation Benefit:** 100% of Investment, in 2021

**Fixed Returns:** Triple Net Lease to Bitcoin Miners

**Quick Returns:** 1% a Month Starting **First** month

**Term of Investment:** 3 Years

**100%**
Bonus Depreciation

**1st Month**
1% Monthly Starting Next Month









**Closing End of December 2021**

## BITCOIN MINING FUND TERMS

- **5+ Years of Mining**
- **Return of Capital within ~12 MONTHS**
- **Monthly Distributions in BTC (Bitcoin) or USD**
- **90/10 Profit Share during Return of Investment**
- **50/50 Profit Share after Return of Capital**
- **$50K Minimum** (Can be split between both funds)
- **Earn While You Wait (6% Annualized Interest)**
  - As soon as you fund your Bitcoin Mining investment with us you can start earning interest on your investment before mining begins. The earliest distribution is expected by Q2 2022, after the first month of live mining operations as logistics and supply chains can delay, so we want to provide investors a reward for your patience.

**SD-IRAs are accepted but checkbook control SD-IRAs are highly recommended** because not every custodian will be able to accept distributions in Bitcoin at this point.




## DATA CENTER INCOME FUND TERMS

- **Monthly Dividends:** Investors receive **1% a month every month starting the first month of their investment.**
- **Fixed Returns: - 12% Annualized Fixed Return** with no associated acquisition or asset management fees.
- **Early Liquidity:** Investors may be redeemed out at **1, 2 or 3 years**. No early redemption Fee.
- **Hold Time:** One year term with one year optional extension for investors to keep earning 1% monthly dividends.
- **$50K Minimum** (Can be split between both funds)

## WATCH INVESTOR WEBINAR

Since investing in Bitcoin Mining is likely new for most investors we highly recommend watching the investor webinar recording that we put together. A lot of your questions will be answered in this webinar and it should give you a good feel for this investment opportunity. Click here or on picture below to watch.




## DOWNLOAD COMPREHENSIVE FAQ GUIDE

We've put together a very comprehensive Frequently Asked Questions Guide for your reference. Please click here or on picture of FAQ Guide to review as many of your

questions related to this exciting opportunity will be covered in the FAQ Guide.


TOUZICAPITAL McKenna CAPITAL

Bitcoin Mining Investor FAQs

TOPICS

Page 2 - INTRODUCTION TO BITCOIN
Page 4 - INTRODUCTION TO BITCOIN MINING
Page 5 - BITCOIN MINING QUESTIONS
Page 8 - FUND 4 OPERATIONS
Page 10 - INVESTMENT QUESTIONS
Page 13 - TAXES AND LEGAL

## DOWNLOAD INVESTMENT SUMMARY DECK

Click here or on picture below to download our Investment Summary Deck which includes further information about this opportunity.



## WHAT IS BITCOIN MINING VIDEO

Below is a quick "What is Bitcoin Mining" tutorial video (presented by Touzi Capital) for those of you unfamiliar with Bitcoin Mining.

What is Bitcoin Mining?

## INVESTOR TIMELINE

**Subscription Documents Ready ➞** Later this week

**Earn 6% Annualized Cash Flow While You Wait Bonus ➞** starts next week for investors who fund early in the Bitcoin Mining Fund

**Funds Due By ➞** December 17th

**Target Closing Date ➞** End of December

**This opportunity is open to Accredited and Non-Accredited Investors**. (Non-Accredited spots are extremely limited)

**Click the links below** to access our **Investment Summary, FAQs Guide** and to **soft reserve** your spot.

Note: Submitting a soft reserve does not lock you in, nor does it guarantee you'll get your full reserve amount. Reservations are taken on a first-come, first-served basis. Any reserves that come in after deal is full will immediately be put on a backup waiting list.

---

## DOWNLOAD INVESTMENT SUMMARY DECK

## CLICK TO SOFT RESERVE YOUR SPOT

---

If you have any questions feel free to reach out at any time. We look forward to potentially partnering with you on this exciting opportunity.

To Your Success!
Ryan

Ryan@McKennaCapital.com
M: 847.354.9766

McKenna
CAPITAL

**Visit us at**
www.McKennaCapital.com

Connect with McKenna Capital

Disclaimer:
This email summary is for informational purposes and to gauge potential investor interest. This email summary is not intended to be a general solicitation or a securities offering of any kind. Prior to making any decision to contribute capital, all investors must review and execute all private offering documents, including the Private Placement Memorandum and its exhibits, which contains the complete information about this investment opportunity. The information contained herein is from sources believed to be reliable, however no representation by the Sponsors, either expressed or implied, is made as to the accuracy of any information on this property and all investors should conduct their own research to determine the accuracy of any statements made. Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or legal document. This e-mail contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive messages

for the addressee), you may not use, copy or disclose this message, or any information contained herein. Unauthorized use of this information in any manner is prohibited.

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit C

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## TOUZI MINE INVEST, LLC

## $40,000,000
## Units of Membership Interests

## November 2021

Touzi Mine Invest, LLC, a Wyoming limited liability company (the "**Company**"), by and through its Manager, Touzi Capital, LLC, a California limited liability company ("**Touzi Capital**" or the "**Manager**"), and McKenna Capital, LLC a Delaware limited liability company, as co-manager, is offering (this "**Offering**") up to $40 million units of membership interests in the Company ("**Units**"), at a purchase price of $1,000 per Unit, to qualified prospective investors in accordance with Rule 506(b) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "**Securities Act**"). There is a minimum investment amount of $50,000 per investor, unless waived by the Manager.

The Company will use the proceeds of this Offering to invest in a bitcoin mining business (the "**Business**") owned and operated by Touzi Mining, LLC, a Wyoming limited liability company (the "**Business Owner**"). In turn, the Business Owner will use the Company's capital investment to purchase assets for the Business and operate the Business, as summarized herein and set forth in the Operating Agreement and any operating agreement of the Business Owner.

This Offering is limited to "accredited investors" (as that term is defined in Rule 501(a) under the Securities Act); provided, that the Company may sell Units to up to 35 non-accredited investors that alone, or together with their purchaser representatives, have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of a purchase of Units. Investors must also have a substantive, preexisting business relationship with the Company, the Manager, or a member of the Manager, or any affiliate of the foregoing, its officers or control persons. An investment in the Units involves significant risk and is suitable only for sophisticated persons of adequate financial means and that have no need for liquidity with respect to the investment and can bear the economic risk of a complete loss of their investment.

This Confidential Private Placement Memorandum dated November 2021 (as it may be amended, restated, supplemented, or otherwise modified from time to time, this "**Memorandum**") is confidential and proprietary to the Company. Prospective investors are encouraged to carefully review this Memorandum, together with the Company's Operating Agreement (as amended or restated from time to time in accordance with the terms thereof, the "**Operating Agreement**") and the form of Subscription Agreement to be entered into between the Company and each investor that subscribes to purchase Units in this Offering (the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

"**Subscription Agreement**") (collectively, the "**Offering Documents**"), in their entirety, and consult with their advisors, prior to making an investment decision.

The Units have not been registered with the Securities and Exchange Commission under the Securities Act or with the securities commission or division of any state under any state securities law, and are being offered and sold in reliance on exemptions from the registration requirements of such laws. The Unit may be acquired for investment only and may not be offered, sold, pledged, hypothecated, assigned, or transferred at any time except in compliance with the Securities Act, any applicable state securities laws, and the terms and conditions of the Operating Agreement. Purchasers of the Units will be required to bear the risk of their investment for an indefinite period of time.

AN INVESTMENT IN THE UNITS INVOLVES A HIGH DEGREE OF RISK AND IS SUBJECT TO CERTAIN CONFLICTS OF INTEREST.

The Manager may not sell more than $40 million in Units without the consent of the Members collectively holding a majority interest in the Company. There is no minimum amount of subscriptions the Manager must receive prior to terminating this Offering and the Manager may conduct multiple closings of this Offering and accept subscriptions from investors at any time prior to the termination of this Offering. The Manager anticipates this Offering will last less than a couple of months before it is fully-subscribed. The Manager reserves the right to (i) withdraw, limit, or terminate this Offering at any time, (ii) reject any offers to purchase Units or rescind any offers to sell Units, and (iii) amend, if necessary and without refund of any Units previously purchased, the terms of this Memorandum to reflect changes, developments, and new information that occur or become known to the Manager while this Offering is in progress. If necessary, the Manager may offer one or more purchasers rescission of their purchases of Units. The Company does not need to accept subscriptions in the order in which they are received. This Offering is subject to prior sale, modification, termination, or withdrawal without prior notice.

Investors will be required to fund their entire subscription amount, by check, wire transfer, or ACH payment to the Company, concurrently with submitting their subscriptions. If the Manager rejects all or any portion of an investor's subscription, the Manager will refund the rejected portion of the investor's subscription amount.

The Units are being offered by the Manager and its employees and agents. No broker/dealers will be engaged to offer or sell the Units and no persons will receive commissions or other compensation based on sales of the Units.

All inquiries with respect to this Offering should be directed to:

Touzi Capital, LLC
Attn: Investor Relations
340 S Lemon Ave #8284,
Walnut, CA 91789
E-Mail: investors@touzicapital.com



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**TABLE OF CONTENTS**


| | Page |
|---|---|
| GENERAL NOTICES | 1 |
| SUMMARY OF THE OFFERING | 5 |
| SUMMARY OF THE OPERATING AGREEMENT | 8 |
| INVESTOR SUITABILITY | 15 |
| HOW TO SUBSCRIBE | 19 |
| THE BUSINESS OF THE COMPANY | 20 |
| MANAGEMENT | 23 |
| MANAGER COMPENSATION AND FEES | 26 |
| CONFLICTS OF INTEREST | 27 |
| RISK FACTORS AND INVESTMENT CONSIDERATIONS | 31 |




Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## GENERAL NOTICES

THIS OFFERING INVOLVES RISKS. SOME, BUT NOT ALL, OF THESE RISKS ARE DISCUSSED IN THE SECTION OF THIS MEMORANDUM ENTITLED “RISK FACTORS AND INVESTMENT CONSIDERATIONS.” PLEASE CAREFULLY REVIEW THE OFFERING DOCUMENTS IN THEIR ENTIRETY BEFORE MAKING AN INVESTMENT DECISION. PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY, ITS INVESTMENT STRATEGY, AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION.

THE COMPANY WILL PROVIDE PROSPECTIVE INVESTORS, PRIOR TO MAKING AN INVESTMENT DECISION, THE OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE MANAGER OR ANY PERSON ACTING ON ITS BEHALF, CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, AND TO OBTAIN ANY ADDITIONAL INFORMATION REGARDING THE COMPANY AS SUCH PROSPECTIVE INVESTORS SHALL DEEM NECESSARY OR APPROPRIATE TO MAKE AN INFORMED INVESTMENT DECISION.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM (OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE COMPANY, THE MANAGER, ITS AFFILIATES, OR THEIR RESPECTIVE EMPLOYEES OR AGENTS) AS LEGAL OR TAX ADVICE AND ARE ADVISED TO CONSULT THEIR OWN COUNSEL, ACCOUNTANT, AND OTHER ADVISORS AS TO LEGAL, TAX, ECONOMIC, AND RELATED MATTERS CONCERNING THIS OFFERING AND ITS SUITABILITY FOR THEM.

THIS MEMORANDUM CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF THE DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN. HOWEVER, THIS IS A SUMMARY ONLY AND DOES NOT PURPORT TO BE COMPLETE. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW THE OPERATING AGREEMENT AND SUBSCRIPTION AGREEMENT, AND ANY OTHER INFORMATION FURNISHED HEREWITH, FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS PERTAINING TO AN INVESTMENT IN THE UNITS.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO ANY PERSON THAT DOES NOT MEET THE SUITABILITY REQUIREMENTS DESCRIBED UNDER “INVESTOR SUITABILITY.” REPRODUCTION OF THIS MEMORANDUM IS STRICTLY PROHIBITED. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, THE RECIPIENT AGREES TO RETURN THIS MEMORANDUM AND ALL RELATED DOCUMENTS TO THE COMPANY UPON THE MANAGER’S REQUEST.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY STATE OR IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

UNLESS OTHERWISE DESCRIBED HEREIN, NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM. THE COMPANY HAS NOT AUTHORIZED ANY OFFERING LITERATURE OR ADVERTISING, EXCEPT THE INFORMATION CONTAINED HEREIN OR IN THE OTHER OFFERING DOCUMENTS. ANY INFORMATION OR REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR IN THE OTHER OFFERING DOCUMENTS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY OR THE MANAGER. EXCEPT AS OTHERWISE INDICATED, THIS MEMORANDUM SPEAKS AS OF THE DATE FIRST SET FORTH ABOVE. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY.

**JURISDICTIONAL NOTICES**

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE UNITS IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY IN ANY STATE OR OTHER U.S. OR NON-U.S. JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH STATE OR JURISDICTION. IT IS THE RESPONSIBILITY OF PROSPECTIVE INVESTORS TO SATISFY THEMSELVES AS TO THE FULL COMPLIANCE OF THE APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT TERRITORY, INCLUDING OBTAINING ANY GOVERNMENTAL OR OTHER CONSENT AND OBSERVING ANY OTHER FORMALITY PRESCRIBED IN SUCH TERRITORY. THE UNITS MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE UNITS, AND ANY FOREIGN EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT THERETO. THIS OFFERING DOES NOT CONSTITUTE AN OFFER OF THE UNITS TO THE PUBLIC, AND NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE. AS USED IN THIS MEMORANDUM, "$" OR "DOLLARS" MEANS U.S. DOLLARS.

**NOTICE FOR FLORIDA INVESTORS ONLY**

THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES. IF SALES ARE MADE TO FIVE OR MORE FLORIDA PURCHASERS, EACH SALE IS VOIDABLE BY THE PURCHASER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH

PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR WITHIN THREE DAYS AFTER AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**NOTICE TO GEORGIA INVESTORS ONLY**

THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE “GEORGIA SECURITIES ACT OF 1973,” AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION THAT IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

**NOTICE TO NEW HAMPSHIRE INVESTORS ONLY**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE NEW HAMPSHIRE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER NEW HAMPSHIRE RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE NEW HAMPSHIRE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**NOTICE TO FOREIGN INVESTORS**

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE UNITS IN CERTAIN JURISDICTIONS OUTSIDE THE UNITED STATES MAY BE RESTRICTED BY LAW. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH JURISDICTION. PROSPECTIVE NON-U.S. INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE UNITS, AND ANY FOREIGN EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT THERETO.

**FORWARD-LOOKING STATEMENTS**

THIS MEMORANDUM CONTAINS FORWARD-LOOKING STATEMENTS THAT INVOLVE RISKS AND UNCERTAINTIES. THESE STATEMENTS RELATE TO FUTURE



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

EVENTS OR THE COMPANY'S FUTURE FINANCIAL PERFORMANCE. IN SOME CASES, THE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY TERMINOLOGY INCLUDING "COULD," "MAY," "WILL," "SHOULD," "EXPECT," "INTEND," "PLAN," "ANTICIPATE," "BELIEVE," "ESTIMATE," "PREDICT," "POTENTIAL," "CONTINUE," "OPPORTUNITY" OR THE NEGATIVE OF THESE TERMS OR OTHER COMPARABLE TERMINOLOGY. THESE STATEMENTS ARE ONLY PREDICTIONS. ACTUAL EVENTS OR RESULTS MAY DIFFER MATERIALLY. IN EVALUATING THESE STATEMENTS, A PROSPECTIVE INVESTOR SHOULD SPECIFICALLY CONSIDER VARIOUS FACTORS, INCLUDING THE RISKS DESCRIBED IN THIS MEMORANDUM. THESE FACTORS MAY CAUSE THE COMPANY'S ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE MANAGER BELIEVES THE EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, NEITHER THE COMPANY NOR THE MANAGER CAN GUARANTEE FUTURE RESULTS, LEVELS OF ACTIVITY, PERFORMANCE, OR ACHIEVEMENTS.

*[Remainder of page intentionally left blank]*

## SUMMARY OF THE OFFERING

*The following summary is qualified in its entirety by detailed information appearing elsewhere in this Memorandum or the other Offering Documents. The Company urges prospective investors to carefully review the Offering Documents in their entirety, and not just this summary, including, without limitation, the Company's Operating Agreement, and consult with their advisors, prior to making an investment decision. In the event of any contradiction between the summary below and the terms and conditions of the Offering Documents themselves, the terms and conditions of the Offering Documents themselves shall govern and control.*

| | |
|---|---|
| **The Company:** | Touzi Mine Invest, LLC was recently formed as a Wyoming limited liability company. The Company's principal offices are located at 2093 Philadelphia Pike #8883, Claymont, DE 19703, and it can be reached via email at investors@touzicapital.com. |
| **The Manager:** | The Company is manager-managed, and the Manager is Touzi Capital, LLC, a California limited liability company that was formed on April 29, 2020. The Manager's principal offices are located at 340 S Lemon Ave #8284, Walnut, CA 91789, and it can be reached via email at investors@touzicapital.com. McKenna Capital, LLC, a Delaware limited liability company will be the co-manager of the Company. |
| **Purpose of the Company:** | The purpose of the Company is to invest substantially all of its capital in a bitcoin mining business owned and operated by the Business Owner. In turn, the Business Owner will use the Company's capital investment to purchase assets for the Business and operate the Business, as summarized herein and set forth in the Operating Agreement and any operating agreement of the Business Owner.<br><br>The Operating Agreement gives the Manager substantial latitude to manage the Company and its business. |
| **No Control over Business Owner:** | The Company is, and expects at all times to be, the member of the Business Owner, whereas the Manager is, and expects at all times to be, the manager of the Business Owner. Any and all rights, including voting rights, pertaining to the Company's interest in the Business Owner are vested exclusively in the Company and may be exercised only by the Manager acting in accordance with the terms of the Operating Agreement and any Operating Agreement of the Business Owner, and no Member either alone or acting with one or more other Members shall have any such rights with respect to the Business Owner, the Business, or the Company's interest therein. All determinations, decisions and actions made or taken by the Manager in accordance with the Operating Agreement shall be conclusive and absolutely binding upon the Company, the Members, and |

their respective successors and assigns.

This Offering does not constitute a direct or indirect offering of interests in the Business Owner and each Member will only be an investor in the Company and will not be a member in the Business Owner, own a direct interest in the Business Owner, or have any voting rights in the Business Owner.

**This Offering:** The Company is offering up to $40 million in Units in the Company, at a purchase price of $1,000 per Unit, to qualified prospective investors in accordance with Rule 506(b) under the Securities Act. The Units have the same rights and obligations among the Members, as summarized in this Memorandum and set forth in the Operating Agreement.

The Manager may not sell more than $40 million in Units without the consent of the Members collectively holding a majority interest in the Company. The Manager reserves the right to withdraw, limit, or terminate this Offering in its discretion. There is no minimum amount of subscriptions the Manager must receive prior to terminating this Offering, and the Manager may conduct multiple closings of this Offering and accept subscriptions from investors at any time prior to the termination of this Offering.

**Minimum Investment:** Each investor must subscribe to invest at least $50,000, although the Manager reserves the right to waive this requirement in its sole discretion.

**Offering Period:** This Offering will continue until it is fully-subscribed, which the Manager anticipates will take a couple of months. The Business intends to commence operating the assets by the end of December 2021. Notwithstanding the foregoing, the Manager may terminate this Offering at any time and the Manager will not accept any subscriptions after this Offering is terminated.

**Use of Proceeds:** The Company will use the proceeds from this Offering to implement its investment strategy and pay Company Expenses (as defined below in "SUMMARY OF THE OPERATING AGREEMENT"). Neither the Manager nor any of its affiliates will be entitled to any asset management, servicing, or other fees or compensation in connection with this Offering or providing management services to the Company. However, the Manager will receive 50% of any distributions that would otherwise be made to the Members after the Company pays the Members a 6% return per annum on their capital contributions to the Company for the period prior to the deployment of such capital contributions in the Business and a 100% return of such capital



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

| | |
|---|---|
| | contributions to the Members. (See "MANAGER COMPENSATION AND FEES.") |
| **Suitability Requirements:** | This Offering is being made pursuant to an exemption from the registration requirements of the Securities Act available under Rule 506(b) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act. Accordingly, this Offering is only being made to those prospective investors that are "accredited investors" (as that term is defined in Rule 501(a) under the Securities Act); provided, that the Company may sell Units to up to 35 non-accredited investors that alone, or together with their purchaser representatives, have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of a purchase of Units. Investors must also have a substantive, preexisting business relationship with the Company, the Manager, or a member of the Manager, or any affiliate of the foregoing, its officers or control persons.<br><br>An investment in the Units involves significant risk and is suitable only for sophisticated persons of adequate financial means and that have no need for liquidity with respect to the investment and can bear the economic risk of a complete loss of their investment. (See "INVESTOR SUITABILITY.") |
| **Plan of Distribution:** | This Offering is being conducted on a "best efforts" basis by the Company. This Offering is not underwritten. The Company will not engage any brokers or dealers with respect to this Offering. The Units are being offered by the Manager and its employees and agents. No persons will receive commissions or other compensation based on sales of the Units. |
| **Acceptance of Subscriptions:** | The Manager may accept or reject subscriptions for any reason, in whole or in part, in its sole discretion. The Manager is not obligated to accept a subscription, even when the investor would otherwise meet the suitability requirements for an investment.<br><br>Investors will be required to fund their entire subscription amount, by check, wire transfer, or ACH payment to the Company, concurrently with submitting their subscriptions. If the Manager rejects all or any portion of an investor's subscription, the Manager will refund the rejected portion of the investor's subscription amount.<br><br>Once an investor submits a signed Subscription Agreement, the investor will be contractually obligated to make a capital contribution to the Company in the amount set forth on the investor's signature page to the subscription agreement. |



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

(See "SUMMARY OF THE OPERATING AGREEMENT" AND "HOW TO SUBSCRIBE.")

## SUMMARY OF THE OPERATING AGREEMENT

*The following summary is qualified in its entirety by detailed information appearing elsewhere in this Memorandum or the other Offering Documents. The Company urges prospective investors to carefully review the Offering Documents in their entirety, and not just this summary, including, without limitation, the Company's Operating Agreement, and consult with their advisors, prior to making an investment decision. In the event of any contradiction between the summary below and the terms and conditions of the Offering Documents themselves, the terms, and conditions of the Offering Documents themselves shall govern and control.*

**Management:**

The Company is manager-managed, and the Manager is Touzi Capital. The co-manager is McKenna Capital.

The Operating Agreement gives the Manager broad authority to manage the Company and its business and to make all decisions with respect to the Company. Under the terms of the Operating Agreement, the Manager also determines the amount of net income available for distribution by the Company to the Members.

As provided in the Operating Agreement, the Manager may only be removed as the manager of the Company for cause and upon written notice of removal for cause from the Member or Members holding an aggregate Ownership Interest of no less than 75%. In the event the Manager resigns or is removed as the manager of the Company, the Member or Members holding an aggregate Ownership Interest of no less than 75% may appoint a replacement manager.

**Units:**

The Units are uncertificated and entitle the holders thereof that are admitted as members of the Company pursuant to the terms of the Operating Agreement ("**Members**") to certain governance and economic rights apportioned according to each Member's relative ownership interest in the Company equal to a number, expressed as a percentage interest, determined by dividing the Units held by such Member by the aggregate Units held by all Members as of the date of calculation (each, an "**Ownership Interest**").

**Governance Rights:**

The management of the Company and its affairs is vested in the Manager, and accordingly the Members have minimal rights to participate in the governance of the Company and its affairs, as summarized in this Memorandum and set forth in the Operating Agreement.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

| | |
|---|---|
| **Capital Contributions:** | Investors will be required to fund their entire subscription amount, by check, wire transfer, or ACH payment to the Company, concurrently with submitting their subscriptions.<br><br>If their subscriptions are accepted by the Manager on behalf of the Company, the Manager will notify the investors and update the Operating Agreement to reflect the issuance of the Units to the investors in exchange for their subscription funds, which are their capital contributions to the Company. |
| **Additional Capital:** | No Member will be required to make any additional capital contributions to the Company. If the Company requires additional capital in excess of the initial capital contributions of the Members (for example, to pay Company Expenses), in lieu of requiring the Members to make additional capital contributions to the Company, the Manager may cause the Company to borrow such capital either (i) from a commercial bank, lending institution, or other person or (ii) from the Manager, any Member, any of their affiliates, or any other persons; provided, that the loan is on commercially reasonable terms and bears interest at a rate not to exceed 12% per annum. Any third-party loans must be without recourse to the Members unless otherwise agreed in writing by the Members. |
| **Interim Distributions:** | With respect to any net income generated from the Company's capital investment in the Business Owner, the Company shall distribute such net income to the Members as follows:<br><br>(i) First, to the Members pro rata according to their respective unpaid pre-deployment return, until each Member receives a pre-deployment return on the Member's capital contributions in the amount of 6% per annum, accruing on a cumulative, non-compounding basis from the date such capital contributions are made by the Member to the Company until the date that such capital contributions are deployed in the Business, as determined by the Manager in its sole discretion;<br><br>(ii) Second, to the Members pro rata according to their respective unreturned capital contributions, until each Member receives a full return of the Member's capital contributions from the Company; and<br><br>(iii) Third, 50% to the Members pro rata according to their respective Ownership Interests and 50% to the Manager. |
| **Distributions upon Liquidation:** | Upon the dissolution and liquidation of the Company, any net proceeds of the Company's assets will be distributed as follows: |

(i) First, to the payment and discharge of all of the Company's debts and liabilities; and

(ii) Second, to the Members pro rata according to the interim distributions waterfall set forth above.

**Tax Distributions:** To the extent there is available cash for distribution to the Members as determined by the Manager in its sole discretion, the Manager shall use its commercially reasonable efforts to cause the Company to distribute to the Members within 100 days after the end of each fiscal year sufficient cash to pay their respective tax obligations with respect to the taxable net income of the Company allocated to them for such fiscal year. These tax distributions will be applied against the amounts that would otherwise be distributable to the Members. The Manager is not obligated to make these tax distributions, even if there is available cash for distribution.

**Company Expenses:** The following fees, costs, and expenses, whether paid by the Company or paid by the Manager, any principal, or an affiliate of the Manager or any principal and reimbursed by the Company will be included in the expenses that are borne and payable by the Company prior to the determination of any cash available for distribution to the Members (the "**Company Expenses**"):

- All fees, costs, and expenses incurred by or on behalf of the Company in connection with forming the Company, acquiring a membership interest in the Business Owner, preparing the Offering Documents, conducting the Offering, and related matters (estimated to be about $10,000);

- All fees, costs, and expenses incurred by or on behalf of the Company in connection with the administration of the Company and the enforcement of the terms of the Operating Agreement;

- All fees, costs, and expenses chargeable or passed through to the Company by the Business Owner that are not paid out of the Company's capital contributions to the Business Owner, if any;

- The fees and reasonable expenses incurred by the Partnership Representative;

- Any taxes, corporate maintenance, or qualification or filing or licensing fees, or federal or state "blue sky" securities filing fees incurred by or on behalf of the Company, and any fees, costs, and expenses incurred by or on behalf of the Company in connection with the preparation, reporting, and

filing of foreign, federal, state, or local tax returns by the Company;

- All costs, litigation and alternative dispute resolution expenses, and attorneys' fees incurred by or on behalf of the Company in any claim or action in connection with the recovery, protection or preservation of property received or held by the Company;
- All fees, costs and expenses incurred by or on behalf of the Company in the dissolution and winding-up of the Company; and
- All fees, costs, and expenses incurred by or on behalf of the Company in connection with the obligations of the Company to indemnify any Indemnitee (as defined below) under the terms of the Operating Agreement.

**Management Fees:** Neither the Manager nor any of its affiliates will be entitled to any asset management, servicing, or other fees or compensation in connection with this Offering or providing management services to the Company. However, the Manager will receive 50% of any distributions that would otherwise be made to the Members after the Company pays the Members a 6% return on their capital contributions to the Company for the period prior to the deployment of such capital contributions in the Business and a 100% return of such capital contributions to the Members. (See "MANAGER COMPENSATION AND FEES.")

**Term:** The Company shall have a perpetual existence unless and until the occurrence of certain events, including, without limitation, the sale or other disposition of the Business, dissolution and liquidation of the Business Owner, or sale or other disposition of the Company's interest in the Business Owner, and the reduction to cash of substantially all assets of the Company, or the written election of the Manager and the Members holding an aggregate Ownership Interest of no less than 75%.

**Withdrawals:** No Member shall be entitled to withdraw from the Company or receive any return of the Member's capital contribution, except as specified in the Operating Agreement. No Member may demand redemption of the Member's Unit.

The Manager, by written notice to any Member, may suspend payment of any distribution or withdrawal proceeds to such Member if the Manager reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Company, the Manager, the Members, or any of the Company's service providers.

The Manager may require a Member to withdraw all or any part of the Member's capital contribution to the Company if the Manager considers such withdrawal necessary to correct violations of law or applicable regulation, or to avoid a material adverse impact on the Company, the Manager, or the other Members. In such event, the Manager shall give not less than five business days' written notice to the Member specifying the date of withdrawal. As soon as practicable thereafter, the withdrawing Member shall receive the balance of the value in such Member's capital account, subject to all appropriate adjustments pursuant to the provisions of the Operating Agreement.

**Transfers:** No Member will be able to sell, assign or transfer its Units in the Company, in whole or in part, without the prior written consent of the Manager, which consent may be withheld in the Manager's sole discretion. Transfers of Units are severely restricted under applicable federal and state securities laws and the terms of the Operating Agreement. There is no public market for the Units, and none will develop anytime in the future.

**Information Rights:** The Manager will furnish to the Members (i) unaudited annual financial statements of the Company within 180 days following the end of the Company's fiscal year and (ii) unaudited quarterly financial reports of the Company within 75 days following the end of each of the first three fiscal quarters of the Company's fiscal year.

**Other Interests of the Manager and Affiliates:** The Operating Agreement provides the Manager and its affiliates significant latitude to engage in other business activities, even if such business activities would compete with the interests of the Company or the Members or would limit the Manager's ability to manage the Company and its business.

In particular, and without limiting the foregoing, the Manager and its affiliates may carry on investment activities for their own accounts and for persons other than the Company or the Members, including any prior or future investment funds or other investment activities of the Manager or its affiliates. There is no requirement that the Manager or its affiliates bring a particular opportunity to the Company before taking that opportunity for their own account or the account of any prior or future investment funds or other investment activities of the Manager or its affiliates or any other persons other than the Company or the Members.

Additionally, the Manager and its affiliates may give or refuse to give prior or future investment funds or other investment



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

activities of the Manager or its affiliates, Members, or any other persons, the opportunity to co-invest in the Business alongside the Company. The terms of any such co-investment shall be set by the Manager on a basis the Manager believes to be fair and reasonable to the Company and may include the payment of fees and profit interests to the Manager or affiliates of the Manager. The Manager, the principals, or any of their respective affiliates, may create and operate one or more investment entities which will invest in the Business Owner in parallel with the Company.

(See "CONFLICTS OF INTEREST.")

**Capital Accounts:**

The Company will establish a capital account for each Member in accordance with the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations promulgated thereunder (the "**Regulations**"). The Manager will credit the capital account it establishes for each Member when it receives a capital contribution from the Member. The Manager will allocate to each Member's capital account income, gains, losses, and distributions in accordance with the Operating Agreement. Each Member's capital account will increase by the amount of additional capital contributions such Member makes and by such Member's pro rata share of income and gains realized by the Company. Each Member's capital account will decrease by such Member's pro rata share of losses and any amounts distributed to such Member.

**Federal Income Tax Treatment:**

A limited liability company with more than one member is generally classified as a partnership for federal income tax purposes unless it elects to be classified as an association taxable as a corporation or is considered to be a publicly traded partnership. The Company has no intention of electing to be classified as an association taxable as a corporation for federal income tax purposes. Moreover, the Company does not intend to participate in or allow any of the activities that would cause the Company to be treated as a publicly traded partnership within the meaning of the Code and the Regulations. Accordingly, the Manager believes that the Company will be classified as a partnership for federal income tax purposes and that each Member in the Company will be treated as a partner for federal income tax purposes.

Because it will be treated as a partnership for federal income tax purposes, the Company will file annual income tax information returns but generally will not be subject as an entity to federal income tax liability. Instead, each Member will receive an IRS Form 1065, Schedule K-1, showing the Member's allocable



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

share of the Company's income, gain, loss, deduction, and credit for each tax year. Each Member generally will be required to report, on the Member's separate income tax return, such Member's share of Company income, gain, loss, deduction, and credit, whether or not any cash or other property is distributed to such Member by the Company. In the absence of cash distributions from the Company, a Member may need to use funds from other sources to pay taxes with respect to Company income or gain that is allocated to that Member. Similarly, each Member generally will be able to report its share of tax losses of the Company, if any, for tax purposes, subject to certain limitations, even if the Member receives a cash distribution.

**Members' Tax Basis in Units:** Generally, the initial tax basis of a Member's Units will equal the amount of money contributed to the Company in exchange for those Units, plus the Member's adjusted tax basis in any property contributed to the Company, less liabilities of the Member that are assumed by the Company, plus the Member's allocable share of the Company's liabilities determined in accordance with the Regulations under Section 752 of the Code. A Member's tax basis in its Units will be increased by the Member's allocable share of Company taxable income and the amount of any additional capital contributions by the Member. A Member's tax basis in its Units will be decreased (but not below zero) by the Member's allocable share of Company tax losses and the amount of any distributions to the Member by the Company. Subject to certain potentially applicable limitations, a Member may be able to deduct its allocable share of Company tax losses, but only to the extent that such losses do not exceed the Member's adjusted tax basis in its Units. Losses in excess of basis may be carried forward until the Member's adjusted tax basis in its Units is increased above zero.

**Fiscal Year:** The fiscal year of the Company is the period from January 1 to December 31 of each calendar year; provided, that the Manager may change the fiscal year end as it deems appropriate.

**Exculpation and Indemnification:** Neither the Manager, the Partnership Representative, any of their respective affiliates, nor any of their respective principals, partners, members, officers, employees, or agents (each, an "**Indemnitee**") will be liable for, and each shall be indemnified and held harmless by the Company to the fullest extent legally permissible from and against, any loss or cost arising out of, or in connection with, any act or activity undertaken (or omitted to be undertaken) in fulfillment of any obligation or responsibility under the Operating Agreement, including any such loss sustained by reason of any investment in the Company or the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

| | |
|---|---|
| | Business Owner, except that no Indemnitee will be exculpated from, nor indemnified and held harmless from and against, any liability arising from losses caused by such Indemnitee's gross negligence, willful misconduct, bad faith, or knowing violation of applicable law. |
| **Member Liability:** | A Member will not be liable for the debts or obligations of the Company except to the extent of its capital contributions in the Company. |
| **ERISA Members:** | The Manager intends to operate the Company in such a manner that the assets of the Company are not deemed to be "plan assets" for purposes of ERISA. The Manager intends to monitor the investments in the Company and take actions to ensure that less than 25% of the Units are held by investors that are subject to Part 4 of Title I of ERISA. As a result, the Manager may need to restrict subscriptions, purchases and transfers of Units that would result in such 25% limit being exceeded. The Manager may also expel a Member that is subject to Part 4 of Title I of ERISA by forcing such Member to either redeem its Units or sell its Units to another Member or Person, if it is determined by, the Manager, the United States Department of Labor or Internal Revenue Service, or a court of competent jurisdiction that (i) such Member's continued status as a Member of the Company or the conduct of the Company will result, or there is a material likelihood that such continuation or conduct will result, in a material violation of ERISA or Section 4975 of the Code, or (ii) all or a portion of the Company's assets constitute "plan assets" of such Member. |
| **Amendments:** | Most amendments of the Operating Agreement require the approval of the Manager and the Members collectively holding an Ownership Interest in excess of 50%.<br><br>Certain amendments of the Operating Agreement require the approval of all the Members, including, for example, amendments that would cause Members to be personally liable for the obligations of the Company or that would change the rights and interests of the Members in the income of the Company, the voting rights of the Members under the Operating Agreement, or the rights of Members with respect to capital contributions or on liquidation of the Company.<br><br>Other ministerial or administrative amendments of the Operating Agreement may be made by the Manager without approval by the Members. |

*[Remainder of page intentionally left blank]*

## INVESTOR SUITABILITY

This Offering is being made pursuant to an exemption from the registration requirements of the Securities Act available under Rule 506(b) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act. Accordingly, this Offering is only being made to those prospective investors that are "accredited investors" (as that term is defined in Rule 501(a) under the Securities Act); provided, that the Company may sell Units to up to 35 non-accredited investors that alone, or together with their purchaser representatives, have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of a purchase of Units. Investors must also have a substantive, preexisting business relationship with the Company, the Manager, or a member of the Manager, or any affiliate of the foregoing, its officers or control persons. An investment in the Units involves significant risk and is suitable only for persons of adequate financial means and that have no need for liquidity with respect to the investment and can bear the economic risk of a complete loss of their investment.

The suitability standards discussed herein represent only the minimum suitability standards for investors. The satisfaction of such standards by an investor does not necessarily mean that the Units are a suitable investment for such investor. All prospective investors are encouraged to consult with their own advisors to determine whether an investment in the Units is appropriate for them. The Manager may reject subscriptions in whole or in part in its sole discretion, even when investors may otherwise meet the suitability standards and qualify for an investment.

In order to subscribe to purchase Units, each investor will be required complete, sign, and return a Subscription Agreement, pursuant to which the investor represents and warrants to the Company that (among other things): (i) the investor is an accredited investor; (ii) by reason of the investor's business or financial experience or that of the investor's purchaser representatives, the investor is capable of evaluating the merits and risks of an investment in the Units; (iii) the investor is acquiring the Units for its own account, for investment only, and not with a view toward the resale or distribution thereof; (iv) the investor is aware that the Units have not been registered under the Securities Act or any state securities laws and that transfer thereof is restricted by the Securities Act and applicable state securities laws; and (v) the investor is aware of the absence of a market for the Units.

### Accredited Investor and Net Worth Requirements

To qualify as an accredited investor, an investor must satisfy the definition of "accredited investor" under Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act. Generally, to be treated as an accredited investor, an investor must satisfy one of the following tests:

(a) Individuals. If the purchaser is an individual, the purchaser must represent that he or she (i) has an individual net worth, or joint net worth with that person's spouse, of at least $1 million excluding the value of the purchaser's primary residence and any indebtedness that is secured by the purchaser's residence, except for the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

amount of indebtedness that is secured by the purchaser's primary residence that exceeds, at the time of his or her purchase of the securities offered, (A) the estimated fair market value of the primary residence or (B) the amount of indebtedness outstanding 60 days before the time of his or her purchase of the securities offered, other than as a result of the acquisition of the primary residence, or (ii) had an individual income in each of the two most recent years in excess of $200,000, or joint income with the purchaser's spouse in excess of $300,000 for each of the two most recent fiscal years, and in either case, the purchaser has a reasonable expectation of reaching the same income level in the current year.

(b) Entities. (i) Any corporation, Massachusetts or similar business trust, or partnership that was not formed for the specific purpose of acquiring the securities offered and has total assets in excess of $5 million, or (ii) any entity in which all of the equity owners are individuals who each have a net worth (including assets jointly held with his or her spouse) in excess of $1 million excluding the value of the individual's primary residence and any indebtedness that is secured by the individual's residence, except for the amount of indebtedness that is secured by the individual's primary residence that exceeds, at the time of the entity's purchase of the securities offered, (A) the estimated fair market value of the primary residence or (B) the amount of indebtedness outstanding 60 days before the time of purchase of the securities offered, other than as a result of the acquisition of the primary residence.

(c) Certain Trusts. Any trust with total assets in excess of $5 million not formed for the specific purpose of acquiring the securities offered whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act.

(d) Benefit Plans. Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5 million; any Benefit Plan within the meaning of ERISA (defined below) if the investment decision is made by a "Plan Fiduciary," as defined in Section 3(21) of ERISA, that is a bank, savings and loan association, insurance company or registered investment advisor, or that has total assets in excess of $5 million; or, if the Benefit Plan is a self-directed plan or IRA (defined below), the plan or IRA has its investment decisions made solely by participants or beneficiaries that are accredited investors.

(e) Other Purchasers. Other accreditation standards are described in the Subscription Agreement.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

If a prospective investor cannot represent and warrant that the investor is an "accredited investor," the investor should contact the Manager to determine the investor's eligibility to participate in the Offering and purchase Units.

Investors should only subscribe for Units if they can afford a complete loss of their investment. These risks include risks associated with general economic conditions, capital and debt markets, the cryptocurrency industry, the Company's investment strategy, the unlimited term of the Company, the lack of liquidity, restrictions on transfer and resale of the Units, and the mid-term nature of an investment in the Units. Investors should not purchase Units if they are seeking current income distributions on their investments in the short term. Furthermore, they should not purchase Units for tax write-offs, as the Company's investment strategy is not expected to generate material losses or shelter other income.

**Reliance on Subscriber Information**

Representations and requests for information regarding the satisfaction of investor suitability standards are included in the Subscription Agreement that each prospective investor must complete. The Units have not been registered under the Securities Act and are being offered in reliance on Section 4(a)(2) thereof and Regulation D promulgated by the Securities and Exchange Commission thereunder, and in reliance on applicable exemptions from state law registration or qualification provisions. Accordingly, before selling Units to any offeree, the Manager intends to make all inquiries reasonably necessary to satisfy itself that the prerequisites of such exemptions have been met. Prospective investors will also be required to provide whatever additional evidence is deemed necessary by the Manager to substantiate information or representations contained in their Subscription Agreements. The standards set forth above are only minimum standards. The Manager reserves the right, in its exclusive discretion, to reject any Subscription Agreement for any reason, regardless of whether a prospective investor meets the suitability standards. In addition, the Manager reserves the right, in its exclusive discretion, to waive minimum suitability standards not imposed by law.

The Manager will impose comparable suitability standards in connection with any resale or other transfer of Units permitted under the Operating Agreement.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## HOW TO SUBSCRIBE

To subscribe to purchase Units, an investor must fully complete, sign, and deliver the Subscription Agreement. An investor may complete, sign, and return a Subscription Agreement using DocuSign or a similar means of electronic transmission, or may email or return a fully completed and signed Subscription Agreement to the Company at the following address:

Touzi Mine Invest, LLC
c/o Touzi Capital, LLC
Attention: Investor Relations
2093 Philadelphia Pike #8883, Claymont, DE 19703
E-Mail: investors@touzicapital.com

Investors will be required to fund their entire subscription amount, by check, wire transfer, or ACH payment to the Company, concurrently with submitting their subscriptions. If the Manager rejects all or any portion of an investor's subscription, the Manager will refund the rejected portion of the investor's subscription amount.

Once an investor submits a signed Subscription Agreement, the investor will be contractually obligated to make a capital contribution to the Company in the amount set forth on the investor's signature page to the subscription agreement. The obligation to make such capital contribution to the Company is mandatory, not optional on the investor's part once the investor submits a signed Subscription Agreement.

The Manager may not sell more than $40 million in Units without the consent of the Members collectively holding a majority interest in the Company. There is no minimum amount of subscriptions the Manager must receive prior to terminating this Offering and the Manager may conduct multiple closings of this Offering and accept subscriptions from investors at any time prior to the termination of this Offering. The Manager reserves the right to (i) withdraw, limit, or terminate this Offering at any time, (ii) reject any offers to purchase Units or rescind any offers to sell Units, and (iii) amend, if necessary and without refund of any Units previously purchased, the terms of this Memorandum to reflect changes, developments, and new information that occur or become known to the Manager while this Offering is in progress. If necessary, the Manager may offer one or more purchasers rescission of their purchases of Units. The Company does not need to accept subscriptions in the order in which they are received. This Offering is subject to prior sale, modification, termination, or withdrawal without prior notice.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## THE BUSINESS OF THE COMPANY

### Summary

The Company will use the proceeds of this Offering to invest in a bitcoin mining business (the "**Business**") owned and operated by Touzi Mining, LLC, a Wyoming limited liability company (the "**Business Owner**"). In turn, the Business Owner will use the Company's capital investment to purchase assets for the Business and operate the Business, as summarized herein and set forth in the Operating Agreement and any operating agreement of the Business Owner.

Touzi Capital, LLC, a California limited liability company ("**Touzi Capital**" or the "**Manager**"), will serve as the Manager of the Company and the Business Owner alongside the co-manager McKenna Capital, LLC. The Operating Agreement gives the Manager substantial latitude to manage the business and affairs of the Company, including its interest in the Business Owner and, indirectly through the Business Owner, the Business.

### Investment Thesis

Touzi Capital's fourth deployment of its popular bitcoin mining fund will be located in its new permanent home in Sandusky, Ohio. Occupying 1.3 million square feet in this ex-GM plant, Touzi Capital is launching its fourth bitcoin mining fund. The location has a strong green energy source in a nearby nuclear facility.

### Distributions

Under the Operating Agreement, the Manager will determine from time to time the amount of net income from the Business that is available for distribution to the Members. Any such distributions will be made to the Members as follows:

(i) First, to the Members pro rata according to their respective unpaid pre-deployment return, until each Member receives a pre-deployment return on the Member's capital contributions in the amount of 6% per annum, accruing on a cumulative, non-compounding basis from the date such capital contributions are made by the Member to the Company until the date that such capital contributions are deployed in the Business, as determined by the Manager in its sole discretion;

(ii) Second, to the Members pro rata according to their respective unreturned capital contributions, until each Member receives a full return of the Member's capital contributions from the Company; and

(iii) Third, 50% to the Members pro rata according to their respective Ownership Interests and 50% to the Manager.

The Manager anticipates being able to return capital contributions to the Members within 10-14 months after deployment, but any distributions, whether in return of capital or otherwise, are subject to the Manager's determination of availability in its sole discretion.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**Overview of Cryptocurrency Industry**

Cryptocurrencies are generally blockchain based distributed digital ledgers with properties defined by software. They use cryptographic techniques to secure transactions and control the creation of new units (aka "coins"). Generally, the development and operation of cryptocurrencies happens through a decentralized network of people and machines, though not always. Cryptocurrencies are considered a subset of digital currencies, alternative currencies, and virtual currencies. They generally do not have physical bank notes or coins and are usually not issued by a government. Cryptocurrencies are used primarily outside of existing banking and governmental institution, and exchanged over the Internet. Cryptocurrencies are not backed by any government, fiat currency or commodity. Although in the early stages of development and acceptance, cryptocurrencies have the potential to challenge and disrupt more traditional systems of currency, payments, provisioning, and value transfer.

The first Bitcoin was created in 2009 by pseudonymous developer Satoshi Nakamoto. In the ensuing years, the number of cryptocurrencies, market participants and companies in the space has increased dramatically. Well known cryptocurrencies include Bitcoin, Ethereum, Ripple, Bitcoin Cash, Litecoin and Dash. Cryptocurrencies are used for a variety and rapidly increasing set of purposes. The category and protocols are still being defined and evolving.

Some startup companies play an integral part of the blockchain ecosystem by validating transactions on the blockchain. This process of validating transactions is known as mining. Miners receive a reward for successfully validating these transactions, and receive the cryptocurrency mined as the reward. As cryptocurrencies like bitcoin gain traction and are widely adopted, the need for miners to validate these transactions grows, giving rise to a boom in the blockchain infrastructure economy.

**Investment Strategy**

The Company will make a capital investment in the Business Owner to acquire and operate the ASIC miners and to use their computational hashing power to contribute to the Luxor pool which will provide bitcoin in exchange. Any remaining capital will be used for set-up cost and operational expenses. The bitcoin will be converted to fiat currency, United States Dollars, and used to pay operating expenses, which constitutes to power, maintenance, and operational costs. The funds will then be distributed to investors on a regular basis.

The investment period of the Company is approximately five years, which may be extended at the Manager's discretion if the operations are profitable beyond five years. Since the investment period is dependent on the profitability of mining operations, in the event that the mining operations are no longer profitable, the Manager may choose to halt operations and close the Business. At the Manager's discretion, the Company will likely resell the hardware for a profit when the bitcoin mining production becomes less profitable. The investment returns are highly dependent on the difficulty growth of the bitcoin mining and bitcoin price.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

# MANAGEMENT

**Touzi Capital & McKenna Capital**

The Company's Manager is Touzi Capital, LLC, a California limited liability company founded by Eng Taing and McKenna Capital, LLC founded by Ryan McKenna.

Touzi Capital is a private investment fund manager. Touzi Capital has acquired over $250 million in total assets. It currently has $225M million assets under management.

At Touzi Capital, we are passionate about investing. We base our investment decisions on facts and long-term trends, an approach that sets us apart from our competition. We employ a conservative investment philosophy and have a track record of consistent results.

We are disciplined. We understand the realities of market cycles and the opportunities these cycles create. We focus on the historical trends and determine value by underlying fundamentals and not speculative expectations. We are analytical.

Critical to achieving our goals are the core values we embrace, which include:

- Relationships
- Passion
- Innovation
- Honesty
- Impact
- Communication
- Judgment
- Courage
- Transparency

We value stability – and we are building a company that will be around for years to come. Not only do we have a successful history that spans multiple investment cycles, but we have a strong reputation as a preferred company to do business with. We measure our success by the strength of the relationships we create and the success of our clients and partners.

We have a culture that values doing business the right way. We are thoughtful in the things we do, carefully executing our strategy.

We have built a seasoned team with a successful track record. Today, we have more opportunities than ever before in our history.

Additional information regarding our prior investment projects and investment performance is available to prospective investors on a confidential basis upon request. However, such information is not indicative of the actual or anticipated performance of the Company and no assurances can be made that the Company will invest in similar projects or will have similar results.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**Eng Taing**

Eng Taing is an experienced investor with $225M assets under management and has been investing for 12 years. Eng is a trained economist from the Wharton School of Business. He also has experience leading data science and analytics teams at Apple, Capital One and AT&T. He founded Touzi Capital as a way to provide friends and family a similar opportunity at investing in tax-advantaged investments that provide excellent returns with minimal risk.

**Ryan McKenna**

Ryan McKenna is the CEO of McKenna Capital, a private equity firm that offers passive investing opportunities to limited partners through both funds and syndications. With a primary focus on value-add multifamily, McKenna Capital has invested in over 10,000 units with a combined value of over $1 billion. Ryan's main responsibilities include oversight on acquisitions, sourcing capital, investor relations and building partnerships with top tier operators.

**The Manager's Role**

The Manager controls and manages the Company's affairs and has responsibility and final authority in almost all matters affecting its business. These duties include dealings with Members; accounting, tax, and legal matters; communications and filings with regulatory agencies; and all other required management and operational duties for the Company, as detailed in the Operating Agreement. The authority of the Manager under the Operating Agreement includes, without limitation, the authority to:

- Acquire, sell, exchange, transfer or dispose of any assets, whether or not in the ordinary course of the Company's business;
- Cause the capital contributions received by the Company from Members to be contributed to the Business Owner and used by the Business Owner to purchase assets for the Business and operate the Business;
- Pay, in accordance with the provisions of the Operating Agreement, any Company Expenses;
- Cast any votes or execute any written consents on behalf of the Company with respect to the Company's interest in the Business Owner, unless the action to be approved by such vote or consent would require the approval of the Members if the action were to be taken by the Company;
- Enter into agreements and contracts with third parties and, subject to the terms of the Operating Agreement, affiliates of the Manager or any principal, to provide services to the Company or in furtherance of the Company's business and affairs;



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

- Establish reserves for contingencies and for any other proper Company purpose;
- Review and determine whether to accept subscriptions from investors, admit new or substitute Members, and allow transfers of Units; and
- Determine the amount and timing of any distributions to the Members.

The Members have no right to participate in the management or control of the Company's business or affairs other than to exercise the limited voting rights provided for in the Operating Agreement.

As provided in the Operating Agreement, the Manager may only be removed as the manager of the Company for cause and upon written notice of removal for cause from the Member or Members holding an aggregate Ownership Interest of no less than 75%. In the event the Manager resigns or is removed as the manager of the Company, the Member or Members holding an aggregate Ownership Interest of no less than 75% may appoint a replacement manager.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## MANAGER COMPENSATION AND FEES

**No Fees or Similar Compensation**

Neither the Manager nor any of its affiliates will be entitled to any asset management, servicing, or other fees or compensation in connection with this Offering or providing management services to the Company. However, the Manager will receive 50% of any distributions that would otherwise be made to the Members after the Company pays the Members a 6% return per annum on their capital contributions to the Company for the period prior to the deployment of such capital contributions in the Business and a return of 100% of such capital contributions from the Company.

**Company Expenses**

Any Company Expenses paid by the Manager, any principal, or an affiliate of the Manager or any principal shall be reimbursed by the Company and will be included in the expenses that are borne and payable by the Company prior to the determination of any cash available for distribution to the Members.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## CONFLICTS OF INTEREST

The Company is subject to various conflicts of interest arising out of its relationships with the Manager and affiliates of the Manager. No agreements or other arrangements between the Company and the Manager or its affiliates were the result of arm's-length negotiations. Some of the potential conflicts of interest relating to the Company's business include, without limitation, the following:

**Terms Established by the Manager**

The terms of the Company and the relationship between the Manager and the Members have been determined independently and arbitrarily by the Manager. As a result, there can be no assurance that these terms are as favorable to the Company and the Members as could be obtained from an unaffiliated party or as the result of arm's-length negotiations.

**Simultaneous Management of the Company and the Business Owner**

The Manager will simultaneously serve as the manager of the Company and the Business Owner. As such, the Manager has broad latitude to manage the Company and the Business Owner and oversee and operate the Business in whatever manner the Manager determines is in the best interests of the Company and the Members, on one hand, or the Business Owner and its members (including the Company), on the other hand. Any and all rights, including voting rights, pertaining to the Company's interest in the Business Owner are vested exclusively in the Company and may be exercised only by the Manager acting in accordance with the terms of the Operating Agreement and any operating agreement of the Business Owner, and no Member either alone or acting with one or more other Members shall have any such rights with respect to the Business Owner, the Business, or the Company's interest therein. Furthermore, the Members have no right to participate in the management or control of the Company's business or affairs other than to exercise the limited voting rights provided for in the Operating Agreement.

As a result of the foregoing, the Manager may be incentivized to take actions to the benefit of parties other than the Company or its Members, and the Members will have little to no control over such actions.

**Carried Interest**

Where the Manager will be compensated from 50% of any distributions that would otherwise be made to the Members after the Company pays the Members a 6% return on their capital contributions to the Company for the period prior to the deployment of such capital contributions in the Business and a return of 100% of such capital contributions from the Company, in lieu of the Manager being paid a standard management fee, the Manager may be motivated to operate the Company and the Business Owner, respectively, in a manner to generate more net revenue for distribution to the Manager, to sell the Business earlier to generate proceeds for distribution, or to minimize reserves to the detriment of the Company and its Members.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**Affiliation with Others**

The Manager and its affiliates engage in a broad spectrum of investment activities that are independent from the Company. The Manager and its affiliates have formed and intend to form other entities in which they act or will act as managers, some of which have or may have the same market and same investment objectives as the Company, and own or may own property similar to, and in competition with, the Company. There is no requirement that the Manager or its affiliates bring a particular investment opportunity to the Company before taking that opportunity for their own account or the account of any prior or future investment funds or other investment activities of the Manager or its affiliates or any other persons other than the Company or the Members.

Additionally, the Manager and its affiliates may give or refuse to give prior or future investment funds or other investment activities of the Manager or its affiliates, Members, or any other persons, the opportunity to co-invest in the Business alongside the Company. The terms of any such co-investment shall be set by the Manager on a basis the Manager believes to be fair and reasonable to the Company and may include the payment of fees and profit interests to the Manager or affiliates of the Manager. The Manager, the principals, or any of their respective affiliates, may create and operate one or more investment entities which will invest in the Business Owner in parallel with the Company. The Manager is not obligated to have any of these transactions reviewed and approved by any disinterested persons. By investing in the Company and signing the Operating Agreement, investors are acknowledging and waiving these conflicts of interest.

**Management and Liability**

The Manager and its affiliates believe that they have sufficient staff personnel to be fully capable of discharging their responsibilities to the Company and to any future entities which they may form. The Company will not have independent management, and will rely on the Manager for the operation of the Company. The Manager and its affiliates will devote only so much of their time to the business of the Company as in their judgment is reasonably required. The Manager and its affiliates have conflicts of interest in allocating management time, services, and functions between the Company and these other entities, as well as other business ventures in which the Manager or its affiliates may be involved. Liabilities incurred by the Manager in other ventures could adversely affect its ability to meet its obligations to the Company.

**No Separate Representation**

The Offering Documents are detailed and technical in nature. The law firm engaged by the Manager in connection with the formation of the Company, this Offering, and the preparation of the Offering Documents (the "**Law Firm**") represent the interests solely of the Manager, and will not represent the interests of any investor or Member. No independent counsel has been retained by the Manager or the Members to represent any Member, and the Law Firm disclaims any



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

fiduciary or attorney-client relationship with the Members of the Company. Prospective investors should obtain the advice of their own counsel regarding legal matters. The Law Firm does not investigate or verify the accuracy and completeness of information set forth in this Memorandum concerning the Company, the Manager or any of their respective affiliates, personnel, and prior performance. Although the Manager consults with the Law Firm from time to time, the Law Firm does not undertake to monitor compliance by the Manager and its affiliates with the investment program and other investment guidelines and procedures, and compliance matters set forth in this Memorandum and the Operating Agreement, nor does the Law Firm monitor compliance by the Company, the Manager and/or their affiliates with applicable laws, unless in each case the Law Firm has been specifically retained to do so. In advising as to matters of law (including matters of law described in this Memorandum), the Law Firm has relied, and will rely, upon representations of fact made by the Manager and other persons in this Memorandum and other documents. Such advice may be materially inaccurate or incomplete if any such representations are themselves inaccurate or incomplete, and the Law Firm generally will not undertake independent investigation with regard to such representations.

**Tax Matters**

The Manager will act as "Partnership Representative" in accordance with applicable provisions of the Code and regulations promulgated thereunder pursuant to the terms of the Operating Agreement. Therefore, situations may arise in which the Manager may act on behalf of the Company in administrative and judicial proceedings involving the IRS or other enforcement authorities. Such proceedings may involve or affect other entities for which the Manager or its affiliates act as managers, general partners, or contractors. In such situations, the positions taken by the Manager may have differing effects on the Company and such other entities. Any decisions made by the Manager as the Partnership Representative of the Company will be made in good faith and in a manner the Manager reasonably believes to be in the best interests of the Company and its Members. However, due to differing interests of the Manager and other Members, the decision of the Manager in any audit of the Company by the IRS may be in conflict with the action or decision desired by one or more Members.

**Allocation of Management Resources**

Although the Manager has agreed under the terms of the Operating Agreement to devote time to the business and affairs of the Company, the Manager will also continue to engage in other business activities. The Company will compete with other investment funds managed by the Manager or its affiliates for the time and attention of the Manager. Accordingly, conflicts of interest may arise in the allocation of the Manager's resources between the Company and its other business activities.

**Diverse Members**

The Members may include persons or entities organized in various jurisdictions that may have conflicting investment, tax, and other interests with respect to their investments in the Company. The conflicting interests of individual Members may relate to or arise from, among other things,



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

the nature of the Company's investment strategy, the structure of such investment, and the fact that the Manager or its affiliates have other interests in the Business, as described herein. These factors may result in different returns being realized by different Members. In managing the Company and implementing its investment strategy, the Manager will consider the investment and tax objectives of the Company as a whole, not the investment, tax, or other objectives of any Member individually.

**Limited Fiduciary Duties**

Conflicts may arise between the interests of the Manager and those of the Members. Although the Manager is accountable to the Company as a fiduciary, the Operating Agreement grants the Manager broad discretion as to many matters and limits the Manager's fiduciary duties By investing in the Company and signing the Operating Agreement, each investor acknowledges and consents to the exercise of such discretion, including when the Manager has a conflict of interest.

*[Remainder of page intentionally left blank]*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## RISK FACTORS AND INVESTMENT CONSIDERATIONS

*The purchase of Units is speculative and involves a high degree of risk. Investors will be required to represent that they are familiar with and understand the terms of this Offering, meet certain suitability requirements, and can afford a loss of their entire investment in the Units. In addition to the general investment risk described throughout this Memorandum, prospective investors should carefully consider the risk factors set forth below. Prospective investors should also understand that factors other than those set forth below may ultimately affect their investment in the Units and that the following is just a summary of some, but not all, of the factors that may impact their investment in the Units.*

RISKS RELATING TO THE COMPANY AND THIS OFFERING

### Limited Operating History

The Company was only recently organized and has not any business activity as of the date of this Memorandum. The lack of operating history must be considered in light of the risks and difficulties frequently encountered by new enterprises in their early stages, particularly cryptocurrency investment companies looking to perform in a highly competitive market. The lack of operating history makes the prediction of future results extremely difficult. There can be no assurance that the Company will not incur significant net losses in the future or that it will achieve sufficient revenues to sustain operations or operate profitably.

### Best Efforts

This Offering is being conducted on a “best efforts” basis by the Manager only. No guarantee can be given that all or any of the Units will be sold, or that sufficient proceeds will be available to the Company to successfully implement its investment strategy. The Company is not required to obtain a minimum amount of subscriptions before the Manager holds any closings of this Offering. The Manager may terminate this Offering at any time.

### Concentration; No Diversification

The Company’s sole investment asset is the Company’s interest in the Business Owner, and indirectly through the Business Owner, the Business. Accordingly, the Company’s performance will be limited solely to the success or failure of the Business and any negative issues affecting the Business, or poor investment performance of the Business Owner in general, will significantly affect the total returns achieved by the Company. From an asset allocation standpoint, the Company should not be viewed as a standalone investment that will provide a Member with a diversified portfolio of investments.

### Need for Additional Capital

There can be no assurance of the total amount the Company will raise from this Offering or that additional funds will not be required by the Company or the Business Owner at any time in the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

future or that any funds that may be required will be available, if at all, on acceptable terms. If additional funds are required, the inability of the Company or the Business Owner to raise such funds will have an adverse effect upon the success of the investment strategy. Any debt financing, if available, may involve financial covenants that limit the Company's or Business Owner's operations. There can be no assurance that sufficient financings will be obtained on a timely basis and on terms favorable to the Company and the Members.

**Dilution**

A Member's economic rights are dependent on the relative amount of the Member's capital contributions to the Company in comparison to the other Members' capital contributions to the Company. A Member will likely suffer considerable dilution of its relative investment in the Company as additional Members invest in the Company, which dilution may or may not be based on a total raise of $40 million.

**No Guarantee of Profitability**

The Manager anticipates that returns on the Company's investment in the Business Owner will be sufficient to create net income for distribution by the Company to the Members. However, there can be no assurance that the Business Owner's income or the Company's income will be sufficient for such purpose. Although the Manager believes the investment strategy has economic viability and will generate sufficiently positive returns, it cannot guarantee that the investment strategy will be profitable to the extent anticipated, if at all. Poor performance by the Business could significantly and adversely affect the Company's total returns to Members. In addition, there is no guarantee that distributions by the Business Owner to the Company or by the Company to the Members will be made on a regular basis, if at all. The Manager may choose with respect to the Business Owner or the Company, respectively, not to make a distribution if it believes doing so is in the best interest of the Business Owner or the Company, respectively.

**No Guarantee of Tax Distributions**

The Operating Agreement provides that, to the extent there is available cash for distribution to the Members as determined by the Manager in its sole discretion, the Manager shall use its commercially reasonable efforts to cause the Company to distribute to the Members within 100 days after the end of each fiscal year sufficient cash to pay their respective tax obligations with respect to the taxable net income of the Company allocated to them for such fiscal year. These tax distributions will be applied against the amounts that would otherwise be distributable to the Members. The Manager is not obligated to make these tax distributions, even if there is available cash for distribution and there is no guarantee that they will be in sufficient amounts for the Members to pay their income tax obligations in full.

**No Guaranteed Return of Investor's Capital Contributions**

Investment in the Company is speculative and involves a high degree of risk. There can be no guarantee that an investor will realize a substantial return on its investment in the Units, or any return at all, or that the investor will not lose its entire investment. Each prospective investor



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

should read this Memorandum and the other Offering Documents carefully and should consult with the prospective investor's legal counsel, accountants, or business advisors prior to making any investment decision.

**In-Kind Distributions**

To the extent the Company makes a distribution to Members in the form of cryptocurrencies, neither the Manager nor the Company will be responsible for establishing a "wallet" or storage mechanism for the Members receiving such cryptocurrencies. Distributions will be made in-kind at the Manager's sole discretion. If a Member resides in a jurisdiction where in-kind distributions would impose additional regulatory costs, the Manager may, in its sole discretion and subject to applicable law, liquidate a Member's pro-rata distribution on its behalf. There can be no assurance that the Manager will be able to liquidate assets in a timely manner or that there will be a market available for the disposition of the assets. Accordingly, there may be a delay in the distribution of such proceeds to a Member. Prior to such distribution, a Member's interest in any assets that have not yet been disposed of on its behalf will continue to be subject to gains and losses.

**Governmental Regulation Could Be Costly and Restrictive**

The industry in which the Company will become an active participant may be highly regulated at both state and federal levels, with respect to both its activities as an issuer of securities and its investment in cryptocurrency. The Company and the Business Owner may be subject to governmental regulations in addition to those discussed in this Memorandum, including, but not limited to, those promulgated under and by the Foreign Corrupt Practices Act, the Bank Secrecy Act, the Code and Regulations, the Securities and Exchange Commission, the Federal Trade Commission, the IRS, and the Financial Crimes Enforcement Network. New regulations or regulatory agencies may develop that affect the Company's or the Business Owner's operations and ability to generate revenue. The Company and the Business Owner will attempt to comply with all applicable regulations affecting them, and the market in which they operate. However, such regulation may become overly burdensome and therefore may have a negative effect on their ability to perform as anticipated.

**Dependence on the Manager**

The Company's success will depend in large measure upon the judgment and ability of the Manager, which simultaneously serves as the manager of the Company and the Business Owner. As such, the Manager has broad latitude to manage the Company and the Business Owner and oversee and operate the Business in whatever manner the Manager determines is in the best interests of the Company and the Members, on one hand, and the Business Owner and its members (including the Company), on the other hand. Any and all rights, including voting rights, pertaining to the Company's interest in the Business Owner are vested exclusively in the Company and may be exercised only by the Manager acting in accordance with the terms of the Operating Agreement and any operating agreement of the Business Owner, and no Member either alone or acting with one or more other Members shall have any such rights with respect to the Business Owner, the Business, or the Company's interest therein. Furthermore, the Members

have no right to participate in the management or control of the Company's business or affairs other than to exercise the limited voting rights provided for in the Operating Agreement. Accordingly, an investor should not purchase Units unless the investor is willing to entrust all aspects of the management of the Company, the Business Owner, and the Business to the Manager.

**Conflicts of Interest**

The Company is subject to various conflicts of interest arising out of its relationships with the Manager, the Business Owner, their respective affiliates, and any investment funds or other entities the Manager or its affiliates has invested in or formed in the past or invests in or forms in the future. No agreements or other arrangements, whether between the Company and the Manager, or with other affiliates, were or will be the result of arm's-length negotiations. These conflicts may adversely affect Members where their interests are diverse and may be disparate from the interests of the Company, the Manager, the Business Owner, or their respective affiliates. While the Manager could always choose to utilize an advisory board, the Operating Agreement does not require the Manager to form an advisory board, whether to advise the Manager on transactions that may constitute a conflict of interest or otherwise. (See "CONFLICTS OF INTEREST.")

**Limited Transferability**

The Operating Agreement contains very strict restrictions on the transfer of Units. Units may not be transferred except upon the approval of the Manager. No transferee of any Unit can become a Member without establishing that certain events and conditions are satisfied or have occurred, as detailed in the Operating Agreement. Consequently, it is not anticipated that a public market will develop for the purchase and sale of the Units; therefore, Members may not be able to readily liquidate their investment. Also, the Operating Agreement prohibits a Member from using Units as collateral for a loan and, in any event, Units may not be readily accepted as collateral for a loan. Transferability of the Units is further limited because the Units have not been registered under applicable federal or state securities laws. INVESTORS WHO DO NOT WISH TO REMAIN MEMBERS FOR THE ENTIRE DURATION OF THE COMPANY ARE ADVISED AGAINST INVESTMENT.

**Loss on Dissolution**

In the event of a dissolution of the Company, the proceeds realized from the liquidation of the Company's assets, if any, will be distributed to the Members, but only after the satisfaction of claims of creditors. Accordingly, the ability of a Member to recover all or any portion of the Member's investment in the Units under such circumstances will depend on the amount of funds so realized and claims to be satisfied therefrom.

**Financial Forecasts and Assumptions**



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Financial forecasts, if any, provided by the Manager ("**Financial Forecasts**") are for illustrative purposes only and must not be relied upon by any investor. Financial Forecasts reflect estimates of future operating results developed by the Manager without independent evaluation or analysis, based upon assumptions that may or may not occur and over which the Company will have little or no control, certain of which assumptions are set forth in the notes to the Financial Forecasts. To the extent the assumptions are incomplete or inaccurate, any benefits to the Members may be adversely affected. There can be no assurance that actual events will correspond with these assumptions. Actual results for any period may or may not conform to Financial Forecasts.

**COVID-19 and Similar Pandemics or Emergencies**

As of the date of this Memorandum, there is an outbreak of a novel and highly contagious form of coronavirus ("**COVID-19**"), which the World Health Organization has declared to constitute a "Public Health Emergency of International Concern." The outbreak of COVID-19 has resulted in numerous deaths, adversely impacted global and regional commercial activity, and contributed to significant volatility in the equity investment, energy, and cryptocurrency markets. The locality and scale of the outbreak is rapidly evolving, and many countries, states, and local governments have reacted by instituting (or strongly encouraging) quarantines, prohibitions on travel, the closure of offices, businesses, schools, retail stores, restaurants, hotels, courts, and other public venues, and other restrictive measures designed to help slow the spread of COVID-19. Many businesses are also implementing similar precautionary measures. Such measures, as well as the general uncertainty surrounding the dangers and impact of COVID-19, are creating significant disruptions in supply chains and economic activity, are having particularly adverse effects on governmental operations, employment, and the real estate, retail, transportation, logistics, and construction industries, and are contributing to a severe economic recession. If COVID-19 continues to spread or fails to recede, governments and businesses may take increasingly aggressive or prolonged measures. For this reason, the potential impacts of the COVID-19 outbreak are increasingly uncertain and difficult to project or otherwise assess.

These potential impacts of COVID-19, as well as the potential impacts of any other public health emergencies, including SARS, H1N1/09 flu, avian flu, other coronaviruses, Ebola or other existing or new epidemic diseases, or the threat thereof, could have significant adverse effects on the Company and the Company's ability to successfully implement its investment strategy. The extent of such effects will depend on many factors, including the duration and scope of COVID-19 or such other public health emergency, the extent of any related travel advisories and restrictions implemented, the impact of COVID-19 or such other public health emergency on overall supply and demand, goods and services, employment, access to capital, investor liquidity, currency market volatility, consumer confidence and spending levels, and levels of economic activity, and the extent of the disruption to important global, regional, and local supply chains and economic markets, all of which are highly uncertain and cannot be predicted. Such effects may materially and adversely impact the operation of the Business by, for example, limiting or closing its operations due to outbreaks or loss or disruption of power or causing other issues, which in turn would adversely affect the value and performance of the Business Owner, and the Company's ability to successfully implement its investment strategy, all of which could result in



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

significant losses to the Company. In addition, the operations of the Company, the Manager, or the Business Owner may be significantly impacted, or even temporarily or permanently halted, as a result of government quarantine measures, voluntary and precautionary restrictions on travel or meetings and other factors related to COVID-19 or such other public health emergency, including its potential adverse effect on the health of the personnel of any such entity or the personnel of any such entity's key service providers.

**Risk of Litigation**

The Company's investment activities will subject it to the risks of becoming involved in litigation by third parties. Any amounts payable by the Company with respect to such litigation (or similar proceedings) would be borne by the Company and would reduce amounts that would otherwise be distributable to the Members. The Manager and its affiliates will be indemnified by the Company in connection with such litigation, subject to certain conditions. Litigation involving the Business Owner may also adversely affect the Company's return on its investment.

**Recourse to the Company's Assets**

The Company's assets may be required to be available to satisfy all liabilities and other obligations of the Company in certain circumstances. While the Company's interest in the Business Owner may benefit from limited liability protections, no such protections are guaranteed.

RISKS RELATING TO CRYPTOCURRENCY

**Cryptocurrency regulation is in its infancy and future regulatory change is unpredictable**

As cryptocurrencies have grown in popularity and market size, the U.S. Congress and a number of U.S. federal and state agencies have begun to develop regulations governing the cryptocurrency industry. Regulators are concerned such a large unregulated person to person global economy could potentially enable criminals to evade taxes and lauder money. To the extent that future regulatory actions or policies limit the ability to exchange cryptocurrencies or utilize them for payments, the demand for cryptocurrencies will be reduced. Furthermore, regulatory actions may limit the ability of end-users to convert cryptocurrencies into fiat currency (e.g., USD) or use cryptocurrencies to pay for goods and services. Such regulatory actions or policies would result in a reduction of demand, and in turn, a decline in the underlying cryptocurrency unit prices. Several state and federal regulators in the U.S. have asserted jurisdiction over the regulation of cryptocurrencies.

The SEC and its Chairman have issued several public statements on cryptocurrencies and initial coin offerings. Among other things, the SEC indicated many cryptocurrencies will be deemed securities and subject to the federal securities laws. Other agencies and their respective heads have also issued statements asserting jurisdiction over cryptocurrencies including the Commodities Futures Trading Commission, the Financial Crimes Enforcement Network, various state regulators, and private exchanges and self-regulatory bodies.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

There is substantial uncertainty regarding the classification of certain cryptocurrencies and various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect cryptocurrencies, and their users. Such laws, regulations or directives may conflict with those of the United States and may negatively impact the acceptance of cryptocurrencies by users, merchants and service providers outside the United States and may therefore impede the growth or sustainability of the cryptocurrency economy in the European Union, China, Japan, Russia and the United States and globally, or otherwise negatively affect the value of cryptocurrencies. For example, on October 10, 2017, Russia's President Vladimir Putin denounced cryptocurrency as risky and used by criminals, and Russia's central bank stated that it would support regulation of cryptocurrencies. South Korea announced the ban of all initial coin offerings on October 2, 2017 citing consumer fraud as one reason. On September 4, 2017, China's central bank banned initial coin offerings and subsequently, banned all cryptocurrency exchanges from operating within the country.

The effect of any future regulatory change on the Company and the Business Owner, or cryptocurrencies in general, is impossible to predict, but such change could be substantial and adverse to the Company and the Business Owner and the value of their investment in cryptocurrencies.

**The long-term viability of cryptocurrencies is unknown**

Cryptocurrencies are a new and relatively untested product. There is considerable uncertainty about their long-term viability, which could be affected by a variety of factors, including many market-based factors such as economic growth, inflation, and others. In addition, the success of cryptocurrencies will depend on the long-term utility and economic viability of blockchain and other new technologies related to cryptocurrencies. Due in part to these uncertainties, the price of cryptocurrencies is volatile, and cryptocurrencies may be hard to sell. The Company, the Manager, and the Business Owner do not control any of these factors, and therefore may not be able to control the ability of any cryptocurrency to maintain its value.

The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a high degree of uncertainty. The factors affecting the further development of this industry, include:

- continued worldwide growth in the adoption and use of cryptocurrencies;
- general economic conditions, as well as government and quasi-government regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of cryptocurrency trading systems;
- changes in consumer demographics and public preferences;
- the availability and popularity of other forms or methods of buying and selling goods and
  services, including new means of using government-issued currencies; and



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

- negative consumer sentiment and perception of cryptocurrencies.

Recently, cryptocurrencies and their infrastructure and markets have been subject to increased regulation and negative public attention. For example, various media social media and internet service providers have limited the availability to market cryptocurrency related advertising.

**The cryptocurrency market could be in a bubble**

The market prices of Bitcoin, Ether, and certain other broad-based cryptocurrencies have been subject to extreme fluctuations and recently have appreciated and declined in value rapidly. For example, the initial price of Bitcoin, set in 2010, was one cent.

**Cryptocurrencies are subject to volatile price fluctuations**

Prices of cryptocurrencies have fluctuated widely for a variety of reasons including uncertainties in government regulation and may continue to experience significant price fluctuations. Some market participants believe that there is a cryptocurrency speculative bubble and various factors could affect the price of cryptocurrencies:

- Total cryptocurrencies in existence;
- Global cryptocurrency supply and demand;
- Investors' expectations with respect to the rate of inflation of fiat currencies;
- Currency exchange rates;
- Interest rates;
- Cryptocurrency market fragmentation and consolidation;
- Fiat currency withdrawal and deposit policies of cryptocurrency exchanges and liquidity of such exchanges;
- Interruptions in service from or failure of major cryptocurrency exchanges;
- Cyber theft of cryptocurrencies from online cryptocurrency wallet providers, or news of such theft from such providers, or theft from individual cryptocurrency wallets;
- Investment and trading activities of hedge funds and other large cryptocurrency investors;
- Monetary policies of governments, trade restrictions, currency devaluations and revaluations;
- Regulatory measures, if any, that restrict or facilitate the ability to buy, sell or hold cryptocurrencies or use cryptocurrencies as a form of payment;

- Availability and popularity of businesses that provide cryptocurrency-related services;
- Maintenance and development of the open-source software protocol of the cryptocurrency network;
- Increased competition from other forms of cryptocurrency or payments services; and
- Global or regional political, economic, or financial events and uncertainty.

If cryptocurrency markets continue to be subject to sharp fluctuations, the Members may experience losses as the value of the Company's investment in the Business Owner and the Business Owner's investment in the Business decline. Even if Members are able to hold their Units and the Company is able to hold its interest in the Business for the long-term, their Units may never generate a profit, since cryptocurrency markets have historically experienced extended periods of flat or declining prices, in addition to sharp fluctuations. In addition, investors should be aware that there is no assurance that cryptocurrencies will maintain their long-term value in terms of future purchasing power.

There exists shallow trade volume, extreme hoarding, low liquidity, and high bankruptcy risk in the market for cryptocurrencies.

The market for cryptocurrencies, by trade volume, is very shallow. The majority of cryptocurrencies is hoarded by a few owners or is out of circulation. Ownership concentration is high which creates greater market liquidity risk as large blocks of cryptocurrencies are difficult to sell in a timely and market efficient manner and well-connected customers can gain preferential treatment in order execution. The daily trade volume of cryptocurrencies is only a small fraction of total cryptocurrencies mined. The lack of a robust and regulated derivatives market for cryptocurrencies means that market participants do not have a broad basket of tools at their disposal, making hedging difficult and keeping away many market makers that provide significant liquidity to traditional capital markets. The cryptocurrency market currently lacks institutional- grade infrastructure participants which would help stabilize the market.

**Cryptocurrencies can be subject to permanent loss due to unsecure local storage sites, malware, and data loss**

Similar to fiat currencies, cryptocurrencies are susceptible to theft, loss, and destruction. Destruction of the physical media housing a cryptocurrency can result in a total and permanent loss of the cryptocurrency from the market. While traditional financial products have strong consumer protections, there is no intermediary that can limit consumer loss in connection with cryptocurrencies.

**Certain cryptocurrencies may rely on a public or third-party blockchain and the success of such blockchain may have a direct impact on the success of the Company's investment strategy**

Some cryptocurrencies are built on existing third-party blockchains and are partly dependent on the effectiveness and success of such blockchains, as well as the success of other blockchain and

decentralized data storage systems that are being used by the issuer of the cryptocurrencies. There is no guarantee that any of these systems or their sponsors will continue to exist or be successful. This could lead to disruptions of the operations of the Business Owner and could negatively affect the Company's investment strategy.

**Cryptocurrencies may be negatively affected by technological advances that undermine the cryptographic consensus mechanism underpinning blockchain and distributed ledger protocols**

Advances in cryptography or technical advances such as the development of quantum computing could present risks to the viability of cryptocurrencies by undermining or vitiating the cryptographic consensus mechanism that underpins blockchain and distributed ledger protocols. Similarly, legislatures and regulatory agencies could prohibit the use of current and/or future cryptographic protocols which could limit the use of cryptocurrencies, resulting in a significant loss of value of the Company's interest in the Business Owner or the Units.

**The value of cryptocurrencies may be subject to momentum pricing and therefore, an inaccurate valuation**

Momentum pricing typically is associated with growth stocks and other assets whose valuation, as determined by the investing public, accounts for anticipated future appreciation in value. The price of a cryptocurrency is determined primarily using data from various currency exchanges, over-the-counter markets, and derivative platforms. Momentum pricing of cryptocurrencies has resulted, and may continue to result, in speculation regarding future appreciation in the value of cryptocurrencies, inflating and making more volatile the price of such cryptocurrencies. Cryptocurrencies that lead the market are subject to even more speculation.

**The value of cryptocurrencies is dependent, directly, or indirectly, on prices established by cryptocurrency exchanges and other cryptocurrency trading venues, which are new and, in most cases, largely unregulated**

Cryptocurrency exchanges and other trading venues on which cryptocurrencies trade are relatively new and, in most cases, largely unregulated and may therefore be more exposed to fraud and failure than established, regulated exchanges for securities, derivatives and other currencies. Much of the daily trading volume of cryptocurrencies is conducted on poorly capitalized, unregulated, unaudited, and unaccountable exchanges located outside of the United States where there is little to no regulation governing trading. Such exchanges may engage in unethical practices that may have a significant impact on cryptocurrency pricing, such as front-running, wash trades and trading with insufficient funds. To the extent that the cryptocurrency exchanges or other cryptocurrency trading venues are involved in fraud or experience security failures or other operational issues, this could result in a reduction in the cryptocurrency market prices and adversely affect the Company's investment strategy. The SEC,



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

in March 2017, stated that cryptocurrency exchanges currently lack the ability to enter into surveillance-sharing agreements with significant, regulated markets for trading in cryptocurrencies thereby lacking the ability to detect and deter price manipulation. Although there has been improvement on this front with the self-certification of certain Bitcoin futures contracts resulting in information sharing agreements between certain futures markets and several cryptocurrency exchanges, regulators still lack the ability to surveil many cryptocurrency exchanges. In addition, users transacting on cryptocurrency trading platforms do not receive many of the market protections that they would when transacting through broker-dealers on registered securities exchanges or alternative trading systems, such as best execution, prohibitions on front running, short sale restrictions, and custody and capital requirements.

During the past few years, a number of cryptocurrency exchanges have been closed due to fraud, business failure or security breaches. In many of these instances, the customers of the closed cryptocurrency exchanges were not compensated or made whole for the partial or complete losses of their account balances in such cryptocurrency exchanges.

Cryptocurrency prices on public cryptocurrency exchanges have been volatile and subject to influence by many factors including the levels of liquidity on the exchanges specifically and on the cryptocurrency exchange market generally. Even the largest exchanges have been subject to operational interruption (e.g., thefts of cryptocurrencies from operational or “hot” wallets, suspension of trading on exchanges due to distributed denial of service attacks by hackers and/or malware and bankruptcy proceedings or cessation of services by exchanges), limiting the liquidity of cryptocurrencies on the affected cryptocurrency exchange and resulting in volatile prices and a reduction in confidence in the cryptocurrency exchange market generally. The price of cryptocurrencies on public exchanges may also be impacted by policies on or interruptions in the deposit or withdrawal of fiat currency into or out of larger cryptocurrency exchanges.

On large cryptocurrency exchanges, users may buy or sell cryptocurrencies for fiat currency or transfer cryptocurrencies to other wallets. Operational limits (including regulatory, exchange policy or technical or operational limits) on the size or settlement speed of fiat currency deposits by users into cryptocurrency exchanges may, (1) reduce demand on such exchanges, resulting in a reduction in the cryptocurrency price on such exchange or (2) reduce supply on such exchanges, potentially resulting in a temporary increase in the cryptocurrency price on such exchange during the existence of such operational limits. To the extent that fees for the transfer of cryptocurrencies either directly or indirectly occur between cryptocurrency exchanges, the impact on cryptocurrency prices of operation limits on fiat currency deposits and withdrawals may be reduced by “exchange shopping” among cryptocurrency exchange users. For example, a delay in U.S. Dollar withdrawals on one site may temporarily increase the price on such site by reducing supply (i.e., sellers transferring cryptocurrencies to another exchange without operational limits in order to settle sales more rapidly), but the resulting increase in price will also reduce demand because bidders on cryptocurrencies will follow increased supply on other cryptocurrency exchanges not experiencing operational limits. To the extent that users are able or willing to utilize or arbitrage prices between more than one cryptocurrency exchange, exchange shopping may mitigate the short term impact on and volatility of cryptocurrency prices due to operational limits on the deposit or withdrawal of fiat currency into or out of larger



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

cryptocurrency exchanges.

The Business Owner is designed to have limited exposure to individual trading venue interruptions by using multiple data sources and liquidity providers. Despite efforts to ensure accurate pricing, the Business Owner, and the price of cryptocurrencies generally, remains subject to volatility experienced by the cryptocurrency exchanges and other cryptocurrency trading venues. Such volatility can adversely affect the Company's investment strategy. The value of cryptocurrencies is also dependent on the availability of exchanges on which to buy and sell such assets. If exchanges for cryptocurrencies became increasingly sparse, then there would be a material adverse impact on the value of cryptocurrencies and, therefore, the Company's investment strategy.

**Cryptocurrencies have vulnerabilities which may adversely affect their value**

Instability in the cryptocurrency exchange market and the closure or temporary shutdown of cryptocurrency exchanges due to fraud, business failure, hackers, malware, or government-mandated regulation may reduce confidence in the cryptocurrency exchange market and result in greater volatility in cryptocurrency prices.

**Banks may not provide banking services, or may cut off banking services, to businesses that provide cryptocurrency-related services or that accept cryptocurrencies as payment**

The inability or difficulty of securing banking services could damage the public perception of cryptocurrencies and the utility of cryptocurrencies as a payment system. It could also decrease the price of cryptocurrencies and adversely affect the Company's investment strategy.

A number of companies that provide cryptocurrency-related services have been unable to find banks that are willing to provide them with bank accounts and banking services. Similarly, a number of such companies have had their existing bank accounts closed by their banks. Banks may refuse to provide bank accounts and other banking services to cryptocurrency-related companies or companies that accept cryptocurrencies for a number of reasons, such as perceived compliance risks or costs. If the Company or the Business Owner is unable to secure bank accounts or banking services, it could have a material adverse effect on their respective operations and, accordingly, the Company's investment strategy.

**The impact of geopolitical events on the supply and demand for cryptocurrencies is uncertain**

As an alternative to fiat currencies that are backed by central governments, digital assets such as cryptocurrencies, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political, or economic crises may motivate large-scale acquisitions or sales of cryptocurrencies either globally or locally. Large- scale sales of cryptocurrencies would result in a reduction in the value of cryptocurrencies and adversely affect the Company's investment



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

strategy.

**The further development and acceptance of the cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies, which represents a new and rapidly changing industry, is subject to a variety of factors that are difficult to evaluate**

The use of cryptocurrencies to, among other things, buy and sell goods and services, is part of a new and rapidly evolving industry that employs digital assets based upon a computer-generated mathematical and/or cryptographic protocol. The growth of this industry in general, and the use of cryptocurrencies in particular, are subject to a high degree of uncertainty. The factors affecting the further development of the industry, include, but are not limited to:

- Continued worldwide growth in the adoption and use of cryptocurrencies;
- Governmental and quasi-governmental regulation of cryptocurrencies and other digital assets and their use, or restrictions on or regulation of access to and operation of cryptocurrency exchanges or similar digital asset trading venues;
- Changes in consumer demographics and public tastes and preferences;
- The maintenance and development of the open-source software protocol of cryptocurrency exchanges;
- The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- General economic conditions and the regulatory environment relating to digital assets;
- Negative consumer sentiment and perception of cryptocurrencies generally; and
- The slowing or stopping of the development or acceptance of these protocols may adversely affect the Company's investment strategy.

**The Business requires a tremendous amount of energy and there can be no guaranty that such energy will be available at an affordable price and on a continuous basis**

The Business involves a substantial bitcoin mining business that requires a tremendous amount of energy. It is possible that such rising energy costs or the loss or interruption of energy, whether due to climate change, pandemic, increased demand, infrastructure instability, governmental regulation, or otherwise, will adversely affect the Business and, in turn, negatively impact the success of the Business and the net income generated therefrom. The Company's investment strategy is uniquely susceptible to risks relating to the energy markets.

<u>OTHER RISKS</u>

**U.S. Securities Laws**

The Units will not be registered under the Securities Act or any state securities laws pursuant to an exemption from the registration requirements of the Securities Act and such state securities laws. Each investor must furnish certain information to the Manager and represent, among other customary private placement representations, that it is acquiring Units for investment purposes and not with a view towards resale or distribution.

Additionally, the Securities Act and state securities laws impose certain restrictions upon the ability of Members to transfer the Units because, at the time of their issuance to the Members, they were not registered securities. The Units may not be offered, sold, transferred, or delivered, directly or indirectly, unless (i) they are registered under the Securities Act and applicable state securities laws, or (ii) an exemption from registration under the Securities Act and applicable state securities laws is available. Moreover, there will be no liquid, public market for the Units, and none is expected to develop.

Further, Units may not be offered, sold, transferred, assigned, or delivered, directly or indirectly, to any "Unacceptable Investor." An Unacceptable Investor means any person who is known to be a:

(a) person or entity who is a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the United States Treasury Department, 31 C.F.R. Subtitle B, Chapter V, as amended;

(b) person acting on behalf of, or an entity owned or controlled by, any government against whom the United States maintains economic sanctions or embargoes under the Regulations of the United States Treasury Department, 31 C.F.R. Subtitle B, Chapter V, as amended, including but not limited to the "Government of Sudan," the "Government of Iran," the "Government of Cuba," the "Government of Syria," and the "Government of Burma"; or

(c) person or entity subject to additional restrictions imposed by the following statutes, or regulations and Executive Orders issued thereunder: the Trading with the Enemy Act, 12 U.S.C. §§ 95a–95b and 50 U.S.C. App. §§ 1–44; the Iraq Sanctions Act, Pub. L. 101-513, Title V, §§ 586 to 586J, 104 Stat. 2047; the National Emergencies Act, 50 U.S.C. § 1601 et seq.; the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214, 1319; the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the United Nations Participation Act, 22 U.S.C. § 287c; the International Security and Development Cooperation Act, 22 U.S.C. § 2349aa-9; the Nuclear Proliferation Prevention Act of 1994, Pub. L. 103-236, 108 Stat. 507; the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 et seq.; the Iran and Libya Sanctions Act of 1996, Pub. L. 104-172, 110 Stat. 1541; the Cuban Democracy Act, 22 U.S.C. § 6001 et seq.; the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §§ 6021-91; the Foreign Operations, Export Financing and Related

Programs Appropriations Act of 1997, Pub. L. 104-208, 110 Stat. 3009; or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified, or reviewed from time to time.

In the event of a registered public offering of the Units in the U.S., the Company would become subject to the reporting obligations under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). Under such circumstances, a Member that owns more than 5% of the Company's outstanding Units may be obligated to make certain information filings with the Securities and Exchange Commission pursuant to the Exchange Act. Each prospective investor considering an investment in the Units is advised to consult with its own legal advisor regarding the securities law consequences of ownership of Units if the Units become subject to the Exchange Act.

**Possibility of Losing Registration Exemption**

The Company has not caused the Units to be registered with the Securities and Exchange Commission under the Securities Act, but is offering the Units for sale pursuant to an exemption available under Section 4(a)(2) of the Securities Act and Rule 506(b) of Regulation D promulgated by the Securities and Exchange Commission thereunder. There are a number of technical requirements that must be satisfied for an issuer to rely upon Rule 506(b) of Regulation D, including that the Units be sold only to accredited investors or up to 35 non-accredited investors that alone, or together with their purchaser representatives, have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of a purchase of Units. Investors must also have a substantive, preexisting busines relationship with the Company, the Manager, or a member of the Manager, or any affiliate of the foregoing, its officers, or control persons. There is the possibility that the Company may not satisfy all of the technical requirements of Regulation D, thereby losing its right to rely upon the safe harbor contained in that regulation, or that the Company may conduct this Offering in a way that does not otherwise qualify for the private placement exemption in Section 4(a)(2). Were the Company to offer the Units in a way not exempt from the registration requirements under the Securities Act or similar exemptions under applicable state securities laws, investors may have claims against the Company for a total refund of their subscriptions, together with interest at statutory rates, and claims for attorneys' fees. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the economic demands of the claimants.

**Compliance with Anti-Money Laundering Requirements**

The Company may be subject to certain provisions of the USA PATRIOT Act of 2001 (the "**Patriot Act**"), including, but not limited to, Title III thereof, the International Money Laundering and Abatement and Anti-Terrorist Financing Act of 2001 ("**Title III**"); certain regulatory and legal requirements imposed or enforced by the Office of Foreign Assets Control ("**OFAC**"); and other similar laws of the United States. In response to increased regulatory concerns with respect to the sources of the Company's capital used in investments and other activities, the Manager may request that investors provide additional documentation verifying, among other things, such investor's identity and source of funds to be used to purchase Units.

The Manager may decline to accept a subscription from an investor if this information is not provided or on the basis of the information that is provided. Requests for documentation and additional information may be made at any time during which a Member holds Units. The Manager may be required to report this information, or report the failure to comply with such requests for information, to appropriate governmental authorities, in certain circumstances without informing a Member that such information has been reported. The Manager will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives, or special measures, including, but not limited to, those imposed or enforced by OFAC, the Patriot Act, and Title III. Governmental authorities are continuing to consider appropriate measures to implement anti-money laundering laws, and at this point it is unclear what steps the Manager may be required to take; however, these steps may include prohibiting a Member from making further capital contributions to the Company, depositing distributions to which such Member would otherwise be entitled into an escrow account, or causing the withdrawal of such Member from the Company.

**Absence of Regulatory Oversight**

The Company intends to be exempt from regulation under the Investment Company Act of 1940 (the "**Company Act**") pursuant Section 3(c)(1) of the Company Act, which exempts issuers whose outstanding securities are beneficially owned by not more than 99 beneficial owners. With respect to the determination of beneficial ownership and accredited investor status and other qualifications of purchasers of Units the Company deems appropriate, the Company will obtain appropriate representations and undertakings from purchasers in order to ensure that such purchasers meet the conditions of the exemption on an ongoing basis. Accordingly, Members will not be afforded the protections offered by the Company Act.

The Manager will not be registered as an investment adviser under the Investment Advisers Act of 1940 (the "**Advisers Act**") based on its limited amount of assets under management. By virtue of being exempt from registration, the Manager will not be subject to the performance fee restrictions and other provisions contained in the Advisers Act. The Manager is not a Securities and Exchange Commission or state-registered investment adviser, and the Company will not be an investment advisory client of the Manager. Accordingly, neither the Company nor any of the Members will be afforded the protections of the Advisers Act.

**Compliance with New Regulations**

The U.S., state, and foreign governments have taken or are considering extraordinary actions in an attempt to address real or perceived underlying causes of financial crisis and fraud and to prevent or mitigate the recurrence. It is unforeseeable whether there will be additional proposed laws or reforms that would affect the U.S. financial system, financial institutions, or cryptocurrencies; whether or when such changes may be adopted; how such changes may be interpreted and enforced; or how such changes may affect the Company.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Other laws, regulations, and programs at the federal, state, and local levels that are under consideration seek to address the economic climate and cryptocurrency and other markets and to impose new regulations on various participants in the financial system. It is unforeseeable the effect that these or other actions will have on the Company's business, results of operations and financial condition. Further, the failure of these or other actions and the financial stability plan to stabilize the economy could harm the Company's business, results of operations, and financial condition.

**Certain Considerations for Employee Benefit Plans and Individual Retirement Plans**

The following discussion is a summary of certain considerations associated with an investment in the Units by an "employee benefit plan" that is subject to Part 4 of Title I of the Employee Retirement Investment Security Act of 1974, as amended ("**ERISA**") (such as a pension, profit-sharing or other plan that is qualified under Section 401(a) of the Code), or by a "plan" that is subject to Section 4975 of the Code (such as a qualified tax-deferred annuity plan, an individual retirement account or an individual retirement annuity) (each such plan, a "**Benefit Plan**"). This summary is general in nature and does not address every ERISA or other issue that may be applicable to the Company or a particular investor, and does not constitute (and should not be construed as) legal advice or a legal opinion. This summary is based on the provisions of ERISA, the Code, judicial decisions, and tax and United States Department of Labor regulations and rulings in existence as of the date hereof. Future legislative, administrative, or judicial action could significantly modify the information summarized herein. Any such changes may be retroactive and thereby apply to transactions entered into before the date of their enactment or release, and neither the Manager nor the Company assumes any responsibility to notify Members of any such actual or potential changes. A fiduciary considering investing assets of a Benefit Plan in the Units should consult with its legal advisor about ERISA, fiduciary, and other legal considerations before making such an investment.

*General*

ERISA and the Code impose certain duties on persons who are fiduciaries of Benefit Plans and prohibit the use of "plan assets" for the benefit of the fiduciary and certain transactions involving "plan assets" between the Benefit Plan and "parties in interest" or "disqualified persons," as those terms are defined in ERISA and the Code, respectively. In evaluating whether to invest the assets of a Benefit Plan in the Units, a fiduciary should consider, among other things: (i) whether the fiduciary has the authority to make the investment under the Benefit Plan's investment policies and governing instruments and under Title I of ERISA; (ii) whether the investment is consistent with the fiduciary's responsibilities and satisfies the requirements outlined in Part 4 of Subtitle B of Title I of ERISA (if applicable), in particular the requirements relating to prudence, diversification and delegation of control over "plan assets"; (iii) whether the investment could constitute or give rise to a violation of the prohibited transaction provisions in Section 406 of ERISA or Section 4975 of the Code; (iv) whether the investment will provide sufficient liquidity to permit benefit payments to be made as they become due, particularly because an investment in the Units will be illiquid and there are significant limitations on the marketability of the Units; (v) any requirement (such as that contained in Section 103(b)(3) of ERISA) that the Benefit Plan

be valued annually at fair market value, because there will be no public market for the Units and no annual appraisals of such Units; and (vi) other provisions in ERISA dealing with "plan assets." "IRA" means an individual retirement account as defined in Section 408 of the Code. "Individual Retirement Plan" is defined under Section 7701(a)(37) of the Code and includes an individual retirement account under Section 408(a) of the Code, an individual retirement annuity under Section 408(b) of the Code, or a ROTH IRA under 408A(b) of the Code. Because an Individual Retirement Plan is not established or maintained by an employer, Individual Retirement Plans are not subject to Subtitle A and Parts 1 and 4 of Subtitle B of Title I of ERISA or the related responsibilities, except the prohibited transaction provisions in Section 4975 of the Code, described above.

Neither ERISA nor the Code specifically defines the term "plan assets." However, pursuant to United States Department of Labor regulation 29 C.F.R. § 2510.3 101, as modified by Section 3(42) of ERISA (the "**Plan Asset Regulation**"), the assets of an entity in which a Benefit Plan acquires an equity interest will be deemed to be "plan assets" under certain circumstances. The Plan Asset Regulation generally provides that when a Benefit Plan acquires an equity interest in an entity that is neither a "publicly offered security," as defined in the Plan Asset Regulation, nor a security issued by an investment company registered under the Company Act, the Benefit Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless, among other exceptions not relevant here, it is established that equity participation in the entity by Benefit Plan investors is not significant to this Offering or that the entity is an "operating company," in each case as defined in the Plan Asset Regulation. The Units will be considered to be an equity interest that is neither a publicly offered security nor a security issued by an investment company registered under the Company Act for purposes of the Plan Asset Regulation.

For purposes of the Plan Asset Regulation, equity participation in the Company by Benefit Plan investors will not be considered "significant" so long as in the aggregate Benefit Plan investors hold less than 25% of the value of each class of equity interests in the Company. For purposes of making this determination, the value of any equity interests held by the Manager and any other person (other than a Benefit Plan investor) who has discretionary authority or control with respect to the assets of the Company or who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of any such person, must be disregarded. The equity interests of foreign employee benefit plans, governmental plans and church plans also do not count when making this determination. The term "Benefit Plan investor" includes any Benefit Plan as well as any entity whose underlying assets include the assets of a Benefit Plan investor by reason of a Benefit Plan investor's investment in that entity.

If the assets of the Company are deemed to be "plan assets" of Benefit Plans that invest in the Company (whether as a result of the application of the Plan Asset Regulation or otherwise), then Subtitle A and Parts 1 and 4 of Subtitle B of Title I of ERISA and Section 4975 of the Code will apply to the investments made by the Company. If the only Benefit Plan investors in the Company are Individual Retirement Plans, and the assets of the Company are deemed to be plan assets, only Section 4975 of the Code will apply to the investments made by the Company. If there are Benefit Plan investors other than Individual Retirement Plans and the assets of the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Company are deemed to be plan assets, this will result in, among other things, (i) the Manager becoming a fiduciary of the Benefit Plans and subject to the bonding requirements of ERISA; (ii) the application of ERISA's prudence and other fiduciary standards (which impose liability on Benefit Plan fiduciaries) to investments made by the Company, which could materially affect the operation of the Company; (iii) the application of the disclosure obligations under Section 408(b)(2) of ERISA; (iv) potential co-fiduciary liability of persons having investment discretion over the assets of Benefit Plans that invest in the Company, should any investments made by the Company not conform to ERISA's prudence and fiduciary standards under Part 4 of Subtitle B of Title I of ERISA; and (v) the possibility that certain transactions that the Company might enter into in the ordinary course of its business and operation (e.g., transactions between the Company and the Manager (or its affiliates) or transactions between the Company and any parties in interest or disqualified persons with respect to any Benefit Plan that is a Member) could constitute "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code. A prohibited transaction, in addition to imposing potential personal liability on the fiduciaries of Benefit Plans, may also result in the imposition of a civil penalty under ERISA or an excise tax under the Code on parties in interest or disqualified persons with respect to the Benefit Plans. In addition, if the Benefit Plan involved in a "prohibited transaction" is an IRA", the IRA would lose its tax-exempt status. Since the Manager is not a registered investment advisor, other fiduciaries of the Benefit Plan would not be protected by the "investment manager" rule under Section 405(d) of ERISA with respect to the investment decisions made by the Manager (in its capacity as the manager of the Company).

There is little authority regarding the application of ERISA and the Plan Asset Regulation to entities such as the Company, and there can be no assurance that the United States Department of Labor or the courts would not take a position or promulgate additional rules or regulations that could significantly impact the "plan asset" status of the Company.

The Manager does not intend to manage the assets of the Company as though the assets were "plan assets" of Benefit Plan investors unless participation by Benefit Plan investors in the Company is limited to Individual Retirement Plans. It is the intent of the Manager to monitor the investments in the Company and take actions to ensure that less than 25% of the Units are held by Benefit Plan investors, unless participation by Benefit Plan investors in the Company is limited to Individual Retirement Plans. The Manager reserves the right to reject subscriptions in whole or in part for any reason, including that the Member is a Benefit Plan investor. In the event the Manager elects to limit investment in the Company by Benefit Plan investors, the Manager may have the authority to restrict transfers or redemptions of Units, and may require a full or partial withdrawal of any Benefit Plan investor to the extent it deems appropriate to avoid having the assets of the Company be deemed to be plan assets of any Benefit Plan investor. A Benefit Plan investor may, in the discretion of the Manager, be permitted or required to withdraw from the Company if it is determined by such Member, the Manager, the United States Department of Labor, the IRS or a court of competent jurisdiction that (i) such Benefit Plan's continued status as a Member or the conduct of the Company will result, or there is a material likelihood that such continuation or conduct will result, in a material violation of ERISA or Section 4975 of the Code, or (ii) all or a portion of the Company's assets constitute "plan assets" of such Benefit Plan.

*Governmental Plans*

Government-sponsored plans are not subject to the fiduciary provisions of ERISA and are also not subject to the prohibited transaction provisions under Section 4975 of the Code. However, federal, state, or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above, and may include other limitations on permissible investments. Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to investments in the Company, as well as the general fiduciary considerations discussed above.

The fiduciary of each prospective governmental plan Member will be required to represent and warrant that investment in the Company is permissible, complies in all respects with applicable law and has been duly authorized.

*Representations by Benefit Plans*

A Benefit Plan proposing to invest in the Company will be required to represent that it is, and that any fiduciaries responsible for the Benefit Plan's investments are:

- Aware of and understand the Company's investment objective, policies, and strategies, and responsible for exercising independent judgment in evaluating the Benefit Plan's purchase, holding and disposition of equity interests in the Company;

- Making the decision to invest plan assets in the Company with appropriate consideration of relevant investment factors with regard to the Benefit Plan, and the decision is consistent with the applicable duties and responsibilities imposed by law with regard to the Benefit Plan's investment decisions;

- Independent of the Manager and any affiliate of the Manager;

- Capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies of the Company, including the Benefit Plan investor's purchase of Units; and

- Understanding that neither the Company nor the Manager, nor any director, officer, member, partner, principal, or affiliate of the Company or the Manager, is by having made any oral or written statement prior to the date hereof, or by making any future written or oral statement regarding the Company, undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Benefit Plan investor's purchase, holding or disposition of Units.

Unless participation by Benefit Plan investors in the Company is limited to Individual Retirement Plans, it is intended that the assets of the Company will not be considered plan assets



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

of any Benefit Plan or be subject to any fiduciary or investment restrictions that may exist under ERISA or the Code specifically applicable to such Benefit Plans. Each Benefit Plan will be required to acknowledge and agree in connection with its investment in Units to the foregoing status of the Company and the Manager and that there is no rule, regulation or requirement applicable to the Manager that is inconsistent with the foregoing description of the Company and the Manager.

Whether or not the underlying assets of the Company are deemed "plan assets" under ERISA, an investment in the Company by a Benefit Plan, other than an Individual Retirement Plan, is subject to ERISA. Accordingly, before purchasing Units, any fiduciary of a Benefit Plan should consult with its legal advisor concerning the ERISA considerations discussed above and any other ERISA-related matters.

*Prohibited Transactions*

The Manager shall not accept subscriptions for Units from ERISA, employer-sponsored IRA or other Benefit Plan investors unless, immediately after any such Units are sold, all Benefit Plan investors will hold in the aggregate less than 25% of the total outstanding Units of the Company. If the only Benefit Plan Investors in the Company are Individual Retirement Plan, then the Manager may accept subscriptions from additional Individual Retirement Plan Investors in excess of the 25% threshold.

Any investor that invests funds belonging to a Benefit Plan should carefully review the tax risks of provisions of this Memorandum, as well as consult with its own tax advisors. The contents hereof are not to be construed as tax, legal, or investment advice

PROSPECTIVE BENEFIT PLAN INVESTORS ARE URGED TO CONSULT THEIR ERISA ADVISORS WITH RESPECT TO ERISA AND RELATED TAX MATTERS, AS WELL AS OTHER MATTERS AFFECTING THE BENEFIT PLAN'S INVESTMENT IN THE COMPANY. MOREOVER, MANY OF THE TAX ASPECTS OF THIS OFFERING DISCUSSED HEREIN ARE APPLICABLE TO BENEFIT PLAN INVESTORS AND SHOULD ALSO BE DISCUSSED WITH QUALIFIED TAX COUNSEL BEFORE INVESTING IN THE COMPANY.

**Certain Tax Considerations**

Set forth below is a general discussion of certain material federal income tax consequences relating to an investment in the Units. This summary is based on the Code, the regulations promulgated thereunder by the United States Department of the Treasury, decisions of various courts, IRS rulings and pronouncements, and other authorities, each as in effect on the date hereof and all of which are subject to change, possibly with retroactive effect. Any such change could impact the matters described in this discussion. This summary does not attempt to present all aspects of the federal income tax laws or any aspect of any state, local, or foreign tax laws that may affect an investment in the Company, nor is it intended to be applicable to all investors, including investors that are subject to special tax treatment, such as investors that are subject to



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

the alternative minimum tax, financial institutions, dealers, investors that do not hold their Units as capital assets, insurance companies, and foreign persons or entities. This discussion also does not address U.S. tax considerations that may be relevant to a non-U.S. person making an investment in the Units. No ruling has been or will be requested from the IRS and no assurance can be given that the IRS will agree with the tax consequences described in this summary. Each prospective investor should consult with its own tax adviser in order to fully understand the federal, state, local, and foreign income tax consequences of an investment in the Company. This summary does not constitute tax advice, and is not intended to substitute for tax planning based on each investor's particular circumstances.

*Company's Tax Status*

It is intended that the Company will be classified and reported as a partnership for federal income tax purposes and that the Company will not be treated as a "publicly traded partnership." An entity that would otherwise be classified as a partnership for U.S. federal income tax purposes may nonetheless be taxable as a corporation if it is a "publicly traded partnership." The Manager intends to operate the Company in a manner that will not cause it to be treated as a publicly traded partnership. These measures will include the Manager having the absolute right to deny transfers of Units unless a safe harbor to prevent the Company from being treated as a publicly traded partnership is clearly available, as determined in the Manager's sole discretion. In addition, the Company intends to obtain and rely on appropriate representations and undertakings from each Member so that the Company is not treated as a publicly traded partnership.

The following discussion assumes that the Company will be treated as a partnership for federal income tax purposes. The Manager may, in its sole discretion, establish parallel, feeder, or alternative entities such as partnerships, corporate subsidiaries, or other investment vehicles to address the tax, regulatory, or other concerns of certain investors. In addition, the Manager may also, in its sole discretion, reorganize the Company into a master-feeder structure. Any person reviewing this discussion should seek advice based on such person's particular circumstances from an independent tax advisor.

*Taxation of Members*

As a partnership, the Company generally will not be subject to federal income tax. Instead, for federal income tax purposes, each Member will be required to take into account its distributive share of all items of the Company's income, gain, loss, deduction, and credit for the Company's taxable year ending within or with the Member's taxable year. Each item generally will have the same character and source as it would if Member had realized the item directly.

A Member will be required to include in income for federal income tax purposes its share of the Company's income or gain regardless of whether the Company makes any distribution to such Member. Therefore, each Member should be aware that the tax liability associated with owning Units may exceed (perhaps to a substantial extent) the cash distributed to that Member during a



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

taxable year, and a Member may have to utilize cash from other sources to satisfy a tax liability attributable to its ownership of Units.

The Operating Agreement provides for the allocation of income, gain, loss, deduction, and credits among the Members of the Company for each fiscal year. The Manager expects such allocations to be respected because they have substantial economic effect or are otherwise in accordance with the Members' interests in the Company. It is possible, however, that the IRS may seek to challenge an allocation of income, gain, loss, deduction, or credit among the Members.

*Nature of Company Income*

The Company expects generally to recognize ordinary income in connection with its transactions but may also recognize either (or both) long-term and short-term capital gains. It is also possible that the Company will recognize capital losses for federal income tax purposes, the deductibility of which may be limited.

Upon the sale of assets by the Company, the Company will recognize a gain or loss in an amount equal to the difference between the amount realized and the Company's tax basis in the assets sold. The gains or losses realized by the Company from the sale or other disposition of assets may be treated as capital gains or losses if the asset qualifies as a capital asset; however, if the asset does not qualify as a capital asset, then the gain or loss may be treated as ordinary income or loss for federal income tax purposes. Further, if an asset is sold less than one year from the date of acquisition, gains from such sale may be treated as short-term capital gains and taxed at ordinary income rates. Long-term capital gains, other than certain types of depreciation recapture, are taxable at a reduced rate for individuals (generally at the top rate of 20% plus the 3.8% tax on unearned income described below).

Members who are individuals, estates, or certain trusts may be subject to the 3.8% Net Investment Income tax pursuant to Section 1411 of the Code on certain investment income such as interest, dividends, and rents from certain passive activities. Prospective investors should consult their tax advisors regarding the possible applicability of this tax in respect of an investment in the Company.

*Basis*

Each Member will (subject to certain limits as discussed below) be entitled to deduct its allocable share of the Company's losses to the extent of its tax basis in Units at the end of the tax year of the Company in which such losses are recognized. A Member's tax basis in its interest is, in general, equal to the amount of cash the Member has contributed to the Company, increased by the Member's proportionate share of income and liabilities of the Company, and decreased by the Member's proportionate share of cash distributions, losses, and reductions in such liabilities.

If cash (including in certain circumstances "marketable securities") distributed to a Member in any year, including for this purpose any reduction in a Member's share of the liabilities of the



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Company, exceeds that Member's share of the taxable income of the Company for that year, the excess will constitute a return of capital and will be applied to reduce the tax basis of such Member's interest. Any distribution in excess of such basis will result in taxable gain to such Member. In general, distributions (other than liquidating distributions) of property other than cash and, in certain circumstances, "marketable securities," will reduce the basis (but not below zero) of a Member's interest by the amount of the Company's basis in such property immediately before its distribution, but will not result in the realization of taxable income to the Member.

*Limits on Deductions for Losses and Expenses*

In the case of Members that are individuals, estates, trusts, or certain types of corporations, the ability to utilize any tax losses generated by the Company may be limited under the "at risk" limitation in Section 465 of the Code, the passive activity loss limitation in Section 469 of the Code, and certain other provisions of the Code.

*Sale or Exchange of Units*

A Member that sells or otherwise disposes of an interest in the Company in a taxable transaction generally will recognize gain or loss equal to the difference, if any, between the adjusted basis of the interest and the amount realized from the sale or disposition. The amount realized will include the Member's share of the Company's liabilities outstanding at the time of the sale or disposition. Except to the extent the Company holds inventory or unrealized receivables, any such gain or loss generally should be capital gain or loss. Long-term capital gain may be eligible for a reduced rate of federal income taxation if the interest in the Company has been held for more than one year. The holding period for capital gains purposes begins on the day after the interest is issued to the Member.

In the event of a sale or other transfer of an interest at any time other than the end of the Company's taxable year, the share of income and losses of the Company for the year of transfer attributable to the interest transferred will be allocated for federal income tax purposes between the transferor and the transferee on either an interim closing-of-the-books basis or a pro rata basis reflecting the respective periods during such year that each of the transferor and the transferee owned the interest.

*Tax-Exempt Members*

In general, organizations that are otherwise exempt from federal income taxation pursuant to Section 501(a) of the Code ("**Tax-Exempt Investors**") are subject to taxation with respect to any unrelated business taxable income ("**UBTI**"). Under Section 512(c) of the Code, when computing UBTI, a Tax-Exempt Investor must include its distributive share of income of any partnership of which it is a partner to the extent that such income would be UBTI if earned directly by the Tax-Exempt Investor.

UBTI is generally defined as gross income from a trade or business regularly carried on by a tax-exempt entity that is unrelated to its exempt purpose (including an unrelated trade or business



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

regularly carried on by a partnership of which the entity is a partner) less the deductions directly connected with that trade or business. Subject to income earned through conducting a U.S. trade or business and to the discussion of the "unrelated debt financed income" below, UBTI generally does not include interest, most real property rents or gains from the sale, or exchange or other disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business), but does include operating income from businesses owed directly or through a partnership or other flow-through entity for U.S. federal income tax purposes.

If a Tax-Exempt Investor's acquisition of Units is debt-financed, or the Company incurs "acquisition indebtedness" with respect to an investment, then all or a portion of the income attributable to the debt-financed property generally may be included in UBTI regardless of whether such income would otherwise be excluded as dividends, interest, rents, gain or loss from sale of eligible property, or similar income. Such treatment will apply, in the case of ordinary income, only in tax years in which the Company had acquisition indebtedness outstanding or, in the case of a sale, if the Company had acquisition indebtedness outstanding at any time during the 12-month period prior to the sale.

In addition, UBTI can be realized through an acquisition, development, and disposition strategy whereby the Company would be treated as a "dealer" with respect to all or part of the assets in which it invests. In this case all the gain from the disposition of such assets generally would be UBTI.

Because the Company may incur "acquisition indebtedness" with respect to certain investments, Tax-Exempt Investors likely may recognize UBTI with respect to an investment in the Company. In addition, the loans and some of the direct acquisitions of assets may constitute a U.S. trade or business. The Manager may, in its sole discretion, establish parallel, feeder, or alternative entities such as partnerships, corporate subsidiaries, or other investment vehicles to address the tax, regulatory, or other concerns of certain investors. In addition, the Manager may also, in its sole discretion, reorganize the Company into a master-feeder structure. However, there can be no assurance that the Tax-Exempt Investors will not incur UBTI with respect to any investment. Tax-Exempt Investors are urged to consult with their own tax advisors regarding the possible consequences of an investment in the Company.

TAX-EXEMPT INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING ALL ASPECTS OF INVESTMENTS THAT MAY RESULT IN UBTI.

*Treatment of Withholding Taxes*

The Company will withhold and pay to the IRS any withholding taxes required to be withheld with respect to any Member and will treat such withholding as a payment to such Member. Such payment will be treated as a distribution to the Member with respect to which such withholding is made. To the extent that such payment exceeds the amount of any cash distribution to which such Member is then entitled, such Member is required, as set forth in the Operating Agreement, to make prompt payment to the Company.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Each prospective investor is urged to consult with and must rely upon the advice of its own professional tax advisors with respect to the United States and foreign tax treatment of an investment in the Company.

*State and Local Taxes, and Foreign Tax Considerations*

The foregoing discussion does not address the state, local and foreign tax considerations of an investment in the Company. Prospective investors are urged to consult their own tax advisors regarding those matters and all other tax aspects of an investment in the Company. Members may be subject to state or local income, franchise, or withholding taxes in those jurisdictions where the Company is regarded as doing business and may be required to file tax returns in such jurisdictions. It is possible that the Company itself may be subject to state or local tax in certain jurisdictions.

*Reporting*

The Manager will furnish each Member with an annual statement setting forth information relating to the operations of the Company (including information regarding such Member's distributive share of partnership income and gains, losses, deductions, and credits for the taxable year) as is reasonably required to enable the Member to properly report to the IRS with respect to such Member's participation in the Company.

*U.S. Partnership Tax Audit Risk*

Under current law, the Company, which intends to be treated as a partnership for U.S. tax purposes, will be required to file a tax return with the IRS. If the tax returns of the Company are audited by the IRS, the tax treatment of the Company's income and deductions generally is determined at the Company level.

Also under current law, an audit adjustment of the Company's tax return filed or required to be filed for any tax year beginning during or after 2021 could result in a tax liability (including interest and penalties) imposed on the Company for the year during which the adjustment is determined. The tax liability generally is determined by using the highest tax rates under the Code applicable to U.S. corporations.

To mitigate the potential adverse consequences of the general rule, the Company may be able to elect to pass through such audit adjustments for any year to the Members who were Members for the filing year, in which case those Members generally would be responsible for the payment of any tax deficiency, determined after including their shares of the adjustments on their tax returns for the adjustment year.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

# OPERATING AGREEMENT

# OF

# TOUZI MINE INVEST, LLC

# A WYOMING LIMITED LIABILITY COMPANY

Dated as of 31st December 2021

THE UNITS OF MEMBERSHIP INTEREST IN THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE U.S. OR NON-U.S. SECURITIES LAWS, IN EACH CASE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE UNITS MAY BE ACQUIRED FOR INVESTMENT ONLY, AND NEITHER THE UNITS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS; (II) THE TERMS AND CONDITIONS OF THIS AGREEMENT; AND (III) THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT BETWEEN THE COMPANY AND THE PURCHASER. THE UNITS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS, THIS AGREEMENT AND THE SUBSCRIPTION AGREEMENT BETWEEN THE COMPANY AND THE PURCHASER. THEREFORE, PURCHASERS OF THE UNITS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**TABLE OF CONTENTS**

**Page**


| | | |
|---|---|---|
| ARTICLE 1 | GENERAL PROVISIONS | 1 |
| 1.1 | Formation of the Company | 1 |
| 1.2 | Articles of Organization | 1 |
| 1.3 | Name | 1 |
| 1.4 | Principal Place of Business | 1 |
| 1.5 | Registered Office and Registered Agent | 1 |
| 1.6 | Purposes and Powers of the Company | 1 |
| 1.7 | Term | 2 |
| 1.8 | Fiscal Year | 2 |
| 1.9 | No Partnership Intended Other Than for Tax Purposes | 2 |
| ARTICLE 2 | MANAGEMENT OF THE COMPANY; EXPENSES | 2 |
| 2.1 | Authority of Manager; Relationship Among the Manager and the Members | 2 |
| 2.2 | Removal of the Manager | 5 |
| 2.3 | Business with Affiliates | 6 |
| 2.4 | Reliance by Third Parties | 6 |
| 2.5 | Other Business Activities | 6 |
| 2.6 | Co-Investment Opportunities | 6 |
| 2.7 | Company Expenses | 7 |
| 2.8 | Manager and Affiliate Income | 8 |
| ARTICLE 3 | THE MEMBERS | 8 |
| 3.1 | The Members | 8 |
| 3.2 | Units; Ownership Interests | 8 |
| 3.3 | Liability of Members | 8 |
| 3.4 | Events Affecting the Manager or Members | 8 |
| 3.5 | Representations and Warranties | 9 |
| 3.6 | Acknowledgment and Waiver Regarding Independent Activities, Conflicts of Interest and Certain Related Party Transactions | 10 |
| 3.7 | Investment Company Act, ERISA and Other Limitations | 11 |
| 3.8 | Member Considerations | 12 |




*Confidential*

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**TABLE OF CONTENTS**
(continued)


| | | Page |
|---|---|---|
| ARTICLE 4 | CAPITAL CONTRIBUTIONS | 12 |
| 4.1 | Capital Contributions | 12 |
| 4.2 | Closings | 12 |
| 4.3 | Admission of Members | 12 |
| 4.4 | Deficit Restoration; Interest on Capital Contributions | 12 |
| 4.5 | Member Loans | 12 |
| ARTICLE 5 | CAPITAL ACCOUNTS; TAX ALLOCATIONS | 13 |
| 5.1 | Capital Accounts | 13 |
| 5.2 | Profits and Losses | 14 |
| 5.3 | Special Allocations | 14 |
| 5.4 | Other Allocation Rules | 15 |
| 5.5 | Tax Allocations; Code Section 704(c) | 16 |
| ARTICLE 6 | WITHDRAWALS; DISTRIBUTIONS | 16 |
| 6.1 | Withdrawals | 16 |
| 6.2 | Interim Distributions | 17 |
| 6.3 | Tax Distributions | 17 |
| 6.4 | In-Kind Distribution | 18 |
| 6.5 | Suspension of Payment of Distribution and Withdrawal Proceeds for Anti-Money Laundering Purposes | 18 |
| 6.6 | Withholding Obligations | 18 |
| ARTICLE 7 | TRANSFER OF INTERESTS | 18 |
| 7.1 | Transfer Restrictions | 18 |
| 7.2 | General Transfer Provisions | 20 |
| 7.3 | Waiver of Partition | 20 |
| 7.4 | ERISA Members | 20 |
| ARTICLE 8 | EXCULPATION AND INDEMNIFICATION | 21 |
| 8.1 | Exculpation | 21 |
| 8.2 | Indemnification | 22 |
| ARTICLE 9 | DISSOLUTION; WINDING UP | 23 |




*Confidential*

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**TABLE OF CONTENTS**
(continued)


| | | Page |
|---|---|---|
| 9.1 | Events of Dissolution | 23 |
| 9.2 | Winding Up | 24 |
| 9.3 | Claims of the Members | 24 |
| 9.4 | Survival of Rights, Duties and Obligations | 25 |
| ARTICLE 10 | TAX RETURNS; INSPECTION OF RECORDS; REPORTS TO MEMBERS | 25 |
| 10.1 | Filing of Tax Returns | 25 |
| 10.2 | Reports to Current and Former Members | 25 |
| 10.3 | Partnership Representative | 26 |
| 10.4 | Access to Company Records | 26 |
| ARTICLE 11 | MISCELLANEOUS | 27 |
| 11.1 | General | 27 |
| 11.2 | Power of Attorney | 27 |
| 11.3 | Amendments | 27 |
| 11.4 | Choice of Law; Priority | 29 |
| 11.5 | Notices | 29 |
| 11.6 | Confidential Information | 29 |
| 11.7 | Headings | 30 |
| 11.8 | Legal Counsel | 30 |
| 11.9 | Entire Agreement; Non-Waiver | 31 |
| 11.10 | Further Assurances | 32 |
| 11.11 | Severability | 32 |
| 11.12 | Usage | 32 |
| 11.13 | No Third-Party Rights | 33 |
| 11.14 | Whole Numbers | 33 |
| 11.15 | USA PATRIOT Act Compliance | 33 |
| 11.16 | Payment in U.S. Dollars | 33 |
| 11.17 | Performance and Remedies for Breach | 34 |
| 11.18 | Definitions | 34 |




***Confidential***

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**TABLE OF CONTENTS**
(continued)

**Page**

Schedule A Schedule of Members



***Confidential***

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

# OPERATING AGREEMENT
# OF
# TOUZI MINE INVEST, LLC

THIS OPERATING AGREEMENT (this "**Agreement**") of Touzi DC Invest, LLC, a Wyoming limited liability company (the "**Company**"), is entered into as of 12/31/2021, among Touzi Capital, LLC, a California limited liability company, as the manager (the "**Manager**") and McKenna Capital, LLC, a Delaware limited liability company, as co-manager, and the Persons identified on Exhibit A attached hereto (as it may be amended or restated from time to time) that are parties to this Agreement and are admitted as members of the Company as of the date hereof or become parties to this Agreement and become admitted as members of the Company after the date hereof (each a "**Member**" and collectively the "**Members**"). Capitalized terms used but not defined in this Agreement will have the meanings set forth in Section 11.18.

## ARTICLE 1
## GENERAL PROVISIONS

1.1 Formation of the Company. The Company was formed as a limited liability company under the Wyoming Limited Liability Company Act (as now in effect or subsequently amended or superseded, the "**Act**"), by the filing of Articles of Organization with the Wyoming Secretary of State on 11/19/2021 (the "**Articles of Organization**"). The Manager, for itself, and as agent for the Members, shall make every reasonable effort to ensure that all other certificates and documents are properly executed, and shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all of the requirements for the formation and continuation of the Company as a limited liability company under the Act. The rights and powers, and the obligations and liabilities, of the Manager and the Members shall be as provided in the Act and in this Agreement, which Agreement amends and restates any prior operating of the Company.

1.2 Articles of Organization. The Manager may change the Articles of Organization from time to time through appropriate filings with the Wyoming Secretary of State.

1.3 Name. The name of the Company is "Touzi Mine Invest, LLC" and all business of the Company shall be conducted under that name or one or more additional names as may be adopted by the Company under applicable law.

1.4 Principal Place of Business. The Company's principal place of business is 2093 Philadelphia Pike #8883, Claymont, DE 19703, or such other place as the Manager may choose from time to time.

1.5 Registered Office and Registered Agent. The Company's registered agent for the service of process is the Person reflected on the Company's Articles of Organization or such other Person as the Manager may choose from time to time. The address for the Company's registered agent is the location reflected on the Company's Articles of Organization or such other location as the Manager may choose from time to time.





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

1.6 Purposes and Powers of the Company. The primary purpose of the Company is to invest substantially all of its capital in a bitcoin mining business (the "**Business**") owned and operated by Touzi Mining, LLC, a Wyoming limited liability company (the "**Business Owner**"). The Company shall be the member of the Business Owner and the Manager shall be the manager of the Business Owner. In turn, the Business Owner will use the Company's capital investment to purchase assets for the Business and operate the Business. The Company may engage in any other lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business. The Company has all powers provided for in the Act.

1.7 Term. The term of the Company (the "**Term**") commenced upon the filing of the Articles of Organization and shall continue in perpetuity until dissolved pursuant to the provisions of ARTICLE 9.

1.8 Fiscal Year. The fiscal year of the Company (the "**Fiscal Year**") and the tax year of the Company shall end on December 31 of each year or such other date as the Manager of the Company shall determine from time to time.

1.9 No Partnership Intended Other Than for Tax Purposes. Although the Members intend for the Company to be a partnership for United States federal income tax purposes, the Company is a limited liability company and not a general or limited partnership of any jurisdiction, and no Member shall have personal liability for any Company operations, debts, obligations or liability merely as a result of being a Member.

## ARTICLE 2
## MANAGEMENT OF THE COMPANY; EXPENSES

2.1 **Authority of Manager; Relationship Among the Manager and the Members**.

(a) Except as otherwise expressly provided in this Agreement, the management, operation and control of the Company shall be vested exclusively in the Manager, who shall have the full and complete authority, power and discretion to exercise, on behalf of and in the name of the Company, all rights and powers of a manager of a limited liability company under the Act necessary or convenient to carry out the purposes of the Company, including without limitation, to manage and control the business, affairs and properties on behalf of and in the name of the Company, to make all decisions regarding those matters listed below in Section 2.1(b) or that this Agreement does not make expressly subject to approval by the Members, and to perform and to carry out any and all of the purposes of the Company and to perform any and all acts and activities and enter into and perform all contracts and other undertakings that it may deem necessary, appropriate, proper, customary, advisable, desirable, incidental or convenient thereto. Except as otherwise provided in this Agreement, the Manager shall have full authority in its discretion. The Manager shall take such actions as may be necessary on its part to ensure that the Company is and continues throughout its term to be classified as a partnership for federal income tax purposes. Notwithstanding anything to the contrary contained in this Agreement, the acts of the Manager in carrying on the business of the Company as authorized in this Agreement shall bind the Company.

(b) Subject to the limitations and restrictions expressly set forth in this Agreement, the Manager shall perform or cause to be performed all management and operational functions relating to the business of the Company. Without limiting the generality of the foregoing, the Manager is authorized on behalf of the Company to cause the Company to do the following:

(i) acquire, sell, exchange, transfer or dispose of any assets, whether or not in the ordinary course of the Company's business;

(ii) cause the Capital Contributions received by the Company from Members to be contributed to the Business Owner and used by the Business Owner to conduct the Business;

(iii) pay, in accordance with the provisions of this Agreement, all expenses, debts, and obligations of the Company to the extent that funds of the Company are available therefore;

(iv) issue Units in the Company in exchange for Capital Contributions subject to the terms of this Agreement;

(v) take any action the Manager determines is necessary or desirable to ensure that the assets of the Company are not deemed to be "plan assets" for purposes of ERISA;

(vi) bring, compromise, settle and defend actions at law or in equity;

(vii) engage in any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with, the accomplishment of the purposes of the Company;

(viii) cast any votes or execute any written consents on behalf of the Company with respect to the Business Owner, unless the action to be approved by such vote or consent would require the approval of the Members if the action were to be taken by the Company;

(ix) enter into agreements and contracts with third parties and, subject to the terms of this Agreement, Affiliates of the Manager or any Principal, to provide services to the Company or in furtherance of the Company's business and affairs;

(x) maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures;

(xi) purchase, at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's business, including the assets, the Manager, the Members, and the Company's employees and agents;

(xii) purchase, at the expense of the Company, director and officer liability insurance to protect the Manager and its officers, managers, and employees, and "key

man" life and disability insurance policies insuring the life of the Principals for the benefit of the Manager and for the Manager to be able to locate a replacement for the Principals;

(xiii) open accounts and deposit, maintain and withdraw funds in the name of the Company in any bank, savings and loan association, brokerage firm or other financial institution;

(xiv) establish reserves for contingencies and for any other proper Company purpose;

(xv) retain, and dismiss from retainer, any and all Persons providing legal, accounting, engineering, brokerage, consulting, appraisal, investment advisory or management services to the Company, or such other agents as the Manager deems necessary or desirable for the management and operation of the Company and the assets;

(xvi) incur and pay all expenses and obligations incident to the operation and management of the Company, including, without limitation, the services referred to in subparagraph (xv), taxes, interest, travel, rent, insurance, and supplies;

(xvii) distribute funds to the Members by way of cash or otherwise, all in accordance with the provisions of this Agreement;

(xviii) prepare and cause to be prepared reports, statements, and other relevant information for distribution to Members;

(xix) prepare and file all necessary returns, reports, and statements, and pay all taxes, assessments and other impositions relating to the assets or operations of the Company;

(xx) effect a dissolution of the Company as provided in this Agreement;

(xxi) make investments on a short-term basis of the Company's cash prior to its use for Company purposes or distribution to the Members;

(xxii) act for and on behalf of the Company in all matters incidental to the foregoing; and

(xxiii) authorize any partner, member, manager, officer, employee, or agent of the Manager to act for and on behalf of the Company in all matters incidental to the foregoing.

By executing this Agreement, each Member shall be deemed to have consented to any exercise by the Manager of any of the foregoing powers or other powers of the Manager contained in this Agreement. The Company, and the Manager on behalf of the Company, may enter into and perform any subscription agreements, management agreements, advisory agreements, and agreements to induce any Person to purchase Units, and any documents contemplated thereby or related thereto and any amendments thereto, without any further act,

vote or approval of any Person, including any Member, notwithstanding any other provision of this Agreement.

(c) Any Person dealing with the Company or the Manager may rely upon a certificate signed by the Manager as to:

(i) the identity of the Manager or any Member of this Agreement;

(ii) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Manager or in any other manner germane to the affairs of the Company;

(iii) the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(iv) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

(d) A Member, by virtue of its status as a Member, shall have no right to, and shall not, participate in the management or control of the Company's business or act for or bind the Company, and shall only have the rights and powers granted to Members in this Agreement or the Act.

(e) Each Member acknowledges and understands that the Company has been formed for the sole purpose of investing substantially all of its capital in the Business Owner and the Business as set forth herein. The Company is, and expects at all times to be, the member of the Business Owner and the Manager is, and expects at all times to be, the manager of the Business Owner. Any and all rights, including voting rights, pertaining to the Company's interest in the Business Owner shall be vested exclusively in the Company and may be exercised only by the Manager acting in accordance with the terms of this Agreement and any operating agreement of the Business Owner, and no Member either alone or acting with one or more other Members shall have any such rights with respect to the Business Owner or the Business. All determinations, decisions and actions made or taken by the Manager in accordance with this Agreement shall be conclusive and absolutely binding upon the Company, the Members, and their respective successors and assigns.

2.2 Removal of the Manager.

(a) The Manager may only be removed as the manager of the Company upon the vote or written consent of the Member or Members collectively holding an Ownership Interest of at least 75% (provided, that any Ownership Interests of the Manager, any Principal, or any of their Affiliates shall not be included in the calculation of the vote or written consent required for removal) within 90 days after written notice that a court or arbitral tribunal of competent jurisdiction has finally determined (without regard to the availability of any appeals granted on a discretionary basis) that the Manager or a Principal has (i) committed (or pleads nolo contendere to having committed) embezzlement, fraud or any other act involving material

improper personal benefit against the Company or any of its assets, or (ii) materially breached this Agreement, which breach remains uncured as of the date of such finding, in a manner that had a material adverse effect on the Company and Members; provided, however, that no removal right shall arise under this Section 2.2(a) if, in the case of acts by a Principal, the Principal is removed as the manager and a member of the Manager within 30 days after the court's or arbitral tribunal's judgment that would otherwise have given rise to a right by Members to remove the Manager. The Manager shall promptly provide the Members with written notice of any event described in this Section 2.2(a) which would give rise to the right to remove the Manager.

(b) In the event of a removal of the Manager pursuant to Section 2.2(a) or resignation of the Manager, the Company shall dissolve in accordance with Section 9.1 unless the Member or Members collectively holding an Ownership Interest of at least 75% elect to continue the Company (provided, that any Ownership Interests of the Manager, any Principal, or any of their Affiliates shall not be included in the calculation of the vote or written consent required for continuation) and appoint a new manager of the Company within 90 days after the removal of the Manager.

(c) Upon the removal of the Manager pursuant to Section 2.2(a) or resignation of the Manager, the former Manager shall have no further rights or powers as the manager of the Company, but such removal shall not affect the former Manager's status as a Member or the former Manager's right to receive distributions pursuant to this Agreement.

2.3 Business with Affiliates. In addition to the services and transactions specifically contemplated by this Agreement, the Manager, any Principal, and their respective Affiliates, advisors, representatives, and agents may provide services to and engage in transactions with the Company or any of its assets whenever the Manager reasonably concludes that such Persons are at least as qualified as other qualified vendors providing similar services, and the Company may pay such Persons market-based fees, in amounts commensurate with fees that would be payable to unaffiliated entities for the same services.

2.4 Reliance by Third Parties. Persons dealing with the Company with respect to actions apparently in the ordinary course of the Company's business are entitled to rely conclusively upon a certificate of the Manager to the effect that it is then acting as the manager of the Company and that its actions are duly authorized hereunder.

2.5 Other Business Activities. Management of the Company shall not be the exclusive activity of the Manager or the Principals. The Manager shall itself, and shall cause each Principal for so long as the Principal remains a manager or a member of the Manager to, devote only such time and effort to the Company as is reasonably necessary to effectively carry out the Company's business and affairs, it being understood that time and effort devoted by the Principal to the activities of the Manager or by the Manager to any of the Company's assets shall be considered time and effort devoted to the Company's business. For the avoidance of doubt, Affiliates of the Manager, and any employees of any Affiliate of the Manager, may pursue and engage in whatever other transactions and business activities any of them desires, including those transactions and business activities that are competitive with the Company or any of its assets. Each Member expressly waives application of the corporate opportunity doctrine to the Manager;

provided, however, that such waiver shall not be deemed to waive and shall not waive any non-waivable rights that the Member may have under applicable federal or state law.

2.6 Co-Investment Opportunities. The Company may, in the Manager's sole discretion, give certain Persons, including the Principals, Members, Affiliates, or other third parties, an opportunity to co-invest in the Business alongside the Company or to otherwise invest, directly or indirectly, in the Business. Such co-investment opportunities may be made available through limited partnerships, limited liability companies, or other entities formed for the specific purpose of facilitating such co-investment. The terms of any such co-investment shall be set by the Manager on a basis the Manager believes to be fair and reasonable to the Company and may include the payment of fees and profit interests to the Manager or Affiliates of the Manager. Notwithstanding any provisions of this Agreement to the contrary, the Manager, the Principals, or any of their respective Affiliates, may create and operate one or more investment entities which will invest in the Business Owner in parallel with the Company. For the avoidance of doubt, the Company's acquisition, ownership, and disposition of its interest in the Business Owner shall not be considered or deemed a co-investment by the Company and, instead, are specifically authorized under Sections 1.6 and 2.1(e) as part of the Company's purpose.

2.7 Company Expenses. The following fees, costs, and expenses, whether paid by the Company or paid by the Manager, any Principal, or an Affiliate of the Manager or any Principal and reimbursed by the Company will be included in the expenses that are borne and payable by the Company prior to the determination of any cash available for distribution to the Members (the "**Company Expenses**"):

(i) All fees, costs, and expenses incurred by or on behalf of the Company in connection with forming the Company, acquiring an interest in the Business Owner, preparing the Offering Documents and conducting the Offering, and related matters (estimated to be about $10,000);

(ii) All fees, costs, and expense incurred by or on behalf of the Company in connection with the administration of the Company and the enforcement of the terms of this Agreement;

(iii) All fees, costs, and expenses chargeable or passed through to the Company by the Business Owner that are not paid out of the Company's capital contributions to the Business Owner, if any;

(iv) The fees and reasonable expenses incurred by the Partnership Representative;

(v) Any taxes, corporate maintenance, or qualification or filing or licensing fees, or federal or state "blue sky" securities filing fees incurred by or on behalf of the Company, and any fees, costs, and expenses incurred by or on behalf of the Company in

connection with the preparation, reporting, and filing of foreign, federal, state, or local tax returns by the Company;

(vi) All costs, litigation and alternative dispute resolution expenses, and attorneys' fees incurred by or on behalf of the Company in any claim or action in connection with the recovery, protection or preservation of property received or held by the Company;

(vii) All fees, costs and expenses incurred by or on behalf of the Company in the dissolution and winding-up of the Company; and

(viii) All fees, costs, and expenses incurred by or on behalf of the Company in connection with the obligations of the Company to indemnify any Indemnitee under the terms of this Agreement.

2.8 Manager and Affiliate Income. No management, servicing, or similar fees will be charged by the Manager to the Company. The Manager may cause the Company to contract with any Affiliates of the Manager to provide services to the Company whenever the Manager reasonably concludes that those Affiliates are at least as qualified as other qualified vendors providing similar services, and the Company may pay those Affiliates market-based fees, in amounts commensurate with fees that would be payable to unaffiliated entities for the same services. The Members specifically approve any contracts or other arrangements entered into in accordance with Sections 2.3 through 2.7 of this Agreement and waive to the fullest extent possible any conflicts of interest on the part of the Manager with respect to such contracts or other arrangements.

## ARTICLE 3
## THE MEMBERS

3.1 The Members. The name and address of each Member admitted to the Company, the amount of such Member's Capital Contribution to the Company, the Units issued to and held by such Member, and Ownership Interest of such Member are set forth on Schedule A, as attached hereto as of the date hereof and as it may be amended or restated from time to time by the Manager in accordance with the terms of this Agreement. Schedule A shall be filed with the records of the Company at the principal office of the Company and is hereby incorporated by reference and made a part of this Agreement.

3.2 Units; Ownership Interests.

(a) As of the date hereof, the Company may issue to Members units of membership interest in the Company (the "**Units**") in exchange for Capital Contributions at a price of $1,000 per Unit; provided, that the Company may not issue more than 40,000 Units (for a total of $40,000,000) without the vote or written consent of a Majority in Interest of the Members.

(b) The "**Ownership Interest**" of a Member shall be the Member's relative ownership interest in the Company equal to a number, expressed as a percentage, determined by





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

dividing the Units held by such Member by the aggregate Units held by all Members as of the date of calculation. Schedule A shall reflect the Ownership Interests of each Member and, in accordance with Section 11.3(b), shall be amended or restated by the Manager to reflect the issuance, redemption, or Transfer of any Units. The provisions of this Section 3.2 shall not give a Member an interest in any amount credited to the Capital Account of any other Member.

3.3 Liability of Members. Except as otherwise expressly provided in the Act, the liability of the Members shall be limited to the maximum extent permitted by the Act, and the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability solely by reason of being a Member.

3.4 Events Affecting the Manager or Members.

(a) Except as provided in Sections 2.2(b) and 9.1, the death, temporary or permanent incapacity, insanity, incompetence, Bankruptcy, withdrawal, expulsion, removal, liquidation, dissolution, reorganization, merger, sale of all or substantially all of the stock or assets, or other change in the ownership or nature of the Manager shall not constitute an "event of withdrawal" of the Manager under the Act, and upon the happening of any such event, the affairs of the Company shall be continued without dissolution by the Manager of any successor entity thereto.

(b) The death, temporary or permanent incapacity, insanity, incompetence, Bankruptcy, withdrawal, expulsion, removal, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets, or other change in the ownership or nature of a Member shall not dissolve the Company. The trustee, executor, administrator, committee or guardian of the Member or of the Member's estate, as the case may be, shall have all the rights of the Member for the limited purpose of settling or managing the estate and such power as such Member possessed to assign all or part of such Member's Units; provided, that any such trustee, executor, administrator, committee or guardian shall become a substitute Member for such limited purposes only upon compliance with the applicable provisions of ARTICLE 7.

3.5 Representations and Warranties. Each Member represents and warrants to the Company and to every other Member as follows:

(a) The Member will provide promptly, upon request by the Manager, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Company to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Company.

(b) All representations and warranties made by the Member to the Company or the other Members in any other documents relating to the Company, including the Member's Subscription Agreement, are true and complete.

(c) If such Member is an individual, (i) the Member has full legal capacity to execute and deliver this Agreement and to perform the Member's obligations hereunder, and (ii) the execution, delivery and performance of this Agreement do not and will not violate or result in a breach of any provision of, or give rise to a right by any party to terminate or amend its obligations under, any material contract, agreement or other material arrangement or commitment to which the Member is a party or by which the Member is bound.

(d) If such Member is not an individual, (i) the Member is duly organized and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and (ii) the execution, delivery and performance of this Agreement have been duly authorized by all requisite action and do not and will not violate or result in a breach of any provision of, or give rise to a right by any party to terminate or amend its obligations under, any material contract, agreement or other material arrangement or commitment to which it is a party or by which it is bound.

(e) Each Member that is an entity that would be an "investment company" under the Investment Company Act of 1940, as amended (the "**Company Act**"), but for an exclusion under either section 3(c)(1) or section 3(c)(7) of the Company Act, has informed the Manager of the number of Persons that constitute "beneficial owners of such Member's outstanding securities (other than short-term paper)" within the meaning of clause (A) of subsection 3(c)(1) of the Company Act, and will inform the Manager promptly upon any change in that number.

(f) Each Member affirms that it (i) meets the suitability requirements established by the Manager in connection with its investment in the Company, and (ii) its Units have been acquired by it for its own account for investment and not with a view to resale or distribution thereof. In making its decision to invest in the Company, the Member has relied solely on (x) the Offering Documents; (y) the advice of its own tax, legal or other advisers; and (z) independent investigations made by such Member before becoming a Member.

(g) If such Member is subject to Section 511 of the Code, it acknowledges that the Manager is not obligated to structure the Company's investments in assets, or take into account the Member's tax status, to avoid causing the Member to be allocated "unrelated business taxable income" under Section 512 or 514 of the Code.

(h) The Member acknowledges and understands that the business of the Company involves a high degree of risk, that there is no market for the Units nor is there any prospect that one will develop, that there is no plan or commitment to register the Units for sale under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state securities law, and that withdrawals of Capital Contributions from the Company are limited by the terms of this Agreement.

3.6 Acknowledgment and Waiver Regarding Independent Activities, Conflicts of Interest and Certain Related Party Transactions.

(a) Each Member affirms that it has received and read a copy of the Memorandum outlining, among other things, the organization, purpose and investment objectives of, and the risks and expenses of an investment in, the Company. Each Member acknowledges that it has reviewed and understands the "Conflicts of Interest" section of the Memorandum, and further understands that (i) the Manager, any Principal, or any of their respective Affiliates may (A) carry on investment activities for their own accounts and for Persons who do not invest in the Company; (B) give advice and recommend investments to Persons who do not invest in the Company, which advice may differ from advice given to, or investments recommended or bought for, the Company, even though their business or investment objectives may be the same or similar; (C) be engaged in activities, including investment activities, apart from their management of the Company as permitted by this Agreement, and will devote to the Company only so much of their time as is necessary or appropriate for the Company's activities as provided in Section 2.5; (D) compete with the Company for investment opportunities or have a material interest in any investment held by the Company, subject to Sections 2.5 and 2.6; and (E) manage one or more investment funds that invest in businesses in competition with the Business Owner or the Business; (ii) certain employees of the Manager, any Principal, or any of their respective Affiliates are expected to continue to perform services for them, as well as for new investment funds and accounts that the Manager, any Principal, or any Affiliate may hereafter establish in such manner as the Manager, the Principal, or the Affiliate, in its sole discretion, deems appropriate; and (iii) the Company may co-invest with Affiliates of the Manager or any Principal. Each activity of the Manager, any Principal, or any of their respective Affiliates described in this Section 3.6(a), or described in the "Conflicts of Interest" section of the Memorandum, whether an actual or potential conflict of interest, and occurring in the past, present or future, is referred to in this Agreement as an "**Independent Activity**."

(b) By acquiring Units, each Member (i) acknowledges the existence of the actual and potential conflicts of interest described in Section 3.6(a) and the "Conflicts of Interest" section of the Memorandum and, to the fullest extent permitted by applicable law, hereby waives any claims with respect to the existence of all such conflicts of interest; and (ii) acknowledges and agrees that neither the Company nor any Member shall (x) have any right to participate in any Independent Activity of the Manager, any Principal, or any of their respective Affiliates, (y) receive any revenues, profits, fees or other amounts derived from any such Independent Activity, or (z) have any other interest in any such Independent Activity.

3.7 <u>Investment Company Act, ERISA and Other Limitations</u>.

(a) The Manager will use its reasonable efforts to operate the Company in such a way that (i) the Company will not be required to register as an "investment company" under the Company Act (to the extent applicable); (ii) the Company's assets will not be deemed to be "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") (to the extent applicable); and (iii) each of the Company and the Manager will be in compliance with the rules and regulations of any other material law, regulation or guideline applicable to the Company or the Manager.

(b) The Manager is hereby authorized to take any action that it has determined in good faith to be necessary, appropriate or desirable in order for (i) the Company not to be

deemed an "investment company" under the Company Act (to the extent applicable); (ii) the Company's assets not to be deemed to be "plan assets" for purposes of ERISA (to the extent applicable); or (iii) the Company or the Manager not to be in violation of any other material law, regulation or guideline applicable to the Company or the Manager.

(c) Actions taken by the Manager in accordance with Section 3.7(b) may include (i) making any structural, operating or other changes in the Company by amending this Agreement (provided, however, that any such amendment may not affect the limited liability of a Member or materially adversely affect the economic interest of a Member); (ii) requiring the sale, in whole or in part, of any Member's Units, in each case with respect to or as a result of when such violation arose; (iii) dissolving and terminating the Company (provided, however, that the Manager shall use its reasonable efforts to take other actions so that such dissolution and termination are not necessary); (iv) registering as an investment company or other regulated entity, as applicable; or (v) requiring the withdrawal of any Member. In the event any action is taken under clause (v) of this Section 3.7(c) based on the reasons set forth in clause (ii) of Section 3.7(b), the Manager shall require an opinion of counsel acceptable to the Manager in its sole discretion to the effect that the Member's continued ownership of Units more likely than not will not result in (A) a violation of any material law, regulation or guideline applicable to the Company or the Manager, or (B) the Company's assets being deemed to be "plan assets" for purposes of ERISA. Any action taken by the Manager pursuant to this Section 3.7 shall not require the approval of any Member.

(d) The Manager shall make such revisions to Schedule A as may be necessary or appropriate to reflect the admission of any additional Member or the withdrawal of any Member.

3.8 Member Considerations. The Members recognize that the differing financial, regulatory, income tax and other status and circumstances of the Members may give rise to conflicts of interest among the Members regarding the Company's business and affairs. Except as otherwise specifically provided in this Agreement, the Manager, when making decisions or acting with respect to the Company or its business and affairs, shall not be required to take into consideration the separate status or circumstances of any Member or group of Members.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.1 Capital Contributions. Each Member shall make a capital contribution to the Company (a "**Capital Contribution**") in the total amount of the Member's commitment or subscription that has been accepted by the Manager on behalf of the Company. Each Member shall be required to make such Capital Contribution to the Company in full as a condition precedent to the Member's admission to the Company. Except as provided in this Section 4.1, no Member will be required to make any Capital Contributions to the Company.

4.2 Closings. The initial closing of the Offering (the "**Initial Closing**") shall occur on a date determined in the sole discretion of the Manager (the "**Initial Closing Date**"). Following the Initial Closing, an unlimited number of subsequent closings of the Offering (each, a

"**Subsequent Closing**" and together with the Initial Closing, each, a "**Closing**") may occur until the Maximum Offering Amount is reached.

4.3 Admission of Members. A Person shall be admitted to the Company as Member at the time that (i) the Person executes and delivers to the Manager a fully-completed, dated, and signed Subscription Agreement and such Subscription Agreement has been accepted, in whole or in part, by the Manager on behalf of the Company, and (ii) the Person has made the required Capital Contribution in full by wire transfer in accordance with the terms of this Agreement, the Member's Subscription Agreement, and the instructions provided to the Person by the Company.

4.4 Deficit Restoration; Interest on Capital Contributions. A Member shall not have any obligation to the Company or to any other Member to restore any negative balance in the Capital Account of such Member. No Member may withdraw capital or receive any distributions except as specifically provided in this Agreement. No interest shall be paid by the Company on any Capital Contributions.

4.5 Member Loans. If the Company requires additional capital in excess of the Capital Contributions of the Members (for example, to pay Company Expenses), in lieu of requiring the Members to make additional Capital Contributions to the Company, the Manager may cause the Company to borrow such capital either (i) from a commercial bank, lending institution, or other person or (ii) from the Manager, any Member, any of their Affiliates or any other Persons; provided, that the loan is on commercially reasonable terms and bears interest at a rate not to exceed 12% per annum. The loans must be without recourse to the Members unless otherwise agreed in writing by the Members.

## ARTICLE 5
## CAPITAL ACCOUNTS; TAX ALLOCATIONS

5.1 Capital Accounts. There shall be established for each Member on the books of the Company a capital account (a "**Capital Account**"), which shall be maintained and adjusted in accordance with the following provisions:

(a) To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 5.3, and the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member.

(b) To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 5.3, and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

(c) In the event any Units are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Units.

(d) In determining the amount of any liability for purposes of subparagraphs (a) and (b), there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Regulations, the Manager may make such modification; provided, that it is not likely to have a material adverse effect on the amounts distributable to any Member pursuant to ARTICLE 9 upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b); provided, that, to the extent that any such adjustment is inconsistent with other provisions of this Agreement and would have a material adverse effect on any Member, such adjustment shall require the consent of such Member.

5.2 Profits and Losses. After giving effect to the special allocations set forth in Section 5.3, Profits and Losses for any Allocation Year shall be allocated to the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Member if (i) the Company were dissolved, its affairs wound up and its assets sold for cash in an amount equal to their Gross Asset Values, (ii) all Company liabilities were satisfied (limited, in the case of any nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (iii) the net assets of the Company were distributed in accordance with Section 9.2 to the Members, after subtracting for this purpose each Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately after the hypothetical sale of assets.

5.3 Special Allocations. The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this ARTICLE 5, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net



***Confidential***

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 5.3(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704 2(f) and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this ARTICLE 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.3(b) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.3(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this ARTICLE 5 have been tentatively made as if this Section 5.3(c) were not in the Agreement.

(d) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Allocation Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.3(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this ARTICLE 5 have been made as if Section 5.3(c) and this Section 5.3(d) were not in the Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Allocation Year shall be specially allocated among the Members in proportion to their Ownership Interests.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g) Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of the Member's Units, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

5.4 Other Allocation Rules.

(a) Profits, Losses, and any other items of income, gain, loss, or deduction shall be allocated to the Members pursuant to this ARTICLE 5 as of the last day of each Fiscal Year, provided that Profits, Losses, and such other items shall also be allocated at such times as the Gross Asset Values of Company property are adjusted pursuant to subparagraph (ii) of the definition of "Gross Asset Value."

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(c) The Members are aware of the income tax consequences of the allocations made by this ARTICLE 5 and hereby agree to be bound by the provisions of this ARTICLE 5 in reporting their shares of Company income and loss for income tax purposes, except to the extent otherwise required by law.

(d) Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Ownership Interests.

(e) To the extent permitted by Regulations Section 1.704-2(h)(3), the Manager shall endeavor to treat distributions of Net Income as having been made from the

proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

5.5 Tax Allocations; Code Section 704(c). Except as otherwise provided in this Section 5.6, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under this ARTICLE 5. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of "Gross Asset Value" in Section 11.18) using any allocation method under the Regulations under Code Section 704(c) selected by the Manager. In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of "Gross Asset Value" in Section 11.18, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement; provided, that the Company shall elect to apply the allocation method selected pursuant to the Regulations under Section 704(c). Allocations pursuant to this Section 5.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any other provision of this Agreement. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the Allocation Year.

## ARTICLE 6
## WITHDRAWALS; DISTRIBUTIONS

6.1 Withdrawals.

(a) Without the consent of the Manager, but subject to Section 7.4, no Member may withdraw from the Company (other than in accordance with the provisions of this Agreement) or make a withdrawal from its Capital Account. Distributions that are provided for in this Agreement shall be made only to Persons who, according to the books and records of the Company, are holders of records of Units on the date determined by the Manager as of which the Members are entitled to any such distributions.

(b) The Manager may, by written notice to any Member, require a Member to withdraw all or any amount of the value of the Member's Capital Account if the Manager reasonably deems it necessary to do so to comply with anti-money laundering or other laws and regulations applicable to the Company, the Manager, the Members, or any of the Company's service providers, or to avoid a material adverse impact on the Company or the other Members.

The Manager shall give not less than five days' written notice to the Member specifying the amount and effective date of the withdrawal. As soon as practicable thereafter, the withdrawing Member shall receive the balance of the value in such Member's Capital Account, subject to all appropriate adjustments pursuant to the provisions of this Agreement.

6.2 Interim Distributions. The Company shall not make any distributions during the Term except for (i) tax distributions pursuant to Section 6.3 and (ii) distributions of any Net Income pursuant to this Section 6.2.

(a) Except as provided in Section 9.2, and subject to the other provisions of this ARTICLE 6, the Manager shall distribute any Net Income as follows:

(i) First, to the Members pro rata according to their respective unpaid pre-deployment return, until each Member receives a pre-deployment return on the Member's Capital Contributions in the amount of 6% per annum, accruing on a cumulative, non-compounding basis from the date the Capital Contributions are made by the Member to the Company until the date that such Capital Contributions are deployed in the Business, as determined by the Manager in its sole discretion;

(ii) Second, to the Members pro rata according to their respective unreturned Capital Contributions, until each Member receives a full return of the Member's Capital Contributions; and

(iii) Third, 50% to the Members pro rata according to their respective Ownership Interests and 50% to the Manager.

(b) Notwithstanding any provision to the contrary in this Agreement, the Company, and the Manager on behalf of the Company, shall not make a distribution to any Member on account of the Member's interest in the Company if such distribution would violate the Act or other applicable law.

6.3 Tax Distributions. Subject to the last sentence of this Section 6.3, the Manager shall use its commercially reasonable efforts to cause the Company to distribute, within 100 days after the end of each Fiscal Year, an amount of cash to each Member equal to such Member's tax percentage, calculated in accordance with the next sentence, of the Company's net taxable income and gain allocated to such Member in respect of such Fiscal Year. The amount of any tax distribution will be calculated by the Manager in its sole discretion using the highest blended U.S. federal, state, and local income tax rates applicable to the Members and to capital gains and ordinary income, as applicable. All distributions made pursuant to this Section 6.3 shall (i) be made to the Members in proportion to their respective Ownership Interests, and (ii) reduce, on a dollar-for-dollar basis, the distributions that otherwise would be due to such Member under the applicable provisions of Section 6.2(a) and, accordingly, shall, for all purposes of this Agreement, be deemed to have been made pursuant to such provisions of Section 6.2(a). Any amounts to be distributed to a Member pursuant to this Section 6.3 shall be reduced by any amount distributed to the Member pursuant to Section 6.2(a).

6.4 In-Kind Distribution. The Company may make distributions to the Members in-kind, in lieu of cash, whether that be cash equivalents, bitcoin or other cryptocurrency, or other property. If any assets of the Company are distributed to the Members in kind, such assets shall be valued based on the Fair Value thereof on the date of distribution. The Fair Value of such assets shall be determined by the Manager in its sole discretion. The amount by which the Fair Value of any property to be distributed in kind to the Members exceeds or is less than the basis of such property shall, to the extent not otherwise recognized by the Company, be taken into account in computing gain or loss of the Company for purposes of crediting or charging the Capital Accounts of the Members. At a Member's request, if assets are to be distributed in-kind, the Company may, in the sole discretion of the Manager and at the expense of the Company, form a liquidating trust or other entity to hold such assets on behalf of such Member, and distribute the net proceeds from the sale or other disposition of such assets to such Member from time to time as they become available.

6.5 Suspension of Payment of Distribution and Withdrawal Proceeds for Anti-Money Laundering Purposes. The Manager, by written notice to any Member, may suspend payment of any distribution or withdrawal proceeds to such Member if the Manager reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Company, the Manager, any Principal, or any of the Company's service providers.

6.6 Withholding Obligations. To the extent the Company is required by law to withhold or to make tax payments on behalf of or as to any Member ("**Tax Payments**"), the Company may withhold such amounts and make such Tax Payments as may be required. All such Tax Payments shall be treated for all other purposes of this Agreement as having been paid to such Member (whether before or upon liquidation) in respect of the amount of such Tax Payments. Each Member hereby agrees to (a) indemnify and hold harmless the Company and the Manager from and against any liability as to Tax Payments made on behalf of or as to such Member, and (b) promptly give the Company any certification or affidavit that the Company may request in connection with this Section 6.6.

## ARTICLE 7
## TRANSFER OF INTERESTS

7.1 Transfer Restrictions.

(a) A Member may not assign or otherwise Transfer any of the Member's Units, in whole or in part, to any Person, without the prior written consent of the Manager, which consent may be given or withheld in the sole discretion of the Manager; provided, that no such assignment or Transfer shall be made unless the transferor and transferee provide any such documentation as the Manager shall reasonably request; provided, further, that no such assignment or Transfer shall be made unless the transferee takes such Units subject to the Transfer restrictions in this Agreement; and provided, further, that no such assignment or Transfer shall be made unless, in the opinion of counsel (who may be counsel for the Company) satisfactory to the Manager and which opinion may be waived, in whole or in part, in the sole and absolute discretion of the Manager:

(i) such assignment or Transfer would not violate the Securities Act or any state securities or "Blue Sky" laws applicable to the Company or the Units to be assigned or Transferred;

(ii) such assignment or Transfer would not cause the Company to become subject to the Company Act;

(iii) such assignment or Transfer would not cause the Company to be treated as a "publicly traded partnership" for federal income tax purposes and would not make the Company ineligible for "safe harbor" treatment under Section 7704 of the Code and the regulations promulgated thereunder; and

(iv) such assignment or Transfer would not cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

In addition, the Manager also may require any documentation or other legal opinions, at the expense of the assignor or transferor or the proposed assignee or transferee, that it deems necessary or advisable in connection with any assignment or Transfer, including, without limitation, executing a copy of this Agreement or any amendment hereto (by power of attorney or directly) and a subscription agreement in form and substance satisfactory to the Manager in its sole discretion. Each assigning Member agrees that such Member will pay all reasonable expenses, including, without limitation, legal, accounting and valuation fees and expenses, incurred by the Company in connection with an assignment or Transfer of any Units by such Member, except to the extent that the assignee thereof agrees to bear such expenses.

(b) An assignee of any Units that is not admitted as a substitute Member shall be entitled only to allocations and distributions with respect to such Units and shall have no rights to vote such Units or to any information or accounting of the affairs of the Company and shall not have any of the other rights of a Member pursuant to this Agreement.

(c) Each Member agrees not to pledge, hypothecate, grant a security interest in or otherwise encumber any of the Member's Units at any time. Any such transaction attempted or completed other than in compliance with this Agreement shall be null and void, and the Company shall refuse to register any such transaction on its books and records.

(d) Notwithstanding anything in this Agreement to the contrary, the Manager may Transfer any of its Units to an Affiliate; provided, that a Principal shall continue to control the Manager from and after the date of Transfer.

7.2 General Transfer Provisions. Except as otherwise provided by ARTICLE 9, in no event shall the Company dissolve or terminate upon the admission of any Member to the Company or upon any permitted Transfer of any Units or any economic interest therein by any Member, and each Member hereby waives such Member's right to dissolve, liquidate or terminate the Company in any such event.

7.3 Waiver of Partition. Except for actions that may be taken pursuant to the terms of this Agreement and as otherwise specifically provided in this Agreement, no Member shall, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of its assets or properties, or cause the sale of any Company property, notwithstanding any provisions of applicable law to the contrary and each Member (for the Member and for the Member's legal representative, successor or assign) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to the Member's Units, or with respect to any assets of the Company.

7.4 ERISA Members.

(a) Notwithstanding any provision in this Agreement to the contrary, each ERISA Member may elect to withdraw from the Company, or upon demand by the Manager shall withdraw from the Company, at the time and in the manner hereinafter provided, if either the ERISA Member or the Manager shall obtain an opinion of counsel (which counsel shall be reasonably acceptable to both the ERISA Member and the Manager) to the effect that, as a result of applicable statutes, regulations, case law, administrative interpretations, or similar authority, or if it is determined by the United States Department of Labor or Internal Revenue Service or a court of competent jurisdiction that, (i) the continuation of the ERISA Member as a Member of the Company or the conduct of the Company will result, or it is more likely than not that the same will result, in a material violation of ERISA or Section 4975 of the Code, or (ii) all or any portion of the assets of the Company constitute assets of the ERISA Member for the purposes of ERISA and such assets are subject to the provisions of ERISA to substantially the same extent as if owned directly by the ERISA Member. In such event, the Manager shall provide the ERISA Member with written notice of the demand for withdrawal or the ERISA Member shall provide the Manager with written notice of the election to withdraw, as the case may be. Thereupon, (A) the Manager and the ERISA Member shall use their reasonable best efforts to eliminate the necessity for such withdrawal, and (B) unless within 120 days after receipt of such written notice the Manager is able to eliminate the necessity for such withdrawal to the reasonable satisfaction of the ERISA Member and the Manager, whether by correction of the condition giving rise to the necessity of the Member's withdrawal, or the amendment of this Agreement, or otherwise, such Member shall withdraw from the Company, such withdrawal to be effective upon the last day of the fiscal quarter during which such 120-day period expired.

(b) The withdrawing Member shall be entitled to receive within 120 days after the date of such withdrawal an amount equal to the amount of such Member's Capital Account, adjusted to reflect unrealized gains and losses of the Company, as of the effective date of such withdrawal.

(c) Any distribution or payment to a withdrawing Member pursuant to this Section 7.4 may, in the sole discretion of the Manager, be made in cash; in a pro rata distribution of securities; in the form of a promissory note, the terms of which shall be mutually agreed upon by the Manager and the withdrawing Member and which shall provide for partial payments, as if such promissory note represented an equity interest in the Company, at the time of cash distributions to the Members; or any combination thereof; provided, however, if the Member delivers to the Manager an opinion of legal counsel reasonably acceptable to the Manager that it

is more likely than not that the withdrawing Member's receipt of an amount of any security would cause such Member to own or control in excess of the amount of such security that it may lawfully own or control or may own or control without tax penalty, then, upon receipt of such opinion the Manager shall vary the method of distribution, in an equitable manner, so as to avoid such excessive ownership or control. In determining the form of payment to be made to the withdrawing Member, the Manager will use reasonable efforts to make payments in cash to the extent reasonably available and subject to the ongoing cash requirements of the Company as determined by the Manager.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1 Exculpation.

(a) To the fullest extent not prohibited by law, none of the Manager, the Partnership Representative, any of their respective Affiliates, or any of their respective principals (including the Principals), partners, members, officers, shareholders, directors, managers, employees, or agents (each, a "**Covered Person**"), shall be liable to the Company or any Member for monetary damages for any losses sustained or liabilities incurred as a result of any act or omission taken or suffered by such Covered Person(s), unless and to the extent that a court or arbitral tribunal of competent jurisdiction determines in a final judgment (without regard to the availability of any appeals granted on a discretionary basis) that such losses or liabilities are the result of the Covered Person's gross negligence, intentional misconduct, bad faith, or knowing violation of applicable law.

(b) The Manager and such other Covered Persons may consult with counsel, consultants, appraisers, and accountants selected by them in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel, consultants, appraisers, and accountants, and shall be conclusively presumed to have been and shall be conclusively presumed to have been done or omitted in good faith and in accordance with such advice or opinion.

(c) This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, to the fullest extent permitted by applicable law, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, at law or in equity the Manager or other Covered Person might otherwise have to the Members or the Company or may be implied by applicable law, and in doing so, acknowledges and agrees that the sole duties and obligations of each Covered Person to each other, to the Members, and to the Company are only as expressly set forth in provisions of this Agreement. To the fullest extent permitted by applicable law, the provisions of this Agreement, to the extent that they modify, restrict or eliminate the duties (including fiduciary duties) and liabilities of any Covered Person otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities of such Covered Person; provided, however, that nothing in this Agreement shall be deemed to modify, restrict or eliminate the Manager's implied contractual covenant of good faith and fair dealing.





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

(d) Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the Manager is permitted or required to make a decision in its "sole and absolute discretion," or "discretion," the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty (including any fiduciary duty) or obligation to give any consideration to any interest of or factors affecting the Members. Furthermore, no Covered Person shall be liable to the Company or any Member or other Person for the Manager's or the Covered Person's good faith reliance on the provisions of this Agreement.

(e) Notwithstanding any of the foregoing to the contrary, the provisions of this Section 8.1, as well as the indemnification provisions described below in Section 8.2, shall not be construed so as to provide for the exculpation of any Covered Person for any liability (including liability under federal securities laws which, under certain circumstances, impose liability even on Persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but will be construed to effect the provisions of this Section 8.1 to the fullest extent permitted by law.

(f) The Covered Persons who serve in any such capacity at any time while this Section 8.1 is in effect are intended third party beneficiaries of this Section 8.1.

8.2 Indemnification.

(a) Indemnification Generally. The Company shall, to the fullest extent permitted by applicable law, indemnify out of the assets of the Company only, including the proceeds of any insurance policy, hold harmless and release, each Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("**Claims**"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the activities of the Company, or authorized activities undertaken in connection with the Company, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses reasonably incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "**Proceeding**"), whether civil or criminal (all of such Claims and amounts covered by this Section 8.2, and all expenses referred to in Section 8.2(b), are referred to collectively as "**Damages**"), except to the extent that a court or arbitral tribunal of competent jurisdiction determines in a final judgment (without regard to the availability of any appeals granted on a discretionary basis) that the Covered Person's actions or omissions constituted gross negligence, intentional misconduct, bad faith, or knowing violation of applicable law.

(b) Advancement of Expenses. The reasonable expenses incurred by an Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Company to such Covered Person prior to

the final disposition thereof upon the approval of the Manager and receipt of an undertaking by or on behalf of the Covered Person to repay such amount if (i) it shall be determined ultimately by a court or arbitral tribunal of competent jurisdiction that the Covered Person is not entitled to be indemnified under applicable law or (ii) upon receipt of an opinion of independent counsel to the Company, retained specifically for such purpose, that the Covered Person is not entitled to indemnification; provided, however, any determination pursuant to subclause (i) shall take priority over any determination pursuant to subclause (ii).

(c) No Direct Indemnity by Members. Members shall not be required to directly indemnify any Covered Person. Any right to indemnification pursuant to this Agreement shall be satisfied solely from the property of the Company and the proceeds of insurance, if any.

(d) Notices of Claims, etc. Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of the commencement of such Proceeding; provided, however, that the failure of any Covered Person to give notice as provided in this Agreement shall not relieve the Company of its obligations under this Section 8.2, except to the extent that the Company is actually prejudiced by such failure to give notice. In case any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Company), the Company will be entitled to participate in and to assume the defense thereof to the extent that the Company may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Company to such Covered Person of the Company's election to assume the defense thereof, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Company will not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Claim. The right of any Covered Person to the indemnification provided in this Agreement shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns and legal representatives. Any repeal or amendment of this ARTICLE 8 shall be prospective only and shall not adversely affect rights under this ARTICLE 8 existing at the time of such repeal or amendment.

## ARTICLE 9
## DISSOLUTION; WINDING UP

9.1 Events of Dissolution. Notwithstanding any other provision of this Agreement to the contrary, the Company shall be dissolved and its affairs wound up upon the earliest to occur of any of the following events (each, a "**Dissolution Event**"):

(a) the effective date of a decree of judicial dissolution of the Company pursuant to the Act;





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

(b) sale or other disposition of the Business, dissolution and liquidation of the Business Owner, or sale or other disposition of the Company's interest in the Business Owner, and the reduction to cash or cash equivalents of substantially all assets of the Company;

(c) except as provided by Section 2.2(b), the removal of the Manager, or any other event that results in such entity ceasing to be a Manager;

(d) an election to dissolve the Company made by the Manager and the Member or Members collectively holding an Ownership Interest of at least 75%; or

(e) a good faith determination by the Manager that dissolution of the Company is necessary or desirable as a result of the assets of the Company being deemed to be "plan assets" for purposes of ERISA.

The foregoing events are, to the fullest extent permitted by law, the only events that shall result in a dissolution of the Company.

9.2 Winding Up. If the Company is dissolved pursuant to Section 9.1, the Company shall be wound up and liquidated in accordance with the Act and the following provisions:

(a) The assets of the Company shall be liquidated by the Manager, or a liquidator if there is no Manager, as promptly as possible; provided, however, that such liquidation is carried out in an orderly and businesslike manner so as to maximize value and not involve undue sacrifice;

(b) Profits or Losses of the Company for the year(s) of liquidation, including any net gain or loss realized by the Company upon the sale of the property and assets of the Company pursuant to Section 9.2(a) (other than Net Income that has been distributed to the Members pursuant to Section 6.2(a) prior to the commencement of winding up and liquidation proceedings), shall be credited or charged to the Capital Accounts of the Members in accordance with ARTICLE 5;

(c) Proceeds from the sale of all or substantially all the property and assets of the Company shall be applied and distributed as follows, and in the following order of priority:

(i) First, to creditors of the Company, including Members who were creditors, to the extent permitted by law, in satisfaction of all debts and liabilities of the Company and the expenses of liquidation not otherwise adequately provided for (whether by payment or the making of reasonable provisions of payment thereof), including, without limitation, the setting up of any reserves that reasonably are necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or of the Members arising out of, or in connection with, the Company; and

(ii) Second, in accordance with the provisions of Section 6.2(a); and

(d) Any documents of dissolution of the Company required by law shall be filed as authorized and directed by the Manager.

9.3 Claims of the Members. Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

9.4 Survival of Rights, Duties and Obligations. Dissolution, winding up or termination of the Company for any reason shall not release any party from liability that at the time of such dissolution, winding up or termination already had accrued to any other party or that thereafter may accrue in respect to any act or omission prior to such dissolution, winding up or termination.

## ARTICLE 10
## TAX RETURNS; INSPECTION OF RECORDS; REPORTS TO MEMBERS

10.1 Filing of Tax Returns. The Company or its designated agent shall prepare and file or cause the accountants of the Company to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Company. Except as otherwise provided in this ARTICLE 10, the Manager may cause the Company to make any tax elections allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company, including, without limitation, an election in accordance with the applicable Regulations promulgated under Section 754 of the Code.

10.2 Reports to Current and Former Members.

(a) The Manager shall exercise reasonable efforts to prepare, and shall make available to each Member, a report as of the end of such Fiscal Year prepared in accordance with accounting principles generally accepted in the United States, setting forth (i) a balance sheet of the Company, (ii) a statement of operations of the Company, (iii) a statement of changes in Members' capital and cash flows and (iv) a schedule of the assets held by the Company as of the end of such Fiscal Year, all as prepared by the Company's independent accountants. The Manager may, in its sole discretion, cause the items in (i) – (iii) above to be audited by a certified public accounting firm. All reports, statements, and other related documents set forth in this Section 10.2(a) will be prepared and made available to Members within 180 days after the end of each Fiscal Year.

(b) The Manager shall exercise reasonable efforts to prepare, and shall make available to each Member, a report as of the fiscal quarter ending on such date prepared in accordance with accounting principles generally accepted in the United States, setting forth (i) an unaudited balance sheet of the Company, (ii) an unaudited statement of operations for the Company, (iii) unaudited statements of changes in Members' capital and cash flows, (iv) a

schedule of the assets held by the Company as of the end of such fiscal quarter, and (v) other updates regarding the business and activities of the Company as determined by the Manager in its sole discretion. All reports, statements, and other related documents set forth in this Section 10.2(b) will be prepared and made available to Members within 75 days after the end of each fiscal quarter.

(c) The Company expects to prepare and provide to each Member and, to the extent necessary, to each former Member (or the Member's legal representative), a report setting forth in sufficient detail that information that will enable such Member or former Member (or its legal representative) to prepare the Member's federal, state and local tax returns in compliance with the laws, rules and regulations then prevailing. All reports, statements, and other related documents set forth in this Section 10.2(c) will be prepared and provided to Members as soon as practicable after the end of the Fiscal Year.

(d) Pursuant to Section 11.6(b), the Manager may edit the information provided to the Members pursuant to this Section 10.2 to the extent reasonably necessary to protect the confidentiality of highly sensitive information.

10.3 Partnership Representative.

(a) The Manager shall be the partnership representative ("**Partnership Representative**") of the Company pursuant to Code section 6223. The Partnership Representative shall employ experienced tax counsel to represent the Company in connection with any audit or investigation of the Company by the Internal Revenue Service and in connection with all subsequent administrative and judicial proceedings arising out of such audit. If the Partnership Representative is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Members, then the Company shall be entitled to reimbursement from those Members on whose behalf such fees and expenses were incurred. Other than as described in the preceding sentence, all expenses incurred by the Partnership Representative shall be Company Expenses and shall be paid by the Company. The Manager may, in its sole discretion, designate another Member to serve as the Partnership Representative.

(b) The Partnership Representative shall have the sole discretion to make or refrain from making any election or otherwise act on behalf of the Company in any audit proceeding involving the Company. Furthermore, if the Company receives a notice of final partnership adjustment from the Internal Revenue Service, the Partnership Representative may, as determined in its discretion and with respect to any applicable year, (x) reasonably determine the amount of any "imputed underpayment" (as defined in Section 6225 of the Code) allocable to each Member (or former Member) or (y) cause the Company to (A) elect the application of Section 6226 of the Code with respect to any imputed underpayment arising from such adjustment, and (B) furnish to each Member (or former Member) a statement of such Member's (or former Member's) share of any adjustment to income, gain, loss, deduction or credit (as determined in the notice of final partnership adjustment).

(c) Each Member agrees that any action taken by the Partnership Representative in connection with any U.S. federal, state, or local tax audit or proceeding





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

affecting the Company, including any settlement or closing agreement entered into by the Partnership Representative in respect of the Company and any Member, will be binding upon the Members.

10.4 Access to Company Records. Proper and complete records and books of account of the business of the Company shall be maintained at the Company's principal place of business. The Company agrees that each current Member shall have access to certain information in accordance with the Act subject to the confidentiality provisions set forth therein and in Section 11.6. Upon reasonable advance written notice and during reasonable business hours, a Member may inspect and copy, at the Member's expense and solely for a purpose reasonably related to the Member's interest as a Member, the records of the Company required to be maintained pursuant to the Act and any financial statements maintained by the Company. Notwithstanding the foregoing, no Member shall have a right to receive (i) any information with respect to the economic participation of any other Member in the Company, (ii) any information the Manager reasonably believes to be trade secrets of the Company or (iii) other information the disclosure of which the Manager in good faith believes could damage the Company or its business interests. Any inspection hereunder must be in good faith without any intent to damage the Company or any of its Members in any manner.

## ARTICLE 11
## MISCELLANEOUS

11.1 General. This Agreement (i) shall be binding on the successors, permitted assigns, executors, administrators, estates, heirs and legal representatives of the Members, and (ii) may be executed by manual or facsimile signature, through the use of separate signature pages or in any number of counterparts, with the same effect as if the parties executing such counterparts had all executed one counterpart.

11.2 Power of Attorney. Each of the Members hereby appoints the Manager with the power of substitution as such Member's true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a) any and all instruments, qualification, continuance, merger, consolidation, certificates, and other documents that may be deemed necessary or desirable to effect the qualification, continuance, merger, consolidation, dissolution, winding up and termination of the Company;

(b) any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state or local law; and

(c) any amendment of this Agreement (other than amendments requiring the Member's approval pursuant to Section 11.3); provided, however, notwithstanding the foregoing,

the Manager shall have the power of attorney to make adjustments to the terms of this Agreement resulting from the issuance of Units pursuant to the terms of this Agreement.

The power of attorney hereby granted by each of the Members is coupled with an interest, is irrevocable, and shall survive and shall not be affected by the subsequent death, disability, incapacity, adjudication of incompetency, termination, Bankruptcy, insolvency or dissolution of such Member; provided, however, that such power of attorney will terminate upon the substitution of another Member for all of such Member's investment in the Company or upon the withdrawal of the Member from the Company. Each Member hereby waives any and all defenses that may be available to contest, negate or disaffirm the actions of the Manager taken in good faith under such power of attorney.

11.3 Amendments.

(a) The Manager may at any time amend this Agreement as it considers necessary provided that such amendment shall be effective only if signed or approved by the affirmative vote or written consent of a Majority in Interest of the Members (unless a provision of this Agreement requires the amendment, as an action of the Company or the Manager, to be signed or approved by a higher threshold of the Members than a Majority in Interest of the Members, in which case the amendment shall be effective only if signed or approved by such higher threshold); provided, however, no amendment which would (i) increase or create liabilities for the Members (ii) except to the extent permitted pursuant to Section 11.3(b), change (A) the rights and interests of a Member in income, (B) the voting rights of a Member, or (C) the rights of a Member respecting Capital Contributions or liquidation of the Company, or (iii) amend this Section 11.3, shall become effective without being signed or approved by the affirmative vote or written consent of all the Members adversely affected by such amendment in accordance with Section 11.3(c).

(b) Notwithstanding Section 11.3(a), the terms of this Agreement (including Schedule A) may be amended by the Manager without the consent of the Members in order to:

(i) reflect any change, revision, amendment, or modification permitted by and effected in accordance with the terms of this Agreement with respect to the

(A) name of any Member,

(B) issuance, redemption, or Transfer of any Units,

(C) admission, withdrawal, or resignation of any Member,

(D) aggregate Capital Contributions and Ownership Interests of any Member,

(E) address for notices of any Member,

(ii) change of name or address of the Company's registered agent or address for notices or name of the Company,

(iii) make any other amendment whatsoever to this Agreement which the Manager deems advisable, provided that it does not adversely affect any rights of the Members.

The Manager shall promptly send a notice to each Member describing such amendment or to this the Agreement (including Schedule A).

(c) Amendments to this Agreement requiring the approval of the Members may be proposed by the Manager or by the Member or Members collectively holding an Ownership Interest of 20% or greater. The Manager shall submit to the Members a verbatim statement of any amendment so proposed. The Manager shall include in any such submission its recommendation as to the proposed amendment. The amendment shall become effective only on the vote or consent of the Manager and the Members required under this Section 11.3; provided, that, for purposes of obtaining a written consent on a proposed amendment, the Manager may require a response within a specified reasonable time (which shall not be less than 15 business days) and failure to respond shall constitute an affirmative vote or written consent in accordance with the Manager's recommendation as to the proposed amendment.

11.4 Choice of Law; Priority. Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions of this Agreement shall be construed under the laws of the State of Wyoming and, without limitation thereof, that the Act as now adopted or as may be hereafter amended shall govern this Agreement. In the event of any inconsistency or conflict between any terms of this Agreement and the Act, the terms of this Agreement shall govern to the maximum extent permitted by law.

11.5 Notices. Wherever provision is made in this Agreement for the giving of any notice, such notice shall be in writing and shall be deemed to have been duly given if sent by electronic mail to a known email address for the recipient, mailed by first-class U.S. mail, postage prepaid, addressed to the party entitled to receive the same or delivered personally to such party at the address specified below, or if delivered personally or sent by overnight courier, if to the Members, to the addresses therefor set forth on Schedule A, and if to the Company to:

Touzi Mine Invest, LLC
c/o Touzi Capital, LLC
Attn: Investor Relations
2093 Philadelphia Pike #8883
Claymont, DE 19703
E-Mail: investors@touzicapital.com

or to such other address, in any such case, as any party hereto shall have last designated by notice to the Company. All such notices, requests and other communications will (a) if delivered personally to the address as provided in this Section 11.5, be deemed given upon delivery, (b) if delivered by certified or registered mail, return receipt requested, or by first-class mail in the

manner described above to the address as provided in this Section 11.5, be deemed given three business days after being deposited in the United States mail, postage prepaid, and (c) if delivered by overnight courier to the address as provided in this Section 11.5, be deemed given one business day after being deposited with the overnight courier (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this Section 11.5).

11.6 Confidential Information.

(a) This Agreement and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, the identity of Members and their Affiliates, provided such information is not publicly available, reports or other materials and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the Company, the Manager, the Company's assets, or the Members (collectively, the "**Confidential Information**"), that any Member may receive pursuant to or in accordance with this Agreement, or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Manager, and their Affiliates (the "**Affected Parties**"). The Members acknowledge that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses.

(b) No Member shall reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than to (i) such Member's (A) directors, officers and Affiliates and (B) legal, accounting or investment advisers (provided that such persons are obligated to keep the Confidential Information confidential) without the prior written consent of the Manager (which consent shall include the form and content of such disclosure) and (ii) examiners, auditors, inspectors or Persons with similar responsibilities or duties of a nationally recognized industry regulatory association, federal or state governmental or regulatory body or federal, state or local taxation authority, except to the extent compelled to do so in accordance with applicable law (in which case the Member shall promptly notify the Manager of its obligation to disclose any Confidential Information and shall agree to reasonably cooperate with the Manager to prevent such disclosure) or with respect to Confidential Information which otherwise becomes publicly available other than through breach of this provision by a Member. Notwithstanding any provision of this Agreement, the Manager may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any Member if the Manager reasonably determines such disclosure may result in such Confidential Information becoming publicly available.

(c) For the avoidance of doubt, nothing in this Section 11.6 shall limit the disclosure of the tax treatment or tax structure of (x) the Company or (y) any transactions undertaken by the Company. As used in this Section 11.6, the term "tax treatment" refers to the purported or claimed U.S. federal income tax treatment and the term "tax structure" refers to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment, provided, that, for the avoidance of doubt, (i) except to the extent otherwise

established in published guidance by the U.S. Internal Revenue Service, tax treatment and tax structure shall not include the name of, contact information for, or any other similar identifying information regarding the Company or any of its investments (including the names of any employees or Affiliates thereof) and (ii) nothing in this Section 11.6(c) shall limit the ability of a Member to make any disclosure to such Member's tax advisors or to the U.S. Internal Revenue Service.

11.7 Headings. The titles of the articles and the headings of the sections of this Agreement are for convenience of reference only and are not to be considered in construing the terms and provisions of this Agreement.

11.8 Legal Counsel. The Manager has engaged Stoel Rives LLP ("**Stoel**") as legal counsel to assist with the preparation of this Agreement and the other Offering Documents. Stoel has not been engaged to protect or represent the interests of any Member vis-à-vis the Company or the Manager with respect to this Agreement, and no other legal counsel has been engaged by the Manager or the Company to act in such capacity. The Members understand that Stoel plays an active role as legal counsel to many investment firms, investors and other Persons. Stoel's relationships with such Persons are periodic; they can and do lapse and then restart on an unpredictable basis, making it impractical for Stoel to provide disclosure of each and every such relationship. Without limitation on the foregoing, in its capacity as legal counsel to the Company, Stoel may be subject to actual or potential conflicts arising from: (i) its representation of one or more Members or parties related thereto in connection with matters other than the preparation of this Agreement or the operation of the Company (which representation might provide Stoel with an incentive to place the interests of such Member or Members ahead of the interests of the Company) or (ii) its representation of other Persons that seek or obtain capital from the same class of investors as the Company or compete with the Company for managerial resources or investment opportunities. Moreover, one or more Persons related to Stoel may invest in the Company or an Affiliate thereof. Each Member: (i) has carefully considered the foregoing and hereby approves Stoel's representation of the Company; (ii) acknowledges the possibility that, under the laws and ethical rules governing the conduct of attorneys, Stoel may be precluded from representing any one or more specific parties in connection with any dispute involving Members or the Company; and (iii) agrees that Stoel may decline to represent, or withdraw from its representation of, the Company at any time. Each Member: (i) acknowledges that actual or potential conflicts of interest exist among the Members, that such Member's interests will not be represented by legal counsel unless such Member engages counsel on its own behalf, and that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; (ii) agrees that, in the event of a dispute between one or more Members, on the one hand, and the Manager or the Company, on the other hand, Stoel may represent the Manager (or the Manager may engage other legal counsel), one or more equity holders thereof, or the Company (even if there exists at any time a separate attorney/client relationship between Stoel and such Member pursuant to which Stoel has obtained Confidential Information relating to such Member); (iii) acknowledges that the approvals, acknowledgments and waivers made by such Member pursuant to this Section 11.8 do not reflect or create a right under this Agreement on the part of such Member to approve the Manager's selection of legal counsel to the Manager or the Company; and (iv) represents that such Member has the level of

knowledge and sophistication (either alone or with the assistance of its own counsel) necessary to provide its informed consent to the provisions of this Section 11.8 without additional guidance or information from Stoel, the Manager or the Company. Each Member further agrees that (i) neither this Agreement nor the transactions and Company operations contemplated hereby are intended to create an attorney/client relationship between Stoel and such Member or any other relationship pursuant to which such Member (acting other than in the name of the Company) would have a right to object to Stoel's representation of any Person under any circumstances; and (ii) except as otherwise expressly agreed by Stoel in writing, no subsequent attorney/client or other relationship between Stoel and such Member shall give such Member a right to object to Stoel's continuing role as counsel to the Company or any equity holder of the Manager. Notwithstanding the provisions of Section 11.13, it is intended that Stoel shall be entitled to obtain enforcement of this Section 11.8. Notwithstanding the other provisions of this Agreement, this Section 11.8 shall be treated as a supplement to, and not a substitution or replacement for, any other waiver, consent or other agreement provided to Stoel by any Person. Nothing in this Section 11.8 shall preclude the Company from selecting different legal counsel at any time in the future and, except as specifically provided in this Section 11.8, no Member shall be deemed by virtue of this Agreement to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions, Company operations, and disputes contemplated in this Agreement.

11.9 Entire Agreement; Non-Waiver. This Agreement (including Schedule A), each Subscription Agreement and each side letter or similar agreement ("**Side Letter**") entered into between the Manager and any Member constitute the full, complete, and final agreement of the Members and supersede and preempt all prior understandings, agreements or representations by or among the parties, written or oral, that may have related to the subject matter of this Agreement. Notwithstanding the provisions of this Agreement or any Subscription Agreement, it is hereby acknowledged and agreed that the Company and the Manager (on its own behalf or on behalf of the Company), without the approval of any Member, may enter into a Side Letter with a Member executed contemporaneously with the admission of such Member to the Company, which has the effect of establishing rights under, or altering or supplementing the terms of this Agreement, of any Subscription Agreement in order to meet certain requirements of such Member. The parties hereto agree that any terms contained in a Side Letter shall govern with respect to the Member that is a party thereto notwithstanding the provisions of this Agreement or any Subscription Agreement. No delay on the part of any party in exercising any right hereunder shall operate as a waiver thereof, nor shall any waiver, express or implied, by any party of any right hereunder or of any failure to perform or breach of this Agreement by any other party constitute or be deemed a waiver of any other right hereunder or of any other failure to perform or breach of this Agreement by the same or any other Member, whether of a similar or dissimilar nature thereof.

11.10 Further Assurances. Subject to the provisions of this Agreement, each party hereto agrees to execute, with acknowledgment or affidavit, if required, any and all documents and writings which may be necessary or expedient in connection with the creation of the Company and the achievement of its purposes, specifically including (a) any amendments to this Agreement and such certificates and other documents as the Manager deems necessary or





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

appropriate to form, qualify or continue the Company as a limited liability company (or a company in which the Members have limited liability) in all jurisdictions in which the Company conducts or plans to conduct business and (b) all such agreements, certificates, tax statements, tax returns and other documents as may be required of the Company or its Members by law. In addition, if any of the information provided to the Company by a Member in the Member's Subscription Agreement changes after such Member's admission to the Company, such Member shall provide the Manager with notice of such change promptly after the occurrence thereof.

11.11 Severability. If any provision of this Agreement or the application thereof to any party or circumstance shall be held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by applicable law.

11.12 Usage. Any word or term used in this Agreement in any form shall be masculine, feminine, neuter, singular or plural, as proper reading requires. The words "of this Agreement," "hereby" or "hereto" shall refer to this Agreement unless otherwise expressly provided. References in this Agreement to particular sections of the Code, the Regulations or the Act shall be deemed to refer to such sections as they may be amended after the date of this Agreement or any corresponding sections of any successor law or regulation. When a reference is made in this Agreement to Articles, Sections or Schedules, such references shall be to an Article or a Section or Schedule to this Agreement unless otherwise indicated. It is the intention of the parties that every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

11.13 No Third-Party Rights. Except for the rights of parties expressly created hereby, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefit upon, or create any rights in favor of, any Person other than the parties hereto.

11.14 Whole Numbers. Whenever the application of a mathematical formula contained in this Agreement would result in a fraction, each fraction that is equal to or greater than 0.50 shall be rounded upwards to the nearest whole number and each fraction that is less than 0.50 shall be rounded downwards to the nearest whole number.

11.15 USA PATRIOT Act Compliance.

(a) Prohibited Investments. The Company prohibits the investment of funds in the Company by any Persons or entities that are acting, whether directly or indirectly, (x) in contravention of any United States, international or other money laundering laws, regulations or conventions, or (y) on behalf of terrorists or terrorist organizations, including those Persons or entities that are included on any relevant lists, including the list of Specially Designated





Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

Nationals and Blocked Persons maintained by the United States Office of Foreign assets Control, all as may be amended from time to time ("**Proscribed Investments**").

(b) Authority of the Manager. The Manager shall be authorized, without the consent of any Person, including any other Member, to take such action as it determines to be necessary or advisable to comply, or to cause the Company to comply, with any anti-money-laundering or anti-terrorist laws, rules, regulations, directives or special measures. Notwithstanding anything to the contrary contained in any document (including any Side Letters or similar agreements), if, at any time following any Member's acquisition of Units, it is discovered that such Member's investment is a Proscribed Investment, such Member shall be deemed to have withdrawn from the Company effective immediately and such Member shall have no claim arising out of such deemed withdrawal for any form of Damages against the Company, the Manager, any Affiliate of the Manager or any of their respective shareholders, partners, members, other equity holders, officers, directors, employees, managers, agents and other representatives, other than, if permitted by law, the right to receive payment for the Member's Units in a manner corresponding to that set forth in Section 6.1 applicable to withdrawing Members, as applied in good faith by the Manager in its sole discretion. Any proceeds of such Member's Units pursuant to this Section 11.15(b) or otherwise will be paid to the same account from which the Member's investment in the Company was originally remitted, unless the Manager, in its sole discretion, agrees otherwise.

(c) Release of Confidential Information. The Company or the Manager may release Confidential Information about any Member and, if applicable, any beneficial owner(s) of such Member to proper authorities, if the Manager, in its sole discretion, determines that it is in the best interests of the Company in light of relevant rules and regulations concerning Proscribed Investments.

11.16 Payment in U.S. Dollars. Unless otherwise requested by the Manager, all payments required to be made pursuant to this Agreement shall be payable only in United States dollars and shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than United States dollars, or any other realization in such other currency, whether as proceeds of set-off, distributions or otherwise, except to the extent that such tender, recovery or realization shall result in the effective receipt by the Person to whom such payment was owed of the full amount of United States dollars due and payable hereunder.

11.17 Performance and Remedies for Breach. Except as otherwise specifically provided in this Agreement, the remedies set forth in this Agreement are cumulative and shall not exclude any other remedies to which a Person may be lawfully entitled. The Manager, in its sole and absolute discretion, shall determine what action, if any, shall be taken under this Agreement or applicable law against a Member in connection with such Member's breach of this Agreement.

11.18 Definitions. The following terms used in this Agreement shall be defined as follows:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" means, when used with reference to a specified Person at any specified time, (a) any Person that, at any such time, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such specified Person, or (b) any Person that, at such specified time, directly or indirectly, is the beneficial owner of a majority of the voting ownership interests of such specified Person, which definition shall, as applied to the Manager, specifically include each Principal at such specified time, and any officer of the Manager.

"**Allocation Year**" means (i) the period commencing on the date hereof and ending on the last day of the Company's first taxable year, (ii) any subsequent period commencing on the first day of the Company's taxable year and ending on the following last day of the Company's taxable year, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss, or deduction pursuant to ARTICLE 5.

"**Bankruptcy**" of a Member means: (i) the filing by such Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under title 11 of the United States Code (or corresponding provisions of future laws) or any other bankruptcy or insolvency law, or such Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by such Member of any assignment for the benefit of its creditors or the admission of such Member in writing of its inability to pay its debts as they mature; (iii) seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of or for all or any substantial part of such Member's assets; (iv) the expiration of 180 days after the filing of any involuntary petition under title 11 of the United States Code (or corresponding provisions of future laws), or an involuntary petition seeking liquidation, reorganization, arrangements, composition, dissolution or readjustment of its debts or similar relief under any bankruptcy or insolvency law; provided, however, that the same shall not have been vacated, set aside or stayed within such 180-day period; or (v) the expiration of 150 days after an application, without consent of such Member, for the appointment of a trustee, receiver or liquidator of or for such Member, or all or any substantial part of such Member's assets; provided, however, that the same shall not have been vacated or stayed within such 150-day period, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"**Code**" means the Internal Revenue Code of 1986, as amended.



***Confidential***

Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

"**Company Minimum Gain**" has the meaning set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"**ERISA Member**" means any Member that is an "employee benefit plan" or is an entity that is deemed to hold "plan assets," each within the meaning of, and subject to the provisions of, ERISA.

"**Fair Value**" means the fair value of any asset, security, or other assets of the Company. In determining the Fair Value, all relevant factors shall be considered that are appropriate under the circumstances, including, without limitation, available appraisals, the discounted present value of estimated future cash flows, replacement costs and comparable market prices.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Manager;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (A) the issuance or acquisition of any Units to or by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for the Member's Units; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the issuance of Units (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided, however, that adjustments pursuant to clauses (A), (B), and (D) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b) but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" or Section 5.3(g); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Manager determines that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Majority in Interest of the Members**" means the Member or Members collectively holding an Ownership Interest greater than 50% as of the date of the calculation.

"**Maximum Offering Amount**" means $40,000,000.

"**Member Nonrecourse Debt**" has the same meaning as the term "partner nonrecourse debt" set forth in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the same meaning as the term "partner nonrecourse deductions" set forth in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"**Memorandum**" means the Confidential Private Placement Memorandum dated November 2021 furnished by the Manager to prospective investors in connection with the Offering, as amended, restated, supplemented, or modified from time to time.

"**Net Income**" means all cash received by the Company from distributions from the Business Owner or otherwise, but excluding Capital Contributions and any amounts borrowed by the Company, less any amounts needed to pay or establish reserves for Company Expenses or other expenses or liabilities of the Company as determined by the Manager in its sole discretion.

"**Nonrecourse Deductions**" has the meaning set forth in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

"**Offering**" means the Company's offering of up to 40,000 Units, at a price of $1,000 per Unit for $40,000,000 in the aggregate, to eligible prospective investors.

"**Offering Documents**" means this Agreement, the Memorandum, the Subscription Agreement, and any related documents furnished by the Manager to prospective investors in connection with the Offering.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, government agency or instrumentality or other entity.

"**Principal**" means each of Eng Taing.

"**Profits**" and "**Losses**", as appropriate, means, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses," shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704 (b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 5.3 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.3 shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended, modified, or supplemented from time to time (including corresponding provisions of succeeding regulations).

"**Subscription Agreement**" means the Subscription Agreement entered into between each investor in the Offering and the Company, in the name of and on behalf of the Manager, in form and substance acceptable to the Manager, pursuant to which the investor subscribes to purchase Units

"**Transfer**" means, as applicable, a sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of a Member's Units, either directly or indirectly, to another Person. When used as a verb, the term "Transfer" has a correlative meaning.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Manager has executed this Agreement effective as of the date first set forth above.

**MANAGER:**

Touzi Capital, LLC
a California limited liability company

By: Eng Taing
Eng Taing, Manager

**Co-MANAGER:**

McKenna Capital, LLC
a Delaware limited liability company

By:________________________________
Ryan McKenna, Manager



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**IN WITNESS WHEREOF**, the Members have executed this Agreement effective as of the date first set forth above.

**MEMBERS:**

(by the Manager in the name and on behalf of the Members in accordance with the limited power of attorney granted by them to the Manager pursuant to their Subscription Agreements)

Touzi Capital, LLC
a California limited liability company

By: Eng Taing
Eng Taing, Manager



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**SCHEDULE A**

**SCHEDULE OF MEMBERS**

[ON FILE IN THE COMPANY'S BOOKS AND RECORDS]

# INVESTOR QUESTIONNAIRE

*Name* Vince Faridani

1. I am an Accredited Investor ● Yes ____ No

2. Accredited Investor Status – check one of the following:

____ My individual net worth, or joint net worth with my spouse, excluding the value of my/our primary residence, exceeds $1,000,000.

✓ My individual income (without my spouse) was more than $200,000 each of the last two years, and I reasonably expect it to be more than $200,000 this year.

____ My spouse and I had joint income of more than $300,000 each of the last two years, and I reasonably expect our joint income to exceed $300,000 this year.

____ I hold one of the following licenses from FINRA: a General Securities Representative license (Series 7), a Private Securities Offerings Representative license (Series 82), or a Licensed Investment Adviser Representative license (Series 65).

____ I am a registered investment adviser.

____ I am an investment adviser described in section 203(l) (venture capital fund advisers) or section 203(m) (exempt reporting advisers) of the Investment Advisers Act.

____ I am otherwise an accredited investor. (describe below)

______________________________________________

***Continue this questionnaire only if you checked "None of the above."***

3. Investor Sophistication – check one of the following:

✓ I personally have enough knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in privately-owned real estate and investment projects.

____ I am relying on an external Subscriber representative to help evaluate the merits and risks of investments.

Name, phone, and email address of your Subscriber Representative:

______________________________________________

May we send your Subscriber Representative a Questionnaire?

____ Yes ____ No

Does your Subscriber Representative have enough knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in private companies or loans?

____ Yes ____ No

**SUBSCRIBER INFORMATION SHEET**

*Name of Subscriber* Vince Faridani

*Investment Amount* $ 50000.00

*Tax ID* 20-0182452
*(SSN For Individual / EIN For Entity)*

*Email Address* vfaridani@hotmail.com

*Phone Number* +1-9547741391

*Mailing Address* 8471 STROM PARK DR, MELBOURNE, Florida, 32940
Street, City, State and Zip Code

**TOUZI MINE INVEST, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT (this "Agreement") is made by and between Touzi Mine Invest, LLC, a Wyoming limited liability company (the "Company"), and the undersigned subscriber ("Investor"), effective as of the date this Agreement is executed by Touzi Capital, LLC, a California limited liability company (the "Manager") and McKenna Capital, LLC, a Delaware limited liability company as co-manager, on behalf of the Company. Each of the Company and Investor may be referred to herein as a "Party" and jointly as the "Parties."

WHEREAS, the Company and Investor desire this Agreement to document the Investor's purchase of Units in the Company;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants in this Agreement, each of the Company and Investor, intending to be legally bound, agree as follows:

**ARTICLE 1**
**PURCHASE OF UNITS**

Subscription. Investor hereby irrevocably subscribes for and agrees to purchase that number of Units of the Company set forth on the signature page of this Agreement (collectively, the "Subscribed Units") at the price per Unit of $1,000, which Subscribed Units shall be issued to Investor pursuant to the terms of this Agreement and shall be held by Investor as a Member subject to the terms and conditions of the Company's Operating Agreement, a copy of which has been provided to Investor (as amended or restated from time to time in accordance with the terms thereof, the "Operating Agreement"). Any capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meaning set forth in the Operating Agreement. The Manager may accept or reject Investor's subscription for the Subscribed Units, in whole or in part, for any reason in the Manager's sole discretion.

1.2 Payment. Payment for the Subscribed Units shall be made by Investor to the Company by check, wire transfer of immediately available funds, or ACH payment, in each case concurrently with Investor's execution and delivery of this Agreement to the Company. If all or any portion of Investor's subscription for the Subscribed Units is rejected by the Manager, the Manager shall notify the Investor and return to Investor that portion of the payment for the Subscribed Units that relates to the portion of Investor's subscription for the Subscribed Units that was rejected by the Manager.

1.3 Issuance of Subscribed Units. As set forth in the Operating Agreement, the Units are uncertificated. Accordingly, the Company shall complete and memorialize the issuance and sale of the Subscribed Units to Investor in exchange for Investor's capital contribution to the Company in the amount paid by Investor pursuant to the terms of this Agreement by updating Schedule A to the Operating Agreement to reflect such issuance and sale.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

## Article 2
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Investor as follows:

The Company is fully authorized to execute this Agreement and complete the transaction contemplated hereby, and no consent, approval, or authorization from any third party is required in connection herewith or therewith.

2.1 The Subscribed Units have been duly authorized for issuance and sale to Investor pursuant to this Agreement.

## Article 3
## REPRESENTATIONS AND WARRANTIES OF INVESTOR

Investor hereby represents and warrants to the Company as follows:

Investor is authorized to execute this Agreement and complete the transaction contemplated hereby, and no consent, approval, or authorization from any third party is required in connection herewith or therewith.

3.2. Investor is an "accredited investor" as such term is defined under Rule 501 of the Securities Act of 1933, as amended, (the "Securities Act"). If Investor cannot make this representation, Investor has notified the Manager so that the Manager can review Investor's eligibility to purchase the Subscribed Units.

3.3 Investor has such knowledge and experience in financial, tax and business matters as to enable Investor to evaluate the merits and risks of an investment in the Company and to make an informed investment decision with respect thereto. Investor has a substantive, pre-existing business relationship with the Company, the Manager, or a Member of the Manager, or an Affiliate of the foregoing, its officers, or control persons. Investor did not become aware of the Company or its offering of Units pursuant to any form of general solicitation or advertising.

3.4 Investor has received a copy of the Offering Documents. Investor has not been furnished any offering literature regarding the Subscribed Units other than the Offering Documents, and the undersigned has relied only on the information contained therein. Investor has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Units and has had full access to such other information concerning the Company as Investor has requested.

3.5 Investor is able to bear the economic risk of its investment in the Subscribed Units for an indefinite period of time because none of the Units have been registered under the Securities Act or applicable state securities laws and, therefore, cannot be sold unless (a) subsequently registered under the Securities Act and applicable state securities laws or an exemption from such registration is available, and (b) such sale is consented to by the Manager or permitted under the terms of the Operating Agreement.



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

3.6 Investor is acquiring the Subscribed Units for its own account and without any current intention to resell or transfer the Subscribed Units to any other party.

3.7 The execution, delivery and performance of this Agreement does not and will not conflict with, violate or cause a breach of, or require any consent under (a) any agreement, contract or instrument to which Investor is a party, (b) any applicable law, or (c) any judgment, order or decree to which Investor is subject.

3.8 Upon the Manager's acceptance on behalf of the Company of Investor's subscription for the Subscribed Units, Investor (i) agrees to be admitted as a Member of the Company and to be party to the Operating Agreement as a Member of the Company, (ii) agrees to hold the Subscribed Units subject to the terms and conditions of the Operating Agreement, and (iii) hereby grants the Manager a limited power of attorney, which is coupled with an interest and therefore irrevocable, to execute and deliver the Operating Agreement in the name and on behalf of the Investor, in the capacity as a Member of the Company.

3.9 Investor agrees to indemnify, defend, and hold harmless the Company, the Manager, the other Members of the Company, any Affiliates of the Manager, and their respective managers, officers, directors, members, shareholders, employees, and agents, from any claims, actions, liabilities, or expenses (including reasonable attorneys' fees), arising from a breach of any representation or warranty made by Investor in this Agreement.

## ARTICLE 4
## MISCELLANEOUS

Entire Agreement. This Agreement (a) constitutes the entire agreement and supersedes all prior and contemporaneous agreements, negotiations, arrangements and understandings, both written and oral, among the Parties with respect to the subject matter hereof, and (b) is not intended to confer upon any person or entity, other than the Parties, any rights or remedies.

Amendment. This Agreement may be amended, modified, and supplemented only by written agreement of the Parties.

Waiver. Each Party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance by the other Party with any of the agreements or conditions in this Agreement. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. The failure of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

Severability. Any term or provision of this Agreement that is held to be invalid, void, or unenforceable shall not affect the validity or enforceability of the remaining terms and provisions of this Agreement. If any term or provision of this Agreement is invalid, void or unenforceable, the Parties agree that the arbitrator shall have the power to and shall, subject to the arbitrator's



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

discretion, reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Wyoming.

No Assignment. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by either Party (whether by operation of law or otherwise) without the prior written consent of the other Party. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

Counterparts. This Agreement may be executed in one or more counterparts (whether delivered by facsimile or otherwise), each of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party. This Agreement may be executed via DocuSign or similar electronic signature service. Any execution performed via such service shall be deemed an original signature.

[*Signature page follows*]



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**INVESTOR SIGNATURE PAGE**
**FOR INDIVIDUAL AND MARRIED COUPLE INVESTORS (INCLUDING IRAs*)**

IN WITNESS WHEREOF, the undersigned Investor has signed this Agreement on the date set forth below.

Individual Investor Name: Vince Faridani

By: Vince Faridani
*[Investor Signature]*

By: ______________________
*[Co-Investor Signature, if applicable]*

Name: Vince Faridani
*[Investor Printed Name]*

Name: ______________________
*[Co-Investor Printed Name, if applicable]*

Date: 12/20/2021

Date: ______________________

Amount Subscribed for: $ 50,000.00

Number of Subscribed Units ($1,000 per Unit): ______________________

Primary Social Security No. (for K-1 taxes): 589123448

**INVESTOR CONTACT INFORMATION:**

Address ______________________

City ______________ State ________ Zip ____________ Country ______________

Telephone(s) ______________________

E-Mail(s) ______________________

***If Investor is an Individual Retirement Account, also complete and sign the next page.**



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

**FOR INDIVIDUAL RETIREMENT ACCOUNT INVESTORS ONLY:**

---

**Custodian or Trustee Approval for an IRA Investor:** By signing below, the undersigned, a qualified custodian of the IRA for the individual Investor named above (the "IRA Investor"), consents to the IRA Investor being invested in the Membership Interest:

Name of Custodian or Trustee: ______________________________

By: ______________________________ IRA Account No. 20-0182452
*[Signature of Authorized Representative]*

Name: ______________________________ Date: ______________________________
*[Name of Authorized Representative]*

Title: ______________________________

**IRA CUSTODIAN CONTACT INFORMATION:**

Address 13191 Starkey Rd., Suite 2

City Largo State FL Zip 337773 Country USA

Telephone(s) 954-774-1391

E-Mail(s) Rteed@AdvantaIRA.com

---

**INVESTOR SIGNATURE PAGE**
**FOR ENTITY INVESTORS**

IN WITNESS WHEREOF, the undersigned Investor has signed this Subscription Agreement on the date set forth below.

Entity Investor Name: Vince Faridani

By: Vince Faridani
*[Signature of Authorized Signatory]*

By:____________________
*[Signature of Authorized Co-Signatory, if applicable]*

Vince Faridani
*[Printed Name of Authorized Signatory]*

____________________
*[Printed Name of Authorized Co-Signatory, if applicable]*

Title:____________________ Title:____________________

Date:____________________ Date:____________________

Amount Subscribed for: $ 50,000.00

Number of Subscribed Units ($1,000 per Unit): ____________________

Investor EIN / Tax Identification No. (for K-1 taxes): ____________________

**INVESTOR CONTACT INFORMATION:**

If applicable, Business Name ____________________

Address ____________________

City __________ State ______ Zip ______ Country __________

Telephone(s) ____________________

E-Mail(s) ____________________

**ACCEPTANCE OF SUBSCRIPTION AGREEMENT**

IN WITNESS WHEREOF, the foregoing Agreement is hereby accepted by the Manager on behalf of the Company upon the terms and conditions set forth herein.

**MANAGER:**

Touzi Capital, LLC
a California limited liability company

By: Eng Taing

Name: Eng Taing

Title: Manager

Dated: 12 / 20 / 2021

**(FOR USE BY THE COMPANY ONLY)**

Subscription has been: ❑ Accepted ❑ Accepted in Part ❑ Rejected ❑ Other

Subscription Amount $_________________________________

Date__________________________

# ACH Direct Deposit Receiver Authorization Form

I hereby authorize Touzi Capital, LLC and Touzi Mine Invest, LLC to initiate credit entries (for distributions and other proceeds) and to initiate, if necessary, debit entries and adjustments for any credit entries in error to the bank account listed on my/our investor portal. I further authorize the financial institution named there to credit and/or debit such accounts.

I understand that this authorization remains in effect until Touzi Capital, LLC and its affiliates receives from me, in writing, notification to terminate the authorization in such a time and manner as to afford Touzi Capital, LLC, Touzi Mine Invest, LLC and my financial institution a reasonable amount of time to act upon it.

Initials VJ__________

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

Print or type. See **Specific Instructions** on page 3.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Vince Faridani

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ ________

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ________

Exemption from FATCA reporting code (if any) ________

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

8471 Strom Park Drive

Requester's name and address (optional)

**6** City, state, and ZIP code

Melbourne, FL 32940

**7** List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

[ ][ ][ ] – [ ][ ] – [ ][ ][ ][ ]

**or**

**Employer identification number**

[ ][ ] – [ ][ ][ ][ ][ ][ ][ ]

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** **Signature of U.S. person ▶** Vince Faridani **Date ▶** 12 / 20 / 2021

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments**. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*



Doc ID: 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships,* earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

## Line 6

Enter your city, state, and ZIP code.

# Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester,* later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

# Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code,* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |
| **For this type of account:** | **Give name and EIN of:** |
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships,* earlier.

***Note:** The grantor also must provide a Form W-9 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov.* You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint.* You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

HELLOSIGN

# Audit trail

| | |
|---|---|
| **TITLE** | Bitcoin Mining Fund 4 |
| **FILE NAME** | Touzi_Mine_Invest...1638817879542.pdf |
| **DOCUMENT ID** | 7cab418e9b7318aabe3c9c1e9dd30720fe47a4ba |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was signed on touzicapital.invportal.com**

## Document history

| | | |
|---|---|---|
| SENT | **12 / 20 / 2021**<br>20:59:53 UTC | Sent for signature to Vince Faridani (vfaridani@hotmail.com) and Eng Taing (eng@touzicapital.com) from dev@syndicationpro.com<br>IP: 3.85.97.66 |
| VIEWED | **12 / 20 / 2021**<br>20:59:59 UTC | Viewed by Vince Faridani (vfaridani@hotmail.com)<br>IP: 69.87.230.115 |
| SIGNED | **12 / 20 / 2021**<br>21:16:57 UTC | Signed by Vince Faridani (vfaridani@hotmail.com)<br>IP: 69.87.230.115 |
| VIEWED | **12 / 20 / 2021**<br>22:49:39 UTC | Viewed by Eng Taing (eng@touzicapital.com)<br>IP: 75.80.16.115 |
| SIGNED | **12 / 20 / 2021**<br>22:50:09 UTC | Signed by Eng Taing (eng@touzicapital.com)<br>IP: 75.80.16.115 |
| COMPLETED | **12 / 20 / 2021**<br>22:50:09 UTC | The document has been completed. |

# Exhibit D

Outlook

**Bitcoin Mining Fund IV - Compute North Update & Impact**

**From** McKenna Capital <Ryan@McKennaCapital.com>
**Date** Fri 9/30/2022 9:15 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>

TOUZICAPITAL McKENNA CAPITAL

BITCOIN MINING




# Bitcoin Mining Fund IV - Compute North Update

Hope everyone had a good week. This is not the type of news I'm sure we all want to hear on a Friday night but I'm passing along an update from Eng Taing, CEO of Touzi Capital regarding our TX hosting and data center provider, Compute North.

We recently heard news that one of our key strategic partners, Compute North, filed for Chapter 11 bankruptcy.

Currently, there is a shroud over what's going on. I am in discussions with Compute North, but have gotten limited information. They informed us that their operations shouldn't be impacted; however, we are cautious of what they tell us. The key assets and what Compute North was providing us was their data center. As of now, there is uncertainty on who owns and is in charge of the data center and who will own it after these bankruptcy proceedings.

What is the impact to us:

1. The Grandbury, Texas Site is currently **not operational**. This is not necessarily tied to the bankruptcy directly, but rather likely tied to operational gaps currently in place with what's happening at Compute North. The site was energized earlier this month but has since shut down. Their last communication was that they are still awaiting ERCOT documentation. We do not believe Compute North is operating effectively while they are under these Bankruptcy proceedings.
2. I believe operations will start in the next few weeks, but we don't know who will be operating the data centers. I am cautious of delivering news of operations until it actually happens consistently.

What are we doing now?

1. Exploring backup plans for hosting in the event that Compute North cannot service our miners. Given the low-cost nature of our contract with Compute North, it is unlikely we'll move. Following through on this contract with Compute North is in our best interest unless this operational deficiency is protracted.
2. Filing a claim against Compute North to ensure our rights within this proceeding.
3. Doing a full accounting and audit of our miners, to protect our economic rights. I do not believe these assets are at risk, as they are clearly our assets.
4. I have also sent a letter to the DOJ requesting to be on the committee overviewing the bankruptcy filing.
5. Discussing with strategic industry leaders, who potentially could take over Compute North's data center.

Touzi Capital has not taken leverage to invest in Bitcoin Mining. This keeps us resilient,

but it seems like most other companies have succumbed to this. We are also keeping our overhead costs low and I'm focused on ensuring our operations are all cash flow positive.

I think there could be opportunity here but I'm laser-focused on navigating through this to ensure our investments are minimally disrupted. For now, I have limited news to share. When I have more progress, I will share it.

Thanks,

Eng Taing - CEO of Touzi Capital

---





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

---

McKENNA
CAPITAL
YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**

www.McKennaCapital.com

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit E

Outlook

**Bitcoin Mining Fund IV - Investor Update**

**From** McKenna Capital <Investors@McKennaCapital.com>
**Date** Thu 7/20/2023 8:59 AM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>







## Bitcoin Mining Fund IV - Investor Update

Fellow Investors,

Since January of 2023, we've been working through some communication issues with Eng Taing, Touzi Capital and its representatives. At first Eng met with us and provided information as to the status of the investment. In past communications sent out to you, we have described some of the difficulties starting with the bankruptcy of Compute

North and the re-negotiation of the energy agreement with US BTC, the hosting vendor and energy provider. While, we've communicated these concerns with you previously, we feel it necessary to elevate the level of our concern.

Eng failed to provide us with pertinent information and documents required for our oversight of the operations of the funds. Some of those items included:

1. Unaudited financial and accounting documents
2. Receipts showing the serial numbers of the miners for each of the funds.
3. An inventory of where the miners were being hosted, designated by the Fund

Eng then ceased to attend the meetings. At one point Aaron Beck, a member of his team joined us for the meetings. We explained what we needed to verify the proper operations of the Funds. Aaron took our information but failed to provide any new information. At this point we were still receiving distributions and enough information for investor updates. Aaron was not making any progress getting the materials so we were forced to engage an attorney to create a demand letter for the documentation. At that point Aaron stopped meeting with us.

It later came to our attention that Touzi Capital has been identified in lawsuits, for unrelated funds that they operate. Their continued lack of communication with us, is causing us growing concern, and demands action.

It is important to note that there are a number of entities and investor groups that have invested with Touzi Capital in a variety of Touzi Funds. That said, we've been in communication with many of these groups to band together and create a clear and cohesive strategy and to present the strongest possible legal stance.

Our strategy:

1. We wish to remove Eng Taing and Touzi Capital, as manager of each of the funds we collectively are members of. It is our belief that he is not upholding his fiduciary duty, by way of lack of communication, lack of capital distributions and an inability or unwillingness to clearly account for the assets of these funds.
2. We hope to assume management of the assets and gain control of the income producing assets that we've invested in.
3. We would continue to operate the mining and, as soon as possible restart distributions.

4. If we're unable to achieve steps 1 & 2, this situation may likely end up in a protracted lawsuit where the assets are placed into receivership. In that scenario, it is possible that a significant amount of assets will go towards a legal battle that could be protracted.

We are not attorneys and cannot provide legal counsel. This communication is a proactive approach to be as transparent as possible with you.

As we work though this process, there will be a variety of emotions, and we are here to help work through that. We cannot communicate that which we don't definitively know. The fact that Touzi Capital and Eng Taing have stopped communicating with us, causes us enough concern that the outlined strategy has had to be enacted. It's not the path that we wanted, but it is the path that we feel is necessary to protect capital.

As mentioned, we will be sure to communicate with you regularly with material updates on this matter as the process unfolds. If you have any specific questions in the meantime, feel free to reach out to us at Investors@McKennaCapital.com.

Thanks,

Ryan McKenna

McKenna Capital





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

McKENNA CAPITAL

YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**

www.McKennaCapital.com

---

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com

*why did I get this?* unsubscribe from this list update subscription preferences

McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit F

Outlook

**Bitcoin Mining Fund IV - November Update**

**From** McKenna Capital <Ryan@McKennaCapital.com>
**Date** Wed 12/21/2022 10:41 AM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>






# Bitcoin Mining Fund IV - November Update

Investors,

Below is another update from Eng Taing of Touzi Capital regarding the latest with the Compute North bankruptcy and our Bitcoin Mining Fund 4 Texas miners.

- McKenna Capital

---

Hi All,

I wanted to provide a few updates on the fund and what's happening with our Texas miners at Wolf Hollow.

In regards to Wolf Hollow, we are getting closer to a reconciliation of our miners, and it appears that all of our miners are accounted for.

We have continued negotiations with USBTC (new site host) on possible terms for a new contract rate. Ultimately we believe that a compromise needs to happen. However, we are still positioning that our contract rate should be honored, and for USBTC to turn on the miners asap. We don't believe our contract rate is likely to be honored, considering how significantly lower it is to market rate, as well as how close it is to their true cost.

We have also had several discussions with other clients, including Compass Mining & Marathon; which constitutes the largest clients at the site. We're all trying to ensure all the clients hold their ground in terms of assuming the original contract terms and not accepting Generate's / USBTC proposal for significantly higher hosting rate terms.

We believe that our firm stance is starting to move things, as USBTC continues to ask what we intend to do with our miners and if we want them online now. It appears their initial firm stance is loosening, however, we have still not gotten close to what we want in terms of pricing.

Finally, in terms of the Fund update, we mined 13.047 BTC last month with our online miners, however, our breakeven on miners was closer to $20k. This is due to the significant increase in difficulty from October to November, without any price increase to alleviate those. We have enough cash reserves to maintain these miners while they're unprofitable at these levels, as it would be significantly more expensive and challenging to halt production.

We continue to spend a significant amount of our time and resources on legal efforts on the Compute North / Wolf Hollow situation; as the proposed higher energy prices would multiply millions of dollars in yearly incremental costs.

As such, I'm afraid that we won't be able to provide the 6% annualized yield for investors at this time. We need to be very conscious of our limited resources at this time. We will defer these benefits until a much more suitable time.

Hope everyone has a happy holiday, and we will provide an update if we get a breakthrough during the holidays.

Best,

Eng Taing
CEO, Touzi Capital

---





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

McKENNA CAPITAL
YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**
www.McKennaCapital.com

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit G

Outlook

## Bitcoin Mining Fund IV - January Update

**From** McKenna Capital <Ryan@McKennaCapital.com>
**Date** Wed 1/18/2023 4:21 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>

TOUZICAPITAL McKENNA CAPITAL

# BITCOIN MINING



# Bitcoin Mining Fund IV - January Update

Investors,

Below is an update from Eng of Touzi Capital regarding our latest discussions with Generate Capital. We're hoping to be mining Bitcoin in TX soon!

- McKenna Capital

---

All,

I wanted to share an update on our negotiations with Generate Capital. I'm pleased to say we're on the brink of signing a contract with them, and hopefully, we can start getting our miners online in the next few weeks. In addition, I wanted to provide an update on the market.

I'll also be providing a more detailed analysis and recording by the end of the week as I'll be answering frequently asked investor questions.

Given market pressures and the competitive landscape, we will be signing the dynamic hosting price contract. This will increase our cost and upside but will provide us with the best opportunity to continue to profitably mine. With the halving expected to be next April or May of 2024, we need to be hashing and online as much as possible before then. We will continue to retain our claim against Compute North, but we don't want a protracted legal pursuit to prevent us from going online. I appreciate everyone's feedback after the previous update.

As a reminder, here are the contract terms:

GENERATE
IN PARTNERSHIP WITH USBTC

Dynamic Hosting Price Ranges

Kearney, Wolf Hollow

| Hosting Rate Ranges | Daily Average Hashprice | | Hosting Rate per MWh |
|---|---|---|---|
| | Low | High | |
| 1 | $0.0000 | $0.0750 | **$62.50** |
| 2 | $0.0751 | $0.0800 | **$65.00** |
| 3 | $0.0801 | $0.0900 | **$70.00** |
| 4 | $0.0901 | $0.1100 | **$75.00** |
| 5 | $0.1101 | $0.1300 | **$80.00** |
| 6 | $0.1301 | $0.1500 | **$85.00** |
| 7 | $0.1501 | $0.1700 | **$90.00** |
| 8 | $0.1701 | $0.1900 | **$95.00** |
| 9 | $0.1901 | $0.2200 | **$100.00** |
| 10 | $0.2201 | $0.2500 | **$105.00** |
| 11 | $0.2501 | $0.2800 | **$110.00** |
| 12 | $0.2801 | $1,000+ | **$115.00** |

**Market Update**

Over the past week, Bitcoin has moved up more than 27%. This is certainly a positive trend and hope it continues. However, the biggest challenge is that difficulty has increased by more than 10% last Sunday. A really good metric to track is Hashprice. This is a KPI that tracks the value of the production of the computational power of the Bitcoin miners. You can observe in the graph below that the Hashprice has increased, but it decreased when the difficulty increased.




With difficulty at an all-time high, this creates more tailwinds for Bitcoin miners. This trend appears to not be letting up, as forecasted difficulty looks to continue to increase (https://www.bitrawr.com/difficulty-estimator).

The general thesis is that Bitcoin Miners are upgrading to more efficient, productive machines, which creates a race to the bottom. If difficulty continues to increase and Bitcoin price decreases, we will be forced to pause distributions again.




## 2022 Market Recap – Toughest Year ever for Bitcoin Miners

It was one of the toughest years on record for Bitcoin Miners. Analyzing bitcoin miner stocks, in 2022, these companies fell 78%; compared to a drop of 65% in bitcoin price and 33% decline of the Nasdaq. These mining stocks, and Bitcoin Mining in general can give investors high beta exposure to bitcoin. Unfortunately, this high beta property also holds true during the worst of bitcoin bear markets. This is compounded even further, due to the leverage many of these companies took.




In 2023, we expect public miners to keep increasing as they have laid ambitious plans through mid-2023. Those plans are coming to fruition and is highlighted by the increasing difficulty that we've been observing for the past several months.

However, capital markets have dried up for miners, and miners are no longer expanding at the same rate as previously. However prior contracted orders are still being delivered, which means difficulty will continue to rise through the first half of the year.

2021's bull market flushed the Bitcoin mining industry with lots of new capital. 2022's bear market hit the market hard. Hashprice hit an all-time low in November. Even with last year's market challenges, Bitcoin hashrate (difficulty) grew 41% in 2022 – compared to 18% in 2021. Although 2021 was heavily impacted with China's Bitcoin mining ban.

In 2021, miners made $16.75 billion dollars of revenue from mined bitcoin. 2022 it fell to $9.55 billion dollars. This is still double of what 2020 looks like however.




Bitcoin may be in a bear market, but unfortunately, the energy markets increased by an average of 16% in 2022 from the previous year. Bitcoin mining is still very viable in many states, but it'll depend on the relationship between the energy provider and the miner, and if they have taken long term hedges or power contracts when prices were lower.




With energy prices surging in 2022, hosting costs ballooned as well. This has caused many hosting companies – like Compute North and Core Scientific to default on their debt and file for chapter 11 bankruptcy.

These three-fold challenges of 1. Lower bitcoin prices; 2. Higher energy prices, 3. More competition due to a flush of capital that came in 2021 which increased hashrate is ultimately causing our investments to have significant challenges.

While I'm optimistic for the long term vision and viability of Bitcoin, 2022 was a very challenging year and I'm not optimistic we'll get back to the heyday of 2021. However, I will continue to work hard for all the investors and ensure we can be in a position to continue mining. I'm heavily invested myself in this, and I'm not going to quit even if things look bleak.

Let's hope this past week is a start of a bull market.

Best,

Eng Taing
CEO, Touzi Capital





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

McKENNA CAPITAL

YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**

www.McKennaCapital.com

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit H

Outlook

**Bitcoin Mining Fund IV - Investor Update**

**From** McKenna Capital <Investors@McKennaCapital.com>
**Date** Wed 7/5/2023 12:32 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>







# Bitcoin Mining Fund IV - Investor Update

Fellow Investors,

We wanted to take a moment to provide you with a brief update on Bitcoin Mining Fund IV. As you are aware by now, the fund has experienced numerous challenges. Some of the challenges have been market driven (a significant decline in the market value of Bitcoin, the bankruptcy of many significant industry players, including ComputeNorth,

the data center operator at the Granbury Texas site), while other challenges have been non-market dependent (delays in the site coming online, suboptimal communication and transparency from Touzi Capital). We've continued to be unimpressed by Touzi Capital's lack of transparency and communication, with the latest instance of this being the fact that the monthly reporting that should accompany May's distributions still hasn't been issued. Furthermore, we've still not received distributions or reporting for the month of June.

This is a very frustrating and confounding situation given that Eng Taing (CEO of Touzi Capital) and I had a very solid relationship (talking several times a week) and then out of nowhere he has recently cutoff communications completely. As a result, Eng put us in contact with his new investor relations contact, Aaron Beck. Per our conversations with Aaron, he continues to tell us that he is having difficulty obtaining this information from Eng. This isn't limited to us as we know other capital partners/syndicators are experiencing the same communication issues so we've banded together to help each other and find out what's going on at Touzi Capital. We've also had several of Touzi Capital's investors reach out to us asking if we know anything because they are experiencing similar communication issues with other funds of Touzi's that we aren't a part of. I'm personally the largest investor in Bitcoin Mining Fund IV and have invested in four of Touzi's Bitcoin Mining and Data Center Income Funds so know that we're all over this and doing the best we can to get answers.

Given our marketplace positioning, over the course of the last few months we were able to connect with other significant investors and capital partners who also participated in Touzi Capital's various Bitcoin Mining Funds. For the last several months, McKenna Capital, along with these other capital partners, have conducted weekly meetings with the Touzi Capital team to put pressure on them to significantly improve their level of communication, transparency, and to make sure we had our collective fingers on the pulse of what was going on with the Bitcoin Mining Funds. Initially, these meetings were held with Eng Taing directly and later, with other individuals in leadership positions at Touzi Capital. Unfortunately, we've not seen communications improve and we still have many questions and information requests that are yet to be answered.

Because several of our information requests have now been outstanding for an extended period, we deemed it prudent to seek legal action to compel Touzi Capital to provide us with the requested information as soon as possible. For further context, the main items that are outstanding that we've requested are 1) fund-level financial statements and 2) a detailed accounting of the miners by fund and by location. There are other items that we've asked for, but these items are the most critical.

On the other hand, we have been able to confirm directly with the site hosting provider for the Granbury site (USBTC) that there are a significant number of miners that are allocated to Touzi Capital that are online and hashing. The number of miners is aligned with what we'd anticipate being onsite, when considering our fund combined with other Touzi funds who are also allocated to the site. This gives us some level of comfort to know that there are miners onsite that are hashing and distributions have been made, but the lack of transparency and follow up on the above mentioned information, that we have rights to as investors, is what is driving the elevated level of pressure that we are applying through legal action.

With respect to the legal action, we've paid out of pocket to engage attorneys to issue a demand letter to Touzi Capital and the letter was issued on May 18th, 2023. This letter included a detailed listing of our outstanding requests and demanded that this information be provided by no later than 30 days from the date of the letter (June 17th, 2023). While we did receive a response from Touzi Capital's counsel that they intend to comply with the requested items, the due date of the request has now passed, and we still are not in possession of the requested information. As of today, we are continuing our dialogue with counsel to determine next steps and the most appropriate course of action.

We are hopeful that we receive the requested information soon and that ultimately, this becomes a non-issue. There is reason for optimism given that the site is finally operational, miners are on site, distributions are expected to continue (unless we are informed otherwise) and we're seeing recent Bitcoin pricing action that is very favorable (Blackrock being discussed as launching a Bitcoin ETF, etc.). However, we do find the continued lack of communication and transparency both troubling and completely unacceptable, which is why we feel it is prudent to push forward with more aggressive action.

We will be sure to communicate with you regularly with material updates on this matter as the process unfolds. Also, if you have any specific questions in the meantime, feel free to reach out to us at Investors@McKennaCapital.com.

Thanks,

Ryan McKenna

McKenna Capital





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

McKenna Capital
YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**
www.McKennaCapital.com

Connect with McKenna Capital

---

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit I

Outlook

**Bitcoin Mining Fund IV Update**

**From** McKenna Capital <Ryan@McKennaCapital.com>
**Date** Tue 1/10/2023 12:28 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>







## Bitcoin Mining Fund IV - Update

Investors,

Below is the latest update from Eng Taing of Touzi Capital regarding our path forward with our Bitcoin Mining Fund IV Texas miners that have been impacted by the Compute North bankruptcy.

- McKenna Capital

---

Hi All,

I wanted to provide you with a brief update regarding Bitcoin Mining Fund IV, including the latest status of the Compute North Bankruptcy and our path forward.

***Status of Power Contract***

As a brief reminder from previous updates, with Compute North in bankruptcy, Generate Capital is now the new owner of the site and has appointed USBTC to be the operator of the site. We've continued to fight for our rights to the pricing that we were originally promised by Compute North.

Originally, we formed a united front with Compass Mining and other large users of the site, to fight together to ensure our rights to the original contractual terms. However, given the high demand and low supply of hosting locations for Bitcoin Mining, we recently learned that one of the members of our alliance accepted the updated terms from USBTC, which will make it more difficult for us to continue to hold out.

The latest pricing that has been offered to us by USBTC would start out at 6.25c per KwH and would not be a fixed pricing structure. Rather, it would start out at 6.25c per KwH and would increase based on hash price up to a maximum price of 11.5c per KwH. They are also offering a fixed rate contract, however that would start at 7.5c; which would mean our miners would not be profitable.

To define what "hash price" means, it represents the market value assigned per unit of hashing power. In short, as difficulty increases, or the price of Bitcoin falls, hash price falls. Conversely, as difficulty decreases or the price of Bitcoin goes up, hash price goes up. Below is a snapshot of how hash price has trended over the past year, reflecting the combination of decrease in Bitcoin value and increase in difficulty:



**<u>The upside of accepting the currently proposed terms with USBTC is that we believe we'd be able to begin distributions as soon as the site is energized (more on that below) based on the current price of Bitcoin and current mining difficulty.</u>** Also, this pricing does start out a bit below market, which now appears to be roughly 7.0c per KwH. While it would be great to get distributions going, the downside of this arrangement is that it would cap our upside as it would function effectively as a profit sharing agreement.

We proposed to insert language in the contract so that we would not lose any claims arising from the Compute North bankruptcy. However, Generate Capital is refusing to go forward with this language inserted. Below is what we wanted to have inserted.

*"Customer acknowledges and agrees that the Prior Fees, Deposits and Equipment List is accurate, correct and complete in all respects. In exchange for good and valuable consideration, including the performance by Data Center of the Services, Customer, on behalf of itself and its current and former, affiliates, officers, members, stockholders, equity holders, managers, directors, principals, employees, agents, independent contractors, partners, representatives, predecessors, and successors and assigns, and any other person or entity that has the ability to assert a Claim on behalf of or through Customer, in each case to the extent permitted by applicable law and solely in such parties' capacity as such (the "Releasing Parties"), hereby unconditionally and irrevocably releases, forever discharges and covenants not to sue, Data Center and its affiliates, officers, members, stockholders, equity holders, managers, directors, principals, employees, agents, independent contractors, partners, representatives, predecessors, and lawful successors and assigns (the "Released Parties"), from any and all claims, liabilities or causes of action arising out of or relating to (i) allegations that the Prior Fees, Deposits and Equipment List is not accurate, correct and complete in all respects; and (ii) fees, deposits or equipment not listed on the Prior Fees, Deposits and Equipment List; and (iii) any Prior Order Forms; in each case, against Released Parties ("Claims"). Customer covenants that no Releasing Party shall bring or make any*

*Claim against a Released Party.; provided that, Customer does not release or waive any claim or rights arising from or related to Prior Order Forms, Prior Fees, Prior Deposits, Prior Equipment, claims of negligence, willful misconduct, or any other liabilities that applicable state law does not permit to be released by agreement. GC Data Center Kearney, LLC acknowledges that all contracts between Customer and Compute North Holdings, Inc. ("Compute North"), including Compute North's affiliates and subsidiaries, have been lawfully assigned to Generate Capital prior to Compute North's September 22, 2022 petition in the United States Bankruptcy Court for the Southern District of Texas seeking relief under chapter 11 of the United States Bankruptcy Code."*

In essence, they told us either we accept the contract and get energized and effectively put the past behind, ie. the contracts with Compute North; or we can fight them. We are discussing this with our legal team this week to understand what our best possible outcome could be. We are actively weighing this decision and would welcome feedback.

***Energization of Site***

For the site to be energized, it is first necessary for the contractual uncertainty with USBTC to be cleared up, so that we can formally enter the queue for energization. While it's difficult to predict exactly how long that would take, we believe that the turnaround should be rather quick.

***Custody of Miners***

We have also been working diligently to verify all our assets at the site. As mentioned previously, Compute North's inventorying system left a bit to be desired, but at this point, Touzi has verified approximately 98.5% of all of our miners. Touzi plans to send a team member to the site in the coming months to perform an audit of the machines by physically agreeing serial numbers from the machines on site to our records.

I very much appreciate your patience and support during the challenges that we've faced at the Granbury Texas site. Touzi Capital will continue to diligently focus on creating the best outcome possible for investors.

Thank you,

Eng Taing
CEO, Touzi Capital





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

---

McKENNA CAPITAL
YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**
www.McKennaCapital.com

---

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit J

Outlook

**Bitcoin Mining Fund IV - Investor Update 7.27.23**

**From** McKenna Capital <Investors@McKennaCapital.com>
**Date** Thu 7/27/2023 5:31 PM
**To** vfaridani@hotmail.com <vfaridani@hotmail.com>







## Bitcoin Mining Fund IV - Investor Update

Fellow Investors,

We have taken prompt action to deal with the challenges we previously identified. We are committed to giving you timely reports on our progress, even if we don't have all the answers.

We have learned from Eng Taing's legal counsel that **Eng Taing was removed from all management and control of Touzi Capital and the funds**. In Eng's place is an administrator, about whom we know very little. We also don't know why an administrator was installed. We were told the administrator is not affiliated with Eng Taing or his entities. The administrator is a former SEC employee now in private practice (no current SEC affiliation). The administrator is now getting up to speed and evaluating the issues. The stated goal of the administrator is to quickly get operations back to normal and resume distributions. This is consistent with the typical duties of an administrator.

We expect to have the identity and contact information for the administrator early next week. We have been assured that we can communicate directly with the administrator. Once we have his contact information, we will arrange a meeting.

Like us, we expect you'll have many questions about the new administrator. In the coming weeks, we should have significantly more information to share and will provide another report to you as soon as we know more.

Finally, be assured that we are considering all available options with our legal advisors.

Thanks,

Ryan & Sean McKenna

McKenna Capital

---





Ryan McKenna
Ryan@McKennaCapital.com
M: 847.354.9766

Sean McKenna, CPA
Sean@McKennaCapital.com
M: 847.971.4121

McKENNA CAPITAL
YOUR PASSIVE REAL ESTATE INVESTING PARTNER

**Visit us at**
www.McKennaCapital.com

Connect with McKenna Capital

This email was sent to vfaridani@hotmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
McKenna Capital · 1598 Cottonwood Dr · Glenview, IL 60026 · USA

# Exhibit K

**Exhibit K — SponsorCloud / SynPro Administrative Records Demonstrating Defendants' Illinois-Directed Operations**

The SponsorCloud/SynPro administrative platform records produced in discovery and submitted as Exhibit K constitute contemporaneous documentary evidence reflecting that Defendants Eng Taing and Touzi Capital, LLC exercised centralized operational authority within the SponsorCloud system over the approval, funding designation, and administrative processing of investors generated through Illinois-based Defendants.

These records reflect that Defendants did not merely receive investor funds passively, but instead operated and supervised an integrated, multi-state fundraising and administration structure through which Illinois-originated investor subscriptions were reviewed, approved, designated as funded, and routed to Touzi-affiliated accounts within the platform's administrative workflow.

**Centralized Administrative Control by Touzi**

Exhibit K reflects that Bitcoin Mining Fund IV was administered through the SponsorCloud/SynPro platform as utilized by Touzi Mine Invest, LLC in connection with the Fund, and that Touzi exercised administrative authority within the platform over the fund's dashboard, investor records, and funding status designations. The portfolio interface displays Touzi's oversight of investor commitments, subscription approvals, and funding classifications within the administrative system governing the Fund.

These records reflect that Touzi functioned as the operational entity responsible for supervising investor onboarding and capital administration within the platform's structured workflow.

**Mandatory Approval and Funding Authority**

The investor records within Exhibit K show that subscriptions were not self-executing. Each investor was required to obtain formal approval and funding designation within Touzi's administrative system before capital was accepted.

The platform reflects distinct "Approved," "Signed," and "Funded" status fields, with corresponding dates, confirming that Touzi exercised discretionary authority over which investors were accepted and when their funds were deployed.

This approval structure establishes Touzi's direct participation in the acceptance of investors generated through Illinois-based solicitation efforts.

**Integrated Participation by Illinois Defendants**

Exhibit K further shows that Illinois-based Defendants Ryan McKenna and Sean McKenna themselves utilized Touzi's platform and appeared within the system as approved and funded investors.

Their participation inside Touzi's administrative infrastructure confirms that the Illinois Defendants were not independent referrers, but active operational participants within Touzi's fund administration framework.

This evidence demonstrates an integrated business relationship between Touzi and its Illinois-based partners.

**Direct Processing of Plaintiff's Investment**

The records in Exhibit K identify Plaintiff's own investments of $50,000 and $125,000 as approved and funded within Touzi's centralized system.

Plaintiff's subscriptions were processed, reviewed, and accepted through the same administrative pipeline used for all other investors, establishing that Touzi directly approved and received Plaintiff's capital.

These records reflect that Plaintiff's investments were processed and approved through the same administrative workflow described above.

**Governance of Offering Structure and Investment Terms**

Exhibit K includes offering detail pages reflecting Touzi's control over the Fund's governing parameters, including minimum investment thresholds, term length, return metrics, visibility controls, and management status.

These administrative controls demonstrate that Touzi exercised ongoing discretionary authority over the substantive operation of the Fund, rather than acting as a passive recipient of investor funds.

**Direction of Investor Funds to Touzi-Controlled Accounts**

The wire instruction records contained within Exhibit K show that investors were directed to transmit funds to bank accounts held in the name of Touzi Mining Invest LLC.

These instructions routed investor capital directly to Touzi-controlled financial accounts and reflect Touzi's knowing acceptance of funds generated through Illinois-based solicitations.

This financial routing reflects Touzi's receipt and use of investor capital generated through Illinois-based solicitations.

**System Administration and Supervisory Access**

Exhibit K further reflects Touzi's use of and access to the SponsorCloud/SynPro administrative interface, including visibility into investor data, financial records, reporting tools, and payment-routing information.
The administrative interface demonstrates Touzi's operational role within the fundraising and administration process as reflected in the platform records.

**Jurisdictional Significance**

Taken together, the SponsorCloud/SynPro records establish that:

1. Touzi controlled the centralized infrastructure governing investor solicitation, approval, and funding;

2. Illinois-based Defendants operated as integrated participants within that infrastructure;
3. Touzi exercised discretionary authority over investor acceptance and capital deployment;
4. Investor funds solicited in Illinois were routed to Touzi-controlled accounts;
5. Plaintiff's investment was processed and approved through this system; and
6. Plaintiff's claims arise directly from these Illinois-directed activities.

Accordingly, Exhibit K reflects that investor solicitation, onboarding, approval, and funding activities were processed through a centralized operational structure integrating Touzi's administrative system with Illinois-based personnel.

The foregoing records reflect a centralized administrative structure through which investor solicitation, approval, funding designation, and capital routing were processed within Touzi's SponsorCloud/SynPro system in coordination with Illinois-based personnel. Plaintiff's investments appear within this same workflow and were approved and designated as funded within that system.

K-1 – Portfolio Overview Dashboard (Fund IV Administrative Interface)

K-2 – Investor Subscription & Approval Records (Approved/Signed/Funded Fields)

K-3 – Administrative Dashboard (Touzi Branded Fund IV Overview)

K-4 – Illinois Defendants Investor Entries (Ryan McKenna & Sean McKenna)

K-5 – Plaintiff's $50,000 and $125,000 Investments

K-6 – Offering Details / Administrative Control Panel

K-7 – Offering Details Configuration Interface

K-8 – Offering Highlights Configuration Interface

K-9 – Wire Instructions (Touzi Mining Invest LLC Account)

**K1: SponsorCloud Administrative Portfolio Dashboard (Bitcoin Mining Fund IV)**

Screenshot produced in discovery by Defendant McKenna Capital, LLC from the SponsorCloud/SynPro administrative portfolio interface. The interface displays active investment offerings, including Bitcoin Mining Fund IV, identifies the associated entity as Touzi Mine Invest, LLC, and reflects launch dates, committed capital amounts, number of investments, and investor classifications.



**K-2 SponsorCloud Investor Subscription and Funding Records – Bitcoin Mining Fund IV**

**Description:**
This screenshot was produced in discovery by Defendant McKenna Capital, LLC from the SponsorCloud/SynPro investment management platform. It reflects the investor subscription, approval, and funding records maintained for Bitcoin Mining Fund IV.

**Key Facts Shown:**

• Individual and entity investor names
• Investor classification (Class A)
• Approval status
• Capital commitment amounts
• Signature dates
• Funding dates
• Self-accreditation status
• Verification status
• Administrative action controls

The screenshot reflects the detailed investor-level records maintained within Touzi's centralized administrative system and used to monitor investor onboarding, accreditation, approval, and capital funding.

---

**Jurisdictional Relevance**

This exhibit demonstrates that investor subscriptions and capital contributions were centrally recorded, reviewed, and processed through Touzi's administrative platform. Funding was not automatic and required affirmative administrative approval within the system. The records further reflect that Touzi maintained operational oversight over investor onboarding and capital deployment through a managed workflow administered in coordination with Illinois-based Defendants.



**Exhibit K-3: SponsorCloud Administrative Dashboard – Bitcoin Mining Fund IV**

**Description:**
This screenshot was produced in discovery by Defendant McKenna Capital, LLC from the SponsorCloud/SynPro investment management platform. It reflects the Touzi Capital administrative dashboard for Bitcoin Mining Fund IV.

**Key Facts Shown:**

- Fund name: *Bitcoin Mining Fund 4*
- Entity name: *Touzi Mine Invest, LLC*
- Touzi Capital branding displayed
- $40,000,000 total offering size
- $23,770,900 total approved
- $23,770,900 total funded
- 302 approved investors
- Accreditation verification tracking
- Funding status controls
- Centralized investor management functions

The dashboard reflects the internal administrative interface through which investor subscriptions were reviewed, approved, designated as funded, and managed.

---

**Jurisdictional Relevance**

This exhibit demonstrates that Bitcoin Mining Fund IV operated through a centralized Touzi-branded administrative system used to process and control investor capital. The platform was accessed and produced by Illinois-based McKenna Capital in discovery, reflecting coordinated operational integration between Touzi and Illinois-based Defendants. The dashboard further shows that investor approvals and funding status were controlled within Touzi's system, including capital generated through Illinois-originated solicitations.



**K4: SponsorCloud Investor Records Reflecting Investments by Illinois-Based Defendants Ryan McKenna and Sean McKenna**

**Description:**
Screenshot produced in discovery by Defendant McKenna Capital from the SponsorCloud/SynPro investment management platform reflecting investor subscription, approval, and funding records for Bitcoin Mining Fund IV, including investments made by Defendants Ryan McKenna and Sean McKenna.

**Key Facts Shown:**
- Ryan McKenna and Sean McKenna listed as individual investors
- Class A investor classification
- Approved investment status
- Capital commitment amounts
- Signature and funding dates
- Self-accreditation status
- System verification and administrative control indicators

**Significance:**
This exhibit reflects that Defendants Ryan McKenna and Sean McKenna—Illinois-based principals of the Illinois-headquartered McKenna Capital—personally participated in the Fund as investors through the same centralized, Touzi-affiliated administrative platform utilized for third-party investors.
It further reflects that their investments were subject to the same subscription, approval, and funding controls applicable to outside investors and were processed within the same Touzi-controlled administrative infrastructure.



**Exhibit K-5 — Plaintiff's Investments**

**Description:**
Screenshot reflecting Plaintiff Vince Faridani's approved and funded investments within the SponsorCloud/SynPro system, produced by Defendant McKenna Capital in discovery.

**Key Facts Shown:**
- Plaintiff listed as "Approved"
- Investments of $50,000 and $125,000
- Funding and execution dates recorded
- Processing through Touzi-affiliated administrative infrastructure

**Significance:**
This exhibit reflects that Plaintiff's investment was solicited, approved, and funded through the same Illinois-linked administrative infrastructure utilized by Defendants, establishing a direct nexus between Defendants' forum-related conduct and Plaintiff's claims.





**Exhibit K-6 — SponsorCloud Administrative Control Panel for Bitcoin Mining Fund IV**

**Description:**
Screenshot of the internal "Offering Details" administrative control panel for Bitcoin Mining Fund IV within the SponsorCloud/SynPro platform, produced by Defendant McKenna Capital in discovery.

**Key Facts Shown:**
• Centralized administrative modules for Offering Information, Documents, Assets, and Funding Instructions
• Multiple sections designated as "Auto-Sync with Lead Sponsor"
• System synchronization timestamps reflecting continuous platform updates

**Significance:**
This exhibit reflects that Touzi Capital utilized and exercised administrative authority within the platform over material aspects of the offering and operated an integrated system designed to synchronize investor and offering data with the Illinois-based lead sponsor, McKenna Capital. These features reflect ongoing operational coordination as shown in the platform records.



**Exhibit K-7**

Screenshot of the SponsorCloud/SynPro "Offering Details" interface for Bitcoin Mining Fund IV, produced by Defendant McKenna Capital in discovery, reflecting that Touzi Mine Invest, LLC operated the Fund as a managed $40 million offering through the SponsorCloud platform utilized in coordination with Illinois-based McKenna Capital, with centralized control over investor access, subscription terms, and fund administration.



**Exhibit K-8 — SponsorCloud Offering Highlights Configuration Interface**

Screenshot of the SponsorCloud/SynPro administrative interface for Bitcoin Mining Fund IV, produced in discovery by Defendant McKenna Capital. The interface reflects Touzi Capital branding and displays configurable offering parameters, including offering size ($40,000,000), minimum investment fields, asset type, term, investor eligibility settings, and administrative toggle controls governing the display and visibility of offering details.

This exhibit reflects Touzi's administrative control over the configuration and management of core offering terms within the SponsorCloud system used to process and manage investor subscriptions.



**Exhibit K-9 — SponsorCloud Funding Instructions Interface – Bitcoin Mining Fund IV**

This screenshot was produced in discovery by Defendant McKenna Capital, LLC and reflects the SponsorCloud/SynPro funding instruction interface for Bitcoin Mining Fund IV.

The interface displays Touzi Capital branding and identifies the beneficiary account as "TOUZI MINING INVEST LLC." It provides wire transfer and check instructions directing investor funds to a JPMorgan Chase Bank account held in the name of Touzi Mining Invest LLC, including routing numbers, account numbers, beneficiary address, and payment reference instructions.

The funding instructions appear within the same administrative system used to manage investor subscriptions and approvals, reflecting that investor capital generated through the offering was routed directly to Touzi-affiliated bank accounts.

This exhibit demonstrates:

- That investor funds were directed to Touzi Mining Invest LLC accounts;
- That the funding instructions were embedded within the SponsorCloud administrative workflow governing the offering;
- That capital solicited through the platform was transmitted to Touzi-controlled accounts;
- That Touzi was the designated recipient of investor funds processed through this system.





# Exhibit L

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Vince Faridani,<br><br>Plaintiff,<br><br>v.<br><br>McKenna Capital, LLC, Ryan McKenna, an Individual, Sean McKenna, an Individual, Eng Taing, an Individual, Touzi Capital, LLC,<br><br>Defendants. | Case No. 1:24-cv-08030 |

**MCKENNA CAPITAL'S RESPONSES TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant McKenna Capital hereby serves the following responses to Plaintiff's First Set of Interrogatories.

**INTERROGATORIES**

**Interrogatory No. 1:**

State in detail McKenna Capital, LLC's involvement in the preparation, review, approval, distribution, or use of any Private Placement Memorandum ("PPM") relating to Bitcoin Mining Fund IV, including the decision to identify McKenna Capital as a "co-manager" or equivalent managerial participant. In responding, identify: (a) the identity and role of each person who participated in or had authority over such activities; (b) whether McKenna Capital reviewed or approved the PPM language identifying it as co-manager; (c) whether any objection was raised internally to that designation and, if so, by whom; (d) whether any corrective or clarifying disclosure was ever made to investors regarding McKenna Capital's role; and (e) the factual basis for any contention that McKenna Capital was identified to investors as a co-manager yet did not act in that capacity.

**Response to Interrogatory No. 1:**

McKenna Capital, LLC did not draft, prepare, or control the Private Placement Memorandum ("PPM") relating to Bitcoin Mining Fund IV. The PPM was prepared and controlled by Touzi Capital, LLC and its principals, including Eng Taing. Touzi Capital determined the structure, contents, and dissemination of the offering materials.

Although McKenna Capital was referenced in the PPM as a "co-manager," that designation did not confer operational authority over fund activities. McKenna Capital did not control the language of the PPM, did not have editorial authority over its final contents, and did not control its distribution to investors. Touzi Capital controlled investor onboarding, subscription documentation, and dissemination of offering materials.

The designation of McKenna Capital as "co-manager" reflected a contemplated business relationship but did not result in McKenna Capital exercising operational control over investor funds, mining operations, accounting systems, investor portals, or fund administration. Touzi Capital maintained control over those functions.

To the extent any internal discussions occurred regarding the designation, they did not result in McKenna Capital assuming control over operational, financial, or administrative aspects of the fund. McKenna Capital did not issue independent corrective disclosures because it did not control investor communications or the investor portal.

The factual basis for McKenna Capital's position that it was identified as co-manager but did not act in that operational capacity is that Touzi Capital retained exclusive control over investor funds, banking relationships, accounting records, mining operations, and investor communications.

**Interrogatory No. 2:**

Describe McKenna Capital, LLC's knowledge, consideration, and decision-making regarding federal and state securities law compliance in connection with Bitcoin Mining Fund IV. In responding, address: (a) whether McKenna Capital understood the offering to constitute the sale of securities; (b) whether McKenna Capital considered, discussed, or rejected filing a Form D and the basis for any such decision; (c) the identity of any person(s) who determined that no Form D would be filed; (d) whether McKenna Capital was licensed or registered as a broker-dealer or claimed any exemption from such registration; (e) whether McKenna Capital disclosed to investors that it was not licensed or registered; and (f) the facts known to McKenna Capital at the time that were considered in proceeding with investor solicitation notwithstanding the absence of any Form D filing or broker-dealer registration.

**Response to Interrogatory No. 2:**

Touzi Capital structured and administered the offering. Touzi Capital controlled regulatory filings and securities compliance decisions, including any determination regarding Form D filings. McKenna Capital did not act as issuer or administrator of the offering and did not control filing decisions.

McKenna Capital was not licensed or registered as a broker-dealer and did not act in that capacity. Investor subscription agreements, capital intake, and formal offering documentation were handled by Touzi Capital. Decisions regarding securities law compliance and regulatory filings were made by Touzi Capital and its principals.

McKenna Capital did not independently control whether a Form D was filed, nor did it supervise Touzi's compliance process or procedures.

**Interrogatory No. 3:**

Describe McKenna Capital, LLC's role in soliciting investors or communicating with investors regarding Bitcoin Mining Fund IV, including any involvement in representations concerning projected returns, IRR, equity multiples, monthly payments, fund size, or scaling. In responding, identify: (a) the source of any such projections or performance figures; (b) any diligence conducted by or on behalf of McKenna Capital to evaluate or verify their accuracy; (c) any information known to McKenna Capital at the time that contradicted, undermined, or called into question such representations; and (d) the identity of any person who approved, transmitted, or failed to correct such representations.

**Response to Interrogatory No. 3:**

Projected returns, IRR figures, equity multiples, and other performance metrics were generated and controlled by Touzi Capital based on Touzi's internal modeling and operational assumptions. McKenna Capital did not create, calculate, or independently control those projections. McKenna Capital did not control mining site selection, equipment procurement, electricity contracts, or operational data. Those matters were within the control of Touzi Capital and its operational team, including Eng Taing. Accordingly, McKenna Capital did not possess independent mining output data or accounting records from which to generate or verify performance projections.

Investor subscription processes and formal communications were administered by Touzi Capital.

**Interrogatory No. 4:**

Describe in detail McKenna Capital, LLC's position that it lacked possession, custody, or control over documents, records, accounts, or data relating to Bitcoin Mining Fund IV, including any contention that Touzi Capital or Eng Taing maintained exclusive control. In responding, identify: (a) what categories of documents existed; (b) which categories McKenna Capital possessed; (c) which categories it did not possess; (d) when and how any transfer of control occurred; (e) whether McKenna Capital continued to receive reports; (f) whether accounting systems or investor portals were used; (g) whether such systems were modified or disabled; and (h) when Touzi Capital assumed exclusive control.

**Response to Interrogatory No. 4:**

Touzi Capital maintained control over investor subscription records, banking relationships, accounting systems, mining output records, investor portals (including SponsorCloud or similar systems), and investor communications.

McKenna Capital did not possess or control Touzi's bank accounts, did not administer investor portals, and did not maintain Touzi's accounting ledgers or mining output data. Touzi Capital retained operational and financial control throughout the relevant period.
To the extent McKenna Capital received periodic updates or summaries, such materials did not constitute possession or control of underlying financial records, banking data, or accounting systems.

**Interrogatory No. 5:**

Describe when McKenna Capital, LLC first became aware of any facts suggesting that representations made to investors regarding Bitcoin Mining Fund IV were inaccurate, incomplete, or misleading, including issues relating to operations, delays, costs, performance, or recordkeeping. Identify any positions McKenna Capital has previously asserted in litigation concerning investor reliance, fiduciary duties, or access to books and records relating to Bitcoin Mining Fund IV, and describe the factual bases asserted in support of each such position.

**Response to Interrogatory No. 5:**

McKenna Capital did not have day-to-day control over Touzi Capital's mining operations, accounting records, or investor communications. Any awareness of operational concerns arose only after investor complaints surfaced and regulatory scrutiny became known.

McKenna Capital did not control Touzi's corrective disclosures, investor reporting systems, or accounting infrastructure. Its litigation positions have consistently reflected the factual reality that Touzi Capital controlled investor funds, operational decisions, accounting systems, and investor communications.

By: Matthew Clarke

Matthew Clarke
Kelley Clarke PC
603 E. Broadway Street
Prosper, TX 75078
(805) 884-9922
Pro Hac Vice
Email: matt@kelleyclarke.com
PRO HAC VICE –
ATTORNEY FOR MCKENNA
DEFENDANTS

**CERTIFICATE / PROOF OF SERVICE**

**Case No. 1:24-cv-08030**
**Vince Faridani v. McKenna Capital LLC, et al.**
**U.S. District Court, Northern District of Illinois**

I hereby certify that on **February 15, 2026**, I served true and correct copies of the following documents: MCKENNA CAPITAL'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES.

**Service List**

| | |
|---|---|
| Vince Faridani<br>8471 Strom Park Drive<br>Melbourne, FL 32940<br>Email: VFaridani@hotmail.com | Plaintiff appearing Pro Se<br>Service by email |
| Basile P Souferis<br>Paul Gamboa<br>Gordon Rees Scully Mansukhani<br>One N. Wacker<br>Suite 1600<br>Chicago, IL 60606<br>312-565-1400<br>Email: bsouferis@grsm.com<br>Email: pgamboa@gordonrees.com | Counsel for Defendants McKenna Capital LLC, Ryan McKenna, Sean McKenna, Emily McKenna, and Jillian McKenna.<br>Service by Email |
| Rusty O'Kane<br>Wick Phillips Gould & Martin<br>3131 McKinney Avenue<br>Suite 500<br>Dallas, Texas 75204<br>(214) 692-6200<br>Email: Rusty.okane@wickphillips.com | Counsel for Defendants Eng Taing and Touzi Capital, LLC<br>Service by Email |
| Victor J. Pioli<br>Roetzel & Andress LPA<br>70 West Madison Street<br>Ste 3000<br>Chicago, IL 60602<br>312-580-1200<br>Fax: 312-580-1201<br>Email: vpioli@ralaw.com | Counsel for Defendant Ryan Beatty<br>Service by Email |
| Heng Taing<br>679 Elm Tree Ln<br>San Marcos, CA 92069<br>760-583-3873<br>Email: heng512@gmail.com | Defendant appearing Pro Se<br>Service by Email |

Executed on February 15, 2026, at Prosper, Texas.

______________________________
**Matthew M. Clarke**
Attorney for Defendants
McKenna Capital LLC, Ryan McKenna, and Sean McKenna
Kelley Clarke PC
603 E. Broadway Street
Prosper, Texas 75078
Direct: (469) 481-7681 | matt@kelleyclarke.com

# Exhibit M

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Vince Faridani,<br><br>Plaintiff,<br><br>v.<br><br>McKenna Capital, LLC, Ryan McKenna, an Individual, Sean McKenna, an Individual, Eng Taing, an Individual, Touzi Capital, LLC,<br><br>Defendants. | Case No. 1:24-cv-08030 |

# RYAN MCKENNA'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Ryan McKenna hereby serves the following responses to Plaintiff's First Set of Interrogatories.

## INTERROGATORIES

**Interrogatory No. 1:**

State your role, authority, and responsibilities with respect to Bitcoin Mining Fund IV, including your position at McKenna Capital, LLC and your interactions with Touzi Capital or Eng Taing. In responding, identify: (a) your title(s) and responsibilities during the relevant period; (b) the scope of your authority to approve, reject, or influence investor communications; (c) your role in investor solicitation, relationship management, or investor-facing communications; and (d) the factual basis for your contention that you possessed knowledge of the offering but lacked authority or responsibility for representations made to investors.

**Response to Interrogatory No. 1:**

Ryan McKenna was designated as a manager in connection with Bitcoin Mining Fund IV; however, he did not exercise operational control over the fund's activities. His title did not confer authority over banking relationships, investor funds, accounting systems, mining operations, or investor portals.

Touzi Capital, LLC and its principal, Eng Taing, controlled the structure of the offering, the intake of investor funds, investor subscription documentation, and investor communications. Ryan McKenna did not possess unilateral authority to approve, modify, or reject investor communications issued by Touzi Capital.

Although Ryan McKenna was aware of the offering and participated in certain discussions, he did not control operational decision-making, financial recordkeeping, regulatory filings, or investor reporting. The factual basis for his position that he lacked operational authority is that Touzi Capital maintained exclusive control over investor funds, bank accounts, accounting systems, and investor communications throughout the relevant period.

**Interrogatory No. 2:**

Describe your knowledge of and involvement with any Private Placement Memorandum ("PPM") relating to Bitcoin Mining Fund IV, including your awareness that McKenna Capital, LLC was identified as a "co-manager" or equivalent managerial participant. In responding, identify: (a) when you first reviewed or became aware of the PPM; (b) whether you approved, objected to, questioned, or discussed the co-manager designation; (c) whether you took any steps to clarify, correct, or disclaim that designation to investors; and (d) the factual basis for remaining silent if you contend that the designation was inaccurate, incomplete, or misleading.

**Response to Interrogatory No. 2:**

Ryan McKenna became aware of the PPM in connection with the offering but did not draft, control, or supervise its preparation. Touzi Capital prepared and distributed the PPM and controlled the subscription process.

The designation of McKenna Capital as a "co-manager" did not result in Ryan McKenna exercising operational authority over investor funds or mining operations. Touzi Capital retained operational and financial control.

Ryan McKenna did not independently distribute the PPM outside Touzi's subscription process and did not control the investor portal or investor reporting systems. Because he did not control investor communications or the subscription process, he did not independently issue corrective disclosures.

**Interrogatory No. 3:**

Describe your knowledge and understanding of securities-law compliance issues relating to Bitcoin Mining Fund IV. In responding, identify: (a) whether you understood the offering to constitute the sale of securities; (b) whether you were aware that no Form D was filed; (c) whether you discussed Form D filing, broker-dealer registration, or exemption issues with any person and, if so, with whom and when; (d) whether you knew that McKenna Capital, LLC was not licensed or registered as a broker-dealer; and (e) whether you believed investors were entitled to accurate and complete disclosures regarding regulatory compliance, and if so, the steps you took, or failed to take, to ensure such disclosures were provided.

**Response to Interrogatory No. 3:**

Touzi Capital structured and administered the offering. Regulatory compliance decisions,

including any Form D filings, were controlled by Touzi Capital. Ryan McKenna did not act as issuer or administrator of the offering and did not control filing decisions.

Ryan McKenna did not act as a broker-dealer. Investor subscription agreements and capital intake were administered by Touzi Capital. Decisions regarding securities compliance and regulatory filings were handled by Touzi Capital and its principals.

Ryan McKenna did not control Touzi's internal compliance procedures or investor reporting systems.

**Interrogatory No. 4:**

Describe your knowledge of any representations made to investors regarding projected returns, IRR, equity multiples, monthly payments, fund size, or scaling for Bitcoin Mining Fund IV. In responding, identify: (a) the source of such projections; (b) whether you reviewed, relied upon, endorsed, or questioned those figures; (c) any diligence conducted; (d) any information known to you that contradicted such representations; and (e) any steps taken in response.

**Response to Interrogatory No. 4:**

Projected returns, IRR figures, equity multiples, and related performance metrics originated with Touzi Capital based on Touzi's internal modeling and operational assumptions. Ryan McKenna did not create or independently calculate those projections.

Ryan McKenna did not control mining operations, site selection, equipment procurement, electricity contracts, or operational data. Those functions were controlled by Touzi Capital and its operational team, including Eng Taing.

Ryan McKenna did not maintain independent mining data or accounting records from which to generate or verify performance projections.

**Interrogatory No. 5:**

Describe your understanding of who possessed or controlled documents, records, accounts, platforms, or data relating to Bitcoin Mining Fund IV during the relevant period. In responding, identify: (a) whether you had access to investor communications; (b) whether you had access to SponsorCloud, SyndicationPro, or similar platforms; (c) whether any accounting systems were used; (d) whether portals were modified or disabled; (e) the factual basis for any contention that no customary accounting records existed; (f) when Touzi Capital assumed exclusive control; and (g) identify all persons you contend were responsible for maintaining records.

**Response to Interrogatory No. 5:**

Touzi Capital maintained control over investor subscription records, bank accounts, accounting systems, mining output records, and investor portals. Ryan McKenna did not administer investor portals and did not control Touzi's bank accounts or accounting systems.

Touzi Capital and Eng Taing were responsible for maintaining financial and operational records. Ryan McKenna did not possess or control Touzi's internal accounting infrastructure.

By:____________________
Matthew Clarke
Kelley Clarke PC
603 E. Broadway Street
Prosper, TX 75078
(805) 884-9922
Pro Hac Vice
Email: matt@kelleyclarke.com
PRO HAC VICE –
ATTORNEY FOR MCKENNA DEFENDANTS

**CERTIFICATE / PROOF OF SERVICE**

**Case No. 1:24-cv-08030**
**Vince Faridani v. McKenna Capital LLC, et al.**
**U.S. District Court, Northern District of Illinois**

I hereby certify that on **February 15, 2026**, I served true and correct copies of the following documents: RYAN MCKENNA'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES.

**Service List**

| | |
|---|---|
| Vince Faridani<br>8471 Strom Park Drive<br>Melbourne, FL 32940<br>Email: VFaridani@hotmail.com | Plaintiff appearing Pro Se<br>Service by email |
| Basile P Souferis<br>Paul Gamboa<br>Gordon Rees Scully Mansukhani<br>One N. Wacker<br>Suite 1600<br>Chicago, IL 60606<br>312-565-1400<br>Email: bsouferis@grsm.com<br>Email: pgamboa@gordonrees.com | Counsel for Defendants McKenna Capital LLC, Ryan McKenna, Sean McKenna, Emily McKenna, and Jillian McKenna.<br>Service by Email |
| Rusty O'Kane<br>Wick Phillips Gould & Martin<br>3131 McKinney Avenue<br>Suite 500 | Counsel for Defendants Eng Taing and Touzi Capital, LLC<br>Service by Email |

| | |
|---|---|
| Dallas, Texas 75204<br>(214) 692-6200<br>Email: Rusty.okane@wickphillips.com | |
| Victor J. Pioli<br>Roetzel & Andress LPA<br>70 West Madison Street<br>Ste 3000<br>Chicago, IL 60602<br>312-580-1200<br>Fax: 312-580-1201<br>Email: vpioli@ralaw.com | Counsel for Defendant Ryan Beatty<br>Service by Email |
| Heng Taing<br>679 Elm Tree Ln<br>San Marcos, CA 92069<br>760-583-3873<br>Email: heng512@gmail.com | Defendant appearing Pro Se<br>Service by Email |

Executed on February 15, 2026, at Prosper, Texas.

Matthew Clarke

**Matthew M. Clarke**
Attorney for Defendants
McKenna Capital LLC, Ryan McKenna, and Sean McKenna
Kelley Clarke PC
603 E. Broadway Street
Prosper, Texas 75078
Direct: (469) 481-7681 | matt@kelleyclarke.com

# Exhibit N

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Vince Faridani,<br><br>Plaintiff,<br><br>v.<br><br>McKenna Capital, LLC, Ryan McKenna, an Individual, Sean McKenna, an Individual, Eng Taing, an Individual, Touzi Capital, LLC,<br><br>Defendants. | Case No. 1:24-cv-08030 |

**SEAN MCKENNA'S RESPONSES TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Sean McKenna hereby serves the following responses to Plaintiff's First Set of Interrogatories.

## INTERROGATORIES

**Interrogatory No. 1:**

Describe in detail your role, authority, and responsibilities with respect to Bitcoin Mining Fund IV, including your position as Chief Operating Officer of McKenna Capital, LLC and your professional responsibilities as a licensed Certified Public Accountant. In responding, identify: (a) your operational, financial, and oversight responsibilities; (b) your involvement in financial reporting or internal controls; (c) your role in reviewing investor-facing financial information; and (d) the factual basis for any contention that you did not exercise financial oversight.

**Response to Interrogatory No. 1:**

Sean McKenna holds a CPA license and was designated Chief Operating Officer of McKenna Capital, LLC. Sean McKenna is neither a member nor a manager of McKenna Capital, LLC. He did not serve as accountant for Touzi Capital or Bitcoin Mining Fund IV. He did not prepare Touzi's books and records, did not maintain Touzi's accounting ledgers, and did not control investor funds.

His CPA licensure does not equate to responsibility for Touzi's internal accounting. Touzi Capital controlled its own accounting systems and investor reporting.

Sean McKenna did not exercise operational authority over Touzi's bank accounts, investor funds, or mining operations.

**Interrogatory No. 2:**

Describe your knowledge of and involvement with any Private Placement Memorandum ("PPM") relating to Bitcoin Mining Fund IV, including your awareness that McKenna Capital was identified as a "co-manager." In responding, identify: (a) when you reviewed the PPM; (b) whether you approved or questioned the description; (c) whether you raised concerns; and (d) the factual basis for remaining silent if you contend the designation was inaccurate.

**Response to Interrogatory No. 2:**

Sean McKenna became aware of the PPM in connection with the offering but did not draft, control, or supervise its preparation. Touzi Capital prepared and disseminated the PPM.
The designation of McKenna Capital as "co-manager" did not result in Sean McKenna exercising operational authority over investor funds, accounting systems, or mining operations.

**Interrogatory No. 3:**

Describe your knowledge and understanding of securities-law compliance issues relating to Bitcoin Mining Fund IV, including Form D filings and broker-dealer registration.

**Response to Interrogatory No. 3:**

Touzi Capital structured and administered the offering. Decisions regarding Form D filings and securities compliance were controlled by Touzi Capital. Sean McKenna did not control filing decisions and did not act as broker-dealer.

**Interrogatory No. 4:**

Describe your knowledge and understanding of the existence, maintenance, or absence of financial records relating to Bitcoin Mining Fund IV, including accounting ledgers, financial statements, budgets, forecasts, performance reports, or internal analyses.

**Response to Interrogatory No. 4:**

Touzi Capital maintained its own accounting systems and financial records. Sean McKenna did not maintain Touzi's accounting ledgers, did not administer QuickBooks or other accounting platforms for Touzi, and did not control investor subscription records.
If Touzi maintained internal financial models or accounting files, those were within Touzi's control.

///
///

**Interrogatory No. 5:**

Describe when you first became aware of any facts suggesting that representations made to investors regarding Bitcoin Mining Fund IV were inaccurate, incomplete, or misleading, and describe any involvement in corrective disclosures.

**Response to Interrogatory No. 5:**

Sean McKenna did not control Touzi's investor communications or accounting infrastructure. Any awareness of operational concerns arose only after investor complaints surfaced. He did not control Touzi's corrective disclosures or investor reporting systems.

By: Matthew Clarke

Matthew Clarke
Kelley Clarke PC
603 E. Broadway Street
Prosper, TX 75078
(805) 884-9922
Pro Hac Vice
Email: matt@kelleyclarke.com
PRO HAC VICE – ATTORNEY
FOR MCKENNA
DEFENDANTS

**CERTIFICATE / PROOF OF SERVICE**

**Case No. 1:24-cv-08030**
**Vince Faridani v. McKenna Capital LLC, et al.**
**U.S. District Court, Northern District of Illinois**

I hereby certify that on **February 15, 2026**, I served true and correct copies of the following documents: SEAN MCKENNA'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES.

**Service List**

| | |
|---|---|
| Vince Faridani<br>8471 Strom Park Drive<br>Melbourne, FL 32940<br>Email: VFaridani@hotmail.com | Plaintiff appearing Pro Se<br>Service by email |
| Basile P Souferis<br>Paul Gamboa<br>Gordon Rees Scully Mansukhani | Counsel for Defendants McKenna Capital LLC, Ryan McKenna, Sean McKenna, Emily McKenna, and Jillian McKenna. |

| | |
|---|---|
| One N. Wacker<br>Suite 1600<br>Chicago, IL 60606<br>312-565-1400<br>Email: bsouferis@grsm.com<br>Email: pgamboa@gordonrees.com | Service by Email |
| Rusty O'Kane<br>Wick Phillips Gould & Martin<br>3131 McKinney Avenue<br>Suite 500<br>Dallas, Texas 75204<br>(214) 692-6200<br>Email: Rusty.okane@wickphillips.com | Counsel for Defendants Eng Taing and Touzi Capital, LLC<br>Service by Email |
| Victor J. Pioli<br>Roetzel & Andress LPA<br>70 West Madison Street<br>Ste 3000<br>Chicago, IL 60602<br>312-580-1200<br>Fax: 312-580-1201<br>Email: vpioli@ralaw.com | Counsel for Defendant Ryan Beatty<br>Service by Email |
| Heng Taing<br>679 Elm Tree Ln<br>San Marcos, CA 92069<br>760-583-3873<br>Email: heng512@gmail.com | Defendant appearing Pro Se<br>Service by Email |

Executed on February 15, 2026, at Prosper, Texas.

Matthew Clarke

**Matthew M. Clarke**
Attorney for Defendants
McKenna Capital LLC, Ryan McKenna, and Sean McKenna
Kelley Clarke PC
603 E. Broadway Street
Prosper, Texas 75078
Direct: (469) 481-7681
matt@kelleyclarke.com